## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## CHICAGO DIVISION

| | |
|---|---|
| G.G., a minor, and DEANNA ROSE, parent and guardian of G.G., | |
| Plaintiffs, | |
| v. | CIVIL ACTION NO. _____ |
| SALESFORCE.COM, INC., | |
| Defendant. | |

## PLAINTIFFS' ORIGINAL COMPLAINT

### I.    INTRODUCTION

1.    Since the inception of the internet, technology companies have unleashed their knowledge, tools and infrastructure with little to no regulation or accountability.  Technology companies are being used in ways people never imagined. Sometimes for good use and sometimes bad. Some say the complete shield to being held accountable is what makes the internet what it is today.   Laws designed for the internet over two decades ago have not evolved with technology. How far have tech companies stretched the limits of protection afforded under the law?  How many more wrongful judicial interpretations can the tech industry rack up to evade liability?

2.    While the internet has positively influenced our society to a great magnitude, it has undisputedly caused out-and-out facilitation of unlawful activity. The unfettered and unchecked growth of the internet and technology companies have led to extensive illicit drug sales, black market gun sales, unregulated sale of human body parts, the sale of children for sex and the sale of human beings for forced sex and labor.

3.    Our society can no longer turn a blind eye to the negative side of what happens on-line.  It is time to answer the tough questions and adjust accordingly. This case is about the sale of

G.G. who was sold for sex through force, fraud, and coercion and the role Salesforce.com, Inc. ("Salesforce" herein) played in the facilitation of her sale for sex trafficking.

4.      In public, including social media, Salesforce boasted about fighting human trafficking. But behind closed doors, Salesforce was knowingly and directly soliciting and facilitating sex trafficking for the notorious sex trafficking website www.Backpage.com ("Backpage" herein). G.G. was just one of the victims of Backpage and Salesforce's efforts.

5.      Salesforce will claim they simply sell a disc or access to a portal; however, the scope of Salesforce's facilitation and business with Backpage extends far beyond the operation or use of a passive interactive computer system. The design, implementation, and support of Salesforce's service is a complex endeavor, personalized to every business. Salesforce did not simply provide Backpage with an off-the-shelf version of its software.

6.      Salesforce will claim that no matter what role Salesforce played in the development and amplification of Backpage's business model, they should be completely shielded and not have to answer any questions or be held accountable in any manner by asking the Court to dismiss the case at the initial stage.

7.      The distortion and use of the Communications Decency Act as a sword by technology companies such as Salesforce is an outright distortion of the intent of Congress in regard to the development of the internet. The Communications Decency Act ("CDA") was never intended to protect technology companies from being held accountable for unlawful conduct or sex trafficking. Salesforce's own CEO, Marc Benioff, on October 16, 2019, has demanded Section 230 of the CDA be abolished with the need for "standards and practices be decided by law".

8.     Relatedly, the Trafficking Victims Protection Act (TVPA)[1] was enacted to extend liability for sex trafficking beyond the primary actors to others who knowingly benefited by facilitating sex trafficking.  Salesforce is the exact type of offender for which the TVPA was created. For these reasons, and with great strength and courage, G.G. brings suit under the TVPA and related causes of action.

## II.     JURISDICTION & VENUE

9.     This Court has original jurisdiction pursuant to 28 U.S.C. § 1331 because this action involves a federal question under the Trafficking Victims Protection Reauthorization Act ("TRVPA"), 18 U.S.C. § 1581, *et seq.*

10.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to this claim occurred in this District and Division.

11.     G.G. was trafficked in this District and Division.

## III.     THE PARTIES

12.     G.G. is a natural person who is a resident and citizen of Illinois.

13.     Deanna Rose ("Rose") is a natural person who is a resident and citizen of Illinois.

14.     Salesforce is a foreign corporation organized under the laws of Delaware with its principal place of business in California.  Salesforce can be served by delivering a summons to its registered agent, **CT Cor., 208 LaSalle St., Ste. 814, Chicago, IL 60604**. Service is requested at this time. Salesforce does business in a systematic and continuous manner throughout this District and Division.

---

[1] As used herein, TVPA refers to the Trafficking Victims Protection Act (TVPA) of 2000, as amended and the TVPRA legislative package made up of four bills, including the Frederick Douglass Trafficking Victims Prevention and Protection Reauthorization Act of 2018 (H.R. 2200), the Abolish Human Trafficking Act of 2017 (S. 1311), the Trafficking Victims Protection Act of 2017 (S. 1312), and the Trafficking Victims Protection Reauthorization Act of 2017 (S. 1862).

## IV.    JURISDICTIONAL FACTS

15.    Salesforce is registered to do business in Illinois and has been since 2007.

16.    Salesforce has purposefully availed itself of the laws, benefits, and privileges of doing business in Illinois since 2005.

17.    Salesforce's operates and conducts business in Illinois, which includes providing services to companies such as Backpage.

18.    Salesforce caused injury to G.G. in Illinois. Salesforce was a producing and proximate cause of the injury to G.G. in Illinois.

19.    Salesforce has minimum contacts with Illinois. Salesforce targets Illinois as a marketplace for its products and services. Salesforce directs marketing and advertising to Illinois. Salesforce advertised its business in Illinois as a "game-changing" service for every industry under the sun" to provide operational support to businesses.

20.    Salesforce, in concert with Backpage, specifically targeted Illinois to recruit more victims and sex traffickers to drive revenue for Backpage and Salesforce. Salesforce, in concert with Backpage, facilitated the posting of advertisements for sex trafficking in Illinois on Backpage. Salesforce, through its venture with Backpage, profited from the posting of advertisements for sex trafficking in Illinois on Backpage.

21.    G.G. was trafficked in Illinois as a result of Backpage ads posted in Illinois. Salesforce's victims, including G.G., were harmed in Illinois. G.G.'s injuries suffered in Illinois are related to Salesforce's business in and contacts with Illinois.

22.    Salesforce could reasonably have anticipated being sued in Illinois for claims related to its business and contacts with Illinois. The exercise of specific personal jurisdiction over Salesforce in Illinois comports with the notions of fair play and substantial justice. The exercise of

4

specific personal jurisdiction over Salesforce in Illinois is consistent with the due process requirements of the Constitutions of both the United States and Illinois.

23. For these reasons, specific personal jurisdiction over Salesforce is proper.

## V. BACKGROUND FACTS

### A. Sex trafficking hits epidemic proportions in the United States

24. The internet has transformed the commercial sex trade, and in the process, the evil of sex trafficking has hit epidemic proportions. Estimates are that in 2016 there were as many as 40.3 million victims of human trafficking and sexual exploitation worldwide, including 4.8 million people trapped in sexual exploitation.[2] With the help of online advertising, pimps and traffickers can reach entirely new audiences, evade law enforcement detection, maintain control of victims by transporting them quickly between locations thus maximizing profits far beyond traditional trafficking methods.

25. Sex trafficking previously took place on the streets, casinos, truck stops, and in other physical locations. Now, most sex trafficking, including the trafficking of G.G., is facilitated online. Backpage, as early as 2008, had been publicly identified by law enforcement, United States Attorneys General and every United States Governor as the biggest and most notorious sex trafficking and pimping website in the United States. The National Association of Attorneys General described Backpage as a "hub" of "human trafficking, especially the trafficking of minors." During 2013-2015, Backpage earned over 99% of its revenue from online sex trafficking.[3]

---

[2] INT'L LABOUR OFFICE, *Global estimates of modern slavery: Forced labour and forced marriage*, at 9, 38 (available at https://www.ilo.org/wcmsp5/groups/public/---dgreports/---dcomm/documents/publication/wcms_575479.pdf).)
[3] https://oag.ca.gov/system/files/attachments/press_releases/signed%20dec%20for%20arrest%20warrant%20pdf_Redacted.pdf (at *11).

**B.** **Salesforce acknowledges the responsibility, importance and the power technology companies have in our communities**

26.    Salesforce's President of Legal and General Counsel, Amy Weaver, stated: "Businesses are becoming very powerful platforms for change. When you have power, it is imperative to use it in a positive way." Salesforce does not deny that it has an ethical duty and obligation to prevent atrocities such as sex trafficking from being proliferated by its technology.

27.    Salesforce CEO and founder Marc Benioff stated:

> "Here at Salesforce, we have determined that this ethic(al) and humane use of technology, especially within the context of the Fourth Industrial Revolution, must be clearly addressed, not only by us, but by our entire industry. Our industry has reached an inflection point that must be supported by a strong set of guiding values.
>
> We have to make sure that technology strengthens our societies, instead of weakening them. Technology needs to improve the human tradition, not undermine it."

28.    On October 16, 2019, Marc Benioff was vocal about the need to increase the regulation of tech by calling for complete reformation of the Communications Decency Act to hold technology companies accountable for when they fail our communities, tweeting "Facebook is a publisher. They need to be held accountable for propaganda on their platform. We must have standards & practices decided by law. FB is the new cigarettes- it's addictive, bad for us, & our kids are being drawn in. We need to abolish section 230 indemnifying them." Marc Benioff @Benioff

29.    Publicly, Salesforce took credit for using its talent and expertise to help fight human trafficking. *See* Using Technology to Fight Human Trafficking sforce.co/2jfqxYL, *see also* Fighting Human Trafficking With Big Data bddy.me/10Zsx6a /via FastCoExist. Behind the scenes, however, Sales force partnered with one of the most prolific online sex trafficking sites ever known.

C. **Despite being in a unique position to do something about the rampant sex trafficking abuse on Backpage, Salesforce instead chooses to do business with Backpage**

30. In 2013, Backpage did not have the ability to put its online marketing and advertising platform into action without operational support, marketing innovation, and guidance. In 2013, Backpage sought a partnership that would assist in growth objectives as well as concealing their activity and moving operations offshore to evade law enforcement.

31. Salesforce advertises itself as a company that can drive business growth through the use of customer relationship management, marketing consultation and implementation, financial processing implementation and support, bespoke analytics, and other applications and technology.

32. Any examination of Backpage's business operations would have indicated Backpage was not a general online marketplace, but a center for unlawful conduct. Salesforce provided its services to Backpage well after Backpage was the well-known hub for sex trafficking. At the time of Salesforce's involvement in 2013, Backpage's illegal activity was widely known and reported news.[4]

33. Even if Backpage's illegal business practices were not previously known to Salesforce, Salesforce was is a position where it would learn, and in fact did learn, about the illegal business practices of Backpage once the venture was formed. In other words, at all material times, Salesforce was fully informed of exactly what it would be getting into through its venture with Backpage, a well-known hub for sex trafficking. Armed with this knowledge, Salesforce reached a proverbial fork in the road – either take the moral route and refuse to participate in a sex

---

[4] *See, e.g.*, *See, e.g.*, Nicholas Kristof, N.Y. TIMES, Jan. 25, 2012, *Opinion | How Pimps Use the Web to Sell Girls*, available at https://www.nytimes.com/2012/01/26/opinion/how-pimps-use-the-web-to-sell-girls.html; Daniel Fisher, FORBES, Jan. 26, 2012, *Backpage Takes Heat, But Prostitution Ads Are Everywhere*, available at https://www.forbes.com/sites/danielfisher/2012/01/26/backpages-takes-heat-for-prostitution-ads-that-are-everywhere); https://www.justice.gov/opa/press-release/file/1052531/download (acknowledging that vast majority of activity was illegal).

trafficking venture or make money by facilitating sex trafficking through a venture with Backpage. Salesforce chose the latter route; it chose profits.

**D. Providing much more than an off-the-shelf, out-of-box passive or neutral tool, Salesforce integrated itself in the daily operations of Backpage, playing a vital and active role in the company's growth and direction.**

34.     In order to succeed in its venture with Backpage, Salesforce had to create solutions tailored for Backpage's business. Salesforce by its own admission, designs, implements, and administers services, to "find new customers, win their business, and keep them happy and grow your business faster."[5]     The design, implementation, and support of Salesforce's service is a complex endeavor, personalized to every business. Salesforce could not have provided effective assistance to Backpage without full understanding of Backpage's business practices.

35.     In order to optimize its work, Salesforce undertakes to understand the business of its customers.  As Salesforce describes it, our "systems start by collecting a customer's website, email, telephone, social media data, and more, across multiple sources and channels." The collection of data into easily organized groups makes targeting and personalization of messaging possible. According to Salesforce's own description of its services, it integrates useful information about customers, "such as recent news about the company's activity." This information is then organized into a relational environment, so that reports can be made, and campaigns can be built to accomplish goals, such as those fulfilled by Backpage, to efficiently target sex traffickers and victims to use Backpage for more sex trafficking.

36.     Backpage's Salesforce database was complex, large, and distributed, something that could only have been designed and implemented with guidance and assistance from

---

[5] Salesforce, CRM 101, What is CRM?, https://www.salesforce.com/crm/what-is-crm/ (last accessed Mar. 18, 2019).

Salesforce. Thus, it is indisputable, that from day one, Salesforce possessed extensive knowledge of Backpage's business model so that it could customize the services provided to Backpage to facilitate sex trafficking. From the initial sales meeting with Salesforce, Backpage was clear about its most critical needs: growth and privacy for its illicit activities. Salesforce was the driving force that enabled Backpage to scale its operations to span three continents.

37.    Salesforce actively obtained and monitored data and additional information related to pimps and sex traffickers that were using Backpage. Salesforce then conducted detailed and customized analysis of the data collected. That analysis allowed Salesforce to create heavily tailored services to target more customers.

38.    For example, the data collected by Salesforce was then used by Salesforce for direct outreach campaigns, including but not limited to direct advertisements and targeted, personalized e-mails. Salesforce also crafted and delivered other direct marketing campaigns, coupled with information gathering such as ad clicks and tracking internet activity of the sex traffickers to "help [Backpage] manage and track the effectiveness of [Backpage's] marketing efforts." Salesforce then monitored the progress of Backpage's efforts in order to track its success, gain other information from the recipients, and further automate and develop Backpage's operations.

39.    Every interaction that Salesforce tracked was an integral part of the strategy and technology used to solicit sex traffickers and their victims. In furtherance of its efforts with Backpage, Salesforce assisted Backpage in moving its business and operating offshore; additionally, Salesforce designed and operated Backpage's credit card processing system.

40.    Salesforce received direct benefits from its partnership with Backpage. Specifically, Backpage, using the credit card processing system, accepted payments from pimps and traffickers and then used this money to pay Salesforce for its services.

41.     Salesforce's relationship with Backpage endured several nationwide law enforcement efforts, multiple civil lawsuits against Backpage, the U.S. Senate hearing, and most troubling, the arrest of Backpage's CEO for conspiracy to commit pimping by General Kamala Harris, General Attorney for the State of California, Salesforce's headquarters, in 2016. Salesforce's operations continued to promote Backpage and did not conclude until the seizure of Backpage by the Department of Justice in 2018.

42.     Prior to the Department of Justice's seizure of Backpage, scores of victims were trafficked through the extensive efforts of Backpage and Salesforce, both of which received substantial benefits from their role in trafficking of these victims. From the time of its inception and until its conclusion, (Salesforce's relationship with Backpage ended upon the seizure of Backpage by the Department of Justice) Salesforce succeeded in growing Backpage from a small Dallas based company with a handful of employees to an international powerhouse with over 250 employees spanning three continents. Based on publicly available documents, Backpage earned appropriately $71 million in revenue 2012.   In the next 29 months, from January 2013 through May 2015, Backpage earned approximately $346 million in revenue, with nearly $340 million being from online sex trafficking.

**E.      G.G. was trafficked as a result of Backpage and Salesforce's efforts.**

43.     Tragically, before Backpage was seized by the Department of Justice, G.G. was trafficked by Backpage and Salesforce. Beginning in 2015 and continuing through sometime in 2016, G.G., was compelled, through force, fraud and coercion, to engage in unlawful sex acts, often multiple times in a day and at times with adults she knew from her hometown. She was 13 and 14 years old!!!

44.     The trafficking of G.G. was facilitated by advertisements for sexual services on Backpage and by SalesForce as specifically set-out above.  G.G. was trafficked through Backpage

advertisements consistently placed on Backpage's website in the Chicago and other geographic areas in Illinois, throughout 2015 and 2016. G.G. had run away from home and was picked up by the trafficker. After several months he began advertising her on Backpage. Rose was aggressively searching for her daughter and found an ad for her on Backpage's Escort Page. In July, 2016 Rose sent an email to Backpage alerting them to the fact that G.G., a child, was being advertised on their Escort Page and requesting that the ad be pulled down. Backpage's only response was to refer Rose to the National Center for Missing and Exploited Children. They did not pull down the ad for G.G. By this time Salesforce was actively and intimately involved in the marketing practices of Backpage. They knew or certainly should have known what was happening to this child, G.G. They did nothing except to continue to facilitate her trafficking.

45.     As a consequence of being trafficked for this lengthy period to time at such a tender age, G.G. suffered significant physical and emotional injuries and damages.

## VI.     CAUSES OF ACTION

### A.     FIRST CAUSE OF ACTION—SEX TRAFFICKING PURSUANT TO TVPA

46.     G.G. incorporates all other allegations as if set forth in full herein.

47.     At all relevant times, G.G. was and is a victim within the meaning of 18 U.S.C. § 1595(a). At all relevant times, Salesforce was and is a perpetrator within the meaning of 18 U.S.C. § 1595(a). Salesforce benefitted, by receiving financial and other compensation, through its participation in a venture involving the illegal posting of advertisements for sex trafficking, including the sex trafficking of children. 18 U.S.C. §§ 1590(a), 1591(a)(2), 1593A.

48.     More specifically, Salesforce received a benefit by knowingly and intentionally, actively and directly soliciting and facilitating human trafficking in the following ways:

> a.     Gathering and managing information from Backpage's traffickers' and pimps' public social media activity, including but not limited to their likes

and dislikes and what they are saying and sharing about Backpage and its competitors;

b.      Providing and managing Backpage's trafficker and pimp database as well as tracking and collecting trafficker and john data across multiple platforms including phone, email, websites, and social media;

c.      Collecting and managing traffickers' and pimps' data across multiple sources and channels and using this information to promote Backpage and the use of its services;

d.      Automatically generating insights into traffickers' and pimps' purchasing habits to help Backpage understand the traffickers better and predicting how they will feel and act so Backpage could prepare the most effective outreach;

e.      Collecting information of sex traffickers and victims to target through direct e-mail campaigns to advertise and promote illegal prostitution;

f.      Analyzing information and behavior of pimps and victims to target through direct e-mail campaigns to advertise and promote illegal prostitution;

g.      Providing and managing a secure cloud storage database for Backpage to store (and secure) the unspeakable details of its sex trafficking business;

h.      Implementing marketing strategies for Backpage to reach pimps and human traffickers;

i.      Creating a custom PPI for Backpage's payment systems, and integrating payment information with information about pimps, johns, and victims;

j.      Directly soliciting sales opportunities to traffickers and pimps for Backpage;

k.      Directly soliciting referrals from existing traffickers and pimps using Backpage by creating cross-selling and upselling opportunities;

l.      Designing and operating Backpage's financial point of sales system with traffickers and pimps;

m.      Duplicating Backpage's system to evade law enforcement in or around 2015;

n.      Modifying Backpage's system to enable operation from three continents;

o.      Directing marketing campaigns to traffickers and pimps for Backpage; and

p.   Storing trafficker and pimp histories of Backpage including their previous history with Backpage, any outstanding customer issues, and other data for continued direct targeting.

49.   Salesforce knew or should have known it was participating in a venture involving the illegal posting of advertisements for sex trafficking, including the sex trafficking of children, in violation of the TVPRA, 18 U.S.C. § 1581, et seq.  Salesforce's TVPRA violations were a direct, producing, and proximate cause of the injuries and damages to G.G.

## B.   Second Cause of Action— Negligence

50.   G.G. incorporates all other allegations as if set forth in full herein.

51.   Salesforce had a duty to the general public and to persons affected by its products, including G.G., to take reasonable steps to protect them from the foreseeable dangers of its products as related to human trafficking.

52.   Salesforce failed to exercise ordinary care as would a reasonably prudent person under the same circumstances.

53.   Salesforce was also negligent in one or more of the following, non-exclusive particulars:

a.   Failing to stop online posting of G.G. and other human or sex trafficking victims;

b.   Allowing, permitting, and encouraging the posting for sexual exploitation of G.G. and other human and sex trafficking victims;

c.   Using its products to directly solicit illegal prostitution advertisements through targeted e-mail campaigns;

d.   Using its products to collect data from Backpage customers to encourage, facilitate, profit from, and otherwise further illegal activity, including sex trafficking;

e.   Using its products to analyze data from Backpage customers to encourage, facilitate, profit from, and otherwise further illegal activity, including sex trafficking; and

      f.      Directly encouraging, facilitating, profiting from and otherwise furthering criminal activity, including sex trafficking.

54.     Salesforce's negligent actions proximately caused legal injuries to G.G.

55.     Each of Salesforce's negligent acts and omissions, singularly or collectively, constituted negligence and proximately caused legal injuries to G.G.

## C.    THIRD CAUSE OF ACTION—GROSS NEGLIGENCE, RECKLESSNESS, WILLFUL AND WANTON CONDUCT

56.     G.G. incorporates all other allegations as if set forth in full herein.

57.     Salesforce's acts and omissions constitute gross neglect, recklessness, and willful and wanton conduct.

58.     Viewed objectively from the standpoint of Salesforce at the time of the incidents, Salesforce's acts and omissions involved an extreme degree of risk, considering the probability and magnitude of the potential harm to G.G.

59.     Salesforce nevertheless demonstrated an utter indifference to or conscious disregard for a person's safety or the safety of others, including G.G.

60.     As a result of Salesforce's gross neglect, G.G. was exposed to and did sustain serious and grievous personal injury.

61.     Each of Salesforce's negligent acts and omissions, singularly or collectively, constituted gross negligence, recklessness, and willful and wanton conduct, and proximately caused legal injuries to G.G.

62.     Exemplary damages are warranted for Salesforce's gross negligence, recklessness, and willful and wanton conduct.

## VII.   DAMAGES

63.     Salesforce's acts and omissions, individually and collectively, caused G.G. to sustain legal damages.

64. G.G. is entitled to be compensated for personal injuries and economic damages, including:

        a.     Actual damages;

        b.     Direct damages;

        c.     Incidental and consequential damages;

        d.     Mental anguish and emotional distress damages (until trial and in the future);

        e.     Restitution;

        f.     Unjust enrichment; and

        g.     Penalties.

65. G.G. is entitled to exemplary damages.

66. G.G. is entitled to treble damages.

67. G.G. is entitled to recover attorneys' fees and costs of court.

68. G.G. is entitled to pre- and post-judgment interest at the maximum legal rates.

69. A constructive trust should be imposed on Salesforce and the Court should sequester any benefits or money wrongfully received by Salesforce for the benefit of G.G.

## VIII.   JURY TRIAL

70. G.G. demands a jury trial on all issues.

## IX.   RELIEF SOUGHT

71. Wherefore, G.G. respectfully requests judgment against Defendant for actual damages in excess of the minimum jurisdictional limits of this Court, pre- and post-judgment interest as allowed by law, costs of suit, attorney fees, and all other relief, at law or in equity, to which she may be justly entitled.

Respectfully Submitted,

MEYERS AND FLOWERS, LLC


By:   *s/ Peter J. Flowers*
      Peter J. Flowers, Esq. (IL #06210847)
      Meyers and Flowers, LLC
      3 North Second Street, Suite 300
      St. Charles, Illinois 60174
      Phone:  (630) 232-6333
      Fax:  (630) 845-8982
      pjf@meyers-flowers.com

      Tommy Fibich, Esq. *(Pro Hac Vice Pending)*
      Sara J. Fendia, Esq. *(Pro Hac Vice Pending)*
      Erin Copeland, Esq. *(Pro Hac Vice Pending)*
      Fibich Leebron Copeland Briggs
      1150 Bissonnet Boulevard
      Houston, Texas 77005
      Phone: (713) 751-0025
      Fax: (713) 751-0030
      tfibich@fibichlaw.com
      sfendia@fibichlaw.com
      ecopeland@fibichlaw.com

**ATTORNEYS FOR PLAINTIFF**