**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

G.G. (a minor) *et al.*,

                    *Plaintiffs*,

     v.

SALESFORCE.COM, INC.,

                    *Defendant*.

Case No. 1:20-CV-2335

## MOTION OF DEFENDANT SALESFORCE.COM, INC. TO DISMISS SECOND AMENDED COMPLAINT

## TABLE OF CONTENTS

Page

SUMMARY OF ALLEGATIONS ................................................................. 3

LEGAL STANDARD ............................................................................. 6

ARGUMENT ..................................................................................... 6

    I.    Section 230 Bars Plaintiffs' Claims Against Salesforce ....................................... 6

        A.    Salesforce Is a Provider of an "Interactive Computer Service" ................. 7

        B.    Plaintiffs' Claims Seek to Hold Salesforce Liable for Third-Party Content Posted on Backpage.com ............................................................. 8

        C.    The 2018 Amendments to CDA 230 Expressly Do Not Apply to Most of Plaintiffs' Claims ............................................................. 9

        D.    Retroactive Elimination of the Protections of CDA 230 for TVPA Claims Constituting Criminal Sex Trafficking Violates the Ex Post Facto Clause ............................................................. 12

    II.    Plaintiffs Have Failed to Allege Any Plausible Claims ............................... 14

        A.    Plaintiffs Have Failed Adequately to Allege a TVPA Claim Constituting Criminal Sex Trafficking in Violation of 18 U.S.C. § 1591 ............................................................. 15

        B.    Plaintiffs Have Not Alleged Any Other Violation of the TVPA ............. 19

        C.    Plaintiffs Have Failed to Allege Adequately Any Violation of Illinois Law ............................................................. 20

            1.    Duty ............................................................. 20

            2.    Causation ............................................................. 22

CONCLUSION ............................................................................... 25

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Aidroos v. Vance Uniformed Prot. Servs., Inc.*,
   386 Ill. App. 3d 167 (2008) ................................................................................................21

*Alarm Detection Sys., Inc. v. Vill. of Schaumburg*,
   930 F.3d 812 (7th Cir. 2019) .............................................................................................17

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)..............................................................................................................6

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007)..............................................................................................................6

*Belleau v. Wall*,
   811 F.3d 929 (7th Cir. 2016) .............................................................................................12

*Bennett v. Google, LLC*,
   882 F.3d 1163 (D.C. Cir. 2018) ...........................................................................................8

*Chi. Lawyers' Comm. for Civil Rights Under Law, Inc. v. Craigslist, Inc.*,
   519 F.3d 666 (7th Cir. 2008) ...........................................................................3, 6, 8, 9, 24

*Cohen v. Facebook, Inc.*,
   252 F. Supp. 3d 140 (E.D.N.Y. 2017) ..................................................................................9

*Crosby v. Twitter, Inc.*,
   921 F.3d 617 (6th Cir. 2019) .............................................................................................25

*Crumpton v. Walgreen Co.*,
   375 Ill. App. 3d 73 (2007) .................................................................................................22

*Dart v. Craigslist, Inc.*,
   665 F. Supp. 2d 961 (N.D. Ill. 2009) ..............................................................................8, 24

*Doe 3 v. Red Roof Inns, Inc.*,
   No. 1:19-CV-03843-WMR, 2020 WL 1872333 (N.D. Ga. Apr. 13, 2020) ...................16, 18

*Doe v. GTE Corp.*,
   347 F.3d 655 (7th Cir. 2003) .............................................................................................24

*Doe v. MySpace, Inc.*,
   528 F.3d 413 (5th Cir. 2008) ...............................................................................................7

*Fields v. Twitter, Inc.*,
   881 F.3d 739 (9th Cir. 2018) .............................................................................................25

ii

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*First Springfield Bank & Tr. v. Galman*,
    188 Ill. 2d 252 (1999) ................................................................................22

*Geiss v. Weinstein Co. Holdings LLC*,
    383 F. Supp. 3d 156 (S.D.N.Y. 2019)......................................................17, 18

*INS v. Cardozo-Fonseca*,
    480 U.S. 421 (1987)......................................................................................11

*ISI Int'l, Inc. v. Borden Ladner Gervais LLP*,
    256 F.3d 548 (7th Cir. 2001) ........................................................................12

*Jennings v. Rodriguez*,
    138 S. Ct. 830 (2018) ....................................................................................10

*Keating v. 68th & Paxton, L.L.C.*,
    401 Ill. App. 3d 456 (2010) ..........................................................................23

*Kennedy v. Mendoza-Martinez*,
    372 U.S. 144 (1963) ......................................................................................13

*Kleen v. Homak Mfg. Co.*,
    321 Ill. App. 3d 639 (2001) ..........................................................................23

*Landgraf v. USI Film Prods.*,
    511 U.S. 244 (1994)......................................................................................13

*Lane v. City of Harvey*,
    178 Ill. App. 3d 270 (1988) ......................................................................23, 24

*Law v. Siegel*,
    571 U.S. 415 (2014)......................................................................................10

*Linton v. Smith & Wesson*,
    127 Ill. App. 3d 676 (1984) ..........................................................................21

*MacDonald v. Hinton*,
    361 Ill. App. 3d 378 (2005) ..........................................................................21

*Maglaya v. Kumiga*,
    No. 14-CV-3619, 2015 WL 4624884 (N.D. Ill. Aug. 3, 2015) ............................20

*Majetich v. P.T. Ferro Const. Co.*,
    389 Ill. App. 3d 220 (2009) ..........................................................................22

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Marshall's Locksmith Serv. Inc. v. Google, LLC*,
    925 F.3d 1263 (D.C. Cir. 2019) ...................................................................7

*Merlo v. Pub. Serv. Co.*,
    381 Ill. 300 (1942) ...................................................................................23

*Noble v. Weinstein*,
    335 F. Supp. 3d 504 (S.D.N.Y. 2018) .......................................................18

*Nunag-Tanedo v. E. Baton Rouge Par. Sch. Bd.*,
    790 F. Supp. 2d 1134 (C.D. Cal. 2011) ....................................................19

*Pennie v. Twitter, Inc.*,
    281 F. Supp. 3d 874 (N.D. Cal. 2017) ........................................................9

*Riordan v. Int'l Armament Corp.*,
    132 Ill. App. 3d 642 (1985) .....................................................................20

*Rodriguez v. Glock, Inc.*,
    28 F. Supp. 2d 1064 (N.D. Ill. 1998) .......................................................24

*Roman Catholic Bishop v. Superior Court*,
    128 Cal. App. 4th 1155 (Cal. Ct. App. 2005) ..........................................14

*Silha v. ACT, Inc.*,
    807 F.3d 169 (7th Cir. 2015) ...................................................................17

*Smith v. Doe*,
    538 U.S. 84 (2003)...................................................................................13

*State Farm Mut. Auto. Ins. Co. v. Campbell*,
    538 U.S. 408 (2003).................................................................................14

*Stayart v. Yahoo! Inc.*,
    651 F. Supp. 2d 873 (E.D. Wis. 2009).......................................................7

*Stogner v. California*,
    539 U.S. 607 (2003).................................................................................13

*Taha v. Int'l Bhd. of Teamsters, Local 781*,
    947 F.3d 464 (7th Cir. 2020) .....................................................................6

*Thompson v. Gordon*,
    241 Ill. 2d 428 (2011) .............................................................................20

## TABLE OF AUTHORITIES
(continued)

Page(s)

*Turner v. N. Illinois Gas Co.*,
    401 Ill. App. 3d 698 (2010) ....................................................20

*U.S. v. Vasquez*,
    576 F. Supp. 2d 928 (N.D. Ill. 2008) ..................................13

*United States v. Afyare*,
    632 F. App'x 272 (6th Cir. 2016) ......................................16

*Vesely v. Armslist LLC*,
    762 F.3d 661 (7th Cir. 2014) ........................................21, 24

*Zango, Inc. v. Kaspersky Lab, Inc.*,
    568 F.3d 1169 (9th Cir. 2009) ............................................8

### Constitutional Provisions

U.S. Const., art. 1, § 9, cl. 3 ....................................................12

### Statutes

18 U.S.C. § 1589 *et seq.*.............................................................2

18 U.S.C. § 1590(a) ..................................................................19

18 U.S.C. § 1591 ..............................................................*passim*

18 U.S.C. § 1595(a) ..............................................9, 10, 11, 15, 18, 19

47 U.S.C. § 230..............................................................1, 2, 6, 7, 8

Pub. L. 115-164, 132 Stat. 1253 (2018)..........................9, 10, 11, 12, 15

### Other Authorities

164 Cong. Rec. S1869 (daily ed. Mar. 21, 2018) ..........................14

H.R. 1865 115th Cong. ........................................................10, 11

This case improperly seeks to hold salesforce.com, inc. ("Salesforce") liable for the criminal acts of third parties with whom it had no relationship, based on entirely innocuous conduct: Salesforce's sale of its popular online customer relationship management ("CRM") business software that is used by tens of thousands of companies to manage their customer data. The Court should dismiss this action because all of Plaintiffs' claims are either barred by § 230 of the Communications Decency Act ("CDA 230"), 47 U.S.C. § 230, or insufficiently pled.

The allegations of wrongdoing here are tragic, but do not relate to Salesforce. Plaintiffs G.G. and her mother, Deanna Rose, allege that G.G., when she was a minor, ran away from home and fell into the hands of a sex trafficker. Dkt. 39, Second Amended Complaint ("SAC") ¶ 45. After several months, the trafficker began posting advertisements for sex with G.G. on the classified ad website Backpage.com. *Id.* Although Backpage held itself out to be an online classifieds website similar to Craigslist, the SAC alleges that Backpage was actually a hub of human trafficking and that the vast majority of its revenue came from adult classified ads. *Id.* ¶ 26. G.G. allegedly was "trafficked through Backpage advertisements consistently placed on Backpage's website" in Illinois between 2015 and 2016. *Id.* ¶¶ 44–45.

Plaintiffs have not sued the trafficker who exploited G.G., nor did they sue Backpage or any related person or entity for allegedly allowing or facilitating the classified ads through which she was exploited. Instead, they sued Salesforce, a company that sells subscriptions to cloud-based CRM software. They allege that Salesforce sold its CRM software to a Backpage affiliate, and that Backpage used the software to organize its internal customer data and engage in marketing—including allegedly to reach out to traffickers to advertise on the Backpage.com site. *Id.* ¶¶ 3–4.

The SAC is most notable for what it does not allege. There is no allegation that Salesforce had anything to do with any acts of sex trafficking, or with the posting of classified sex-trafficking

ads on the Backpage.com site. There is no allegation that Salesforce had anything to do with Backpage's advertising policies or practices, including what types of classified ads it permitted users to post, or whether and how such ads would be screened for improper content. And the SAC does not allege any link between Salesforce's CRM software and the classified ads that allegedly led to the trafficking of G.G. (or anyone else). Rather, their claims rest on the allegation that Salesforce sold its CRM software to a Backpage affiliate, and that Backpage then used the software to organize its customer data and conduct marketing activities to ad customers. *Id.* ¶¶ 31, 35, 39.

Despite the lack of any connection between Salesforce and the ads or traffickers who harmed G.G., the SAC alleges that Salesforce violated federal criminal sex trafficking laws, contained in the Trafficking Victims Protection Act ("TVPA"), 18 U.S.C. § 1589 *et seq.* The suggestion that Salesforce somehow knowingly and intentionally participated in a venture to traffic G.G. simply by selling CRM software is as offensive as it is baseless, and the SAC does not allege a single fact that would support such a claim. And the state-law negligence claims—all premised on a claimed duty for Salesforce to monitor the uses of its CRM software by downstream customers—lack any basis in law, and for good reason: if the claimed misuse of a business software product—or, more accurately here, the mere *use* of such software by a bad actor—could result in tort liability, then sellers of such products would become insurers for all manner of wrongful third-party conduct with which they have no involvement. The alleged facts here come nowhere close to establishing a legal duty, much less the essential element of causation.

Even beyond all of these problems with the *merits* of Plaintiffs' claims, their claims are barred by a threshold hurdle that cannot be overcome: the protection from liability provided by CDA 230, which precludes liability where, as here, a plaintiff seeks to hold an interactive computer service liable based on third-party content posted on the internet. *See* 47 U.S.C. § 230(c)(1); *see*

*also Chi. Lawyers' Comm. for Civil Rights Under Law, Inc. v. Craigslist, Inc.*, 519 F.3d 666, 671–72 (7th Cir. 2008). That is precisely what the SAC seeks to do, as their claims seek to hold Salesforce liable for the harms to G.G. resulting from classified ads posted on Backpage.com by a third-party trafficker. As a California court recently ruled in finding a similar action against Salesforce barred by CDA 230, the nature of Plaintiffs' liability theory—which seeks to link Salesforce to Backpage, and then to link Backpage to classified ads posted by traffickers—necessarily means that Salesforce "can only be liable if it is linked to these advertisements." Linsley Decl., Ex. A ("Cal. Order") at 5 (*Does # 1 through # 90 v. Salesforce.com, inc.*, No. CGC-19-574770 (S.F. Super. Ct. Oct. 3, 2019), *appeal pending*, Cal. Ct. App. No. A159566). And there is no allegation—nor could there be—that Salesforce wrote the classified ads or had anything to do with Backpage's content policies that allegedly allowed or encouraged them, nor does the SAC even allege that Backpage used Salesforce's CRM software in any way to develop its ad content policies. As such, CDA 230 bars Plaintiffs' claims, even if they were plausibly alleged.

To be clear, the scourge of sex trafficking is a legitimate and serious concern. Salesforce deeply sympathizes with all victims of sex trafficking and has taken significant steps to shed light on this serious issue, as the SAC acknowledges. SAC ¶ 30. But the SAC's attempt to impose liability on Salesforce for the acts of third-party criminals and the harmful effects of classified ads placed by those criminals on the Backpage.com site is without any legal basis and would create a dangerous precedent for a host of companies that sell legitimate business software. The Court should be dismiss this action with prejudice.

## SUMMARY OF ALLEGATIONS

Salesforce offers a cloud-based CRM platform for subscribers to input and manage their customer data. SAC ¶¶ 3–4, 35. As the Salesforce marketing materials cited in the SAC explain,

CRM "is a technology for managing [a] company's relationships and interactions with customers and potential customers" and allows companies to "store customer and prospect contact information, identify sales opportunities, record service issues, and manage marketing campaigns, all in one central location." Linsley Decl., Ex. B ("What is CRM?") (cited at SAC ¶ 35); *see also* Salesforce's Request for Judicial Notice. In December 2013, a Backpage affiliate purchased a subscription to Salesforce's cloud-based CRM tool. SAC ¶¶ 31, 37. According to the SAC, Backpage then used Salesforce's CRM software to gather information about Backpage's classified ad customers, store information about them, and send them marketing materials. *Id.* ¶ 49. The SAC also alleges that Salesforce's "CRM interface allow[ed] Backpage to integrate with credit card processors," *id.* ¶ 3, but they nowhere link this allegation to any of the classified ads through which G.G. was allegedly harmed.

The SAC reflects significant changes from the pleading by which this action was commenced. The original complaint included a series of false allegations to the effect that Salesforce actively and knowingly helped Backpage build the sex-trafficking-related aspects of its business. For instance, it alleged that, "behind closed doors, Salesforce was knowingly and directly soliciting and facilitating sex trafficking" for Backpage. Dkt. 1, ¶ 3. And it asserted that Salesforce "did not simply provide Backpage with an off-the-shelf version of its software" (*id.* ¶ 5) but instead "customize[d] the services provided to Backpage to facilitate sex trafficking" (*id.* ¶ 36). Even more specifically, the original complaint falsely alleged that Salesforce "actively obtained and monitored data … related to pimps and sex traffickers that were using Backpage" (*id.* ¶ 37) and "used that data for direct outreach campaigns, including but not limited to direct advertisements and targeted, personalized e-mails" (*id.* ¶ 38).

These allegations are now gone. After Salesforce sent two Rule 11 letters to Plaintiffs'

counsel requesting removal of these and other false allegations, they removed all allegations suggesting either that Salesforce was directly involved in Backpage's business operations and/or marketing campaigns or knowingly assisted Backpage in facilitating trafficking. Instead, the SAC alleges that *Backpage* used the CRM software "tools" that it purchased from Salesforce to perform the various customer-related functions that previously were attributed to Salesforce itself. SAC ¶¶ 35, 37, 39, 40. As now pled, the SAC does not allege that Salesforce played any role in developing Backpage's classified ad content policies or the marketing materials by which Backpage solicited actual or potential classified customers, or that any person at Salesforce had involvement with the alleged sex-trafficking activities.

The facts that the SAC does allege are tragic, but they make clear that any legal claim the Plaintiffs may have is against parties or entities other than Salesforce. The SAC asserts that Backpage allegedly "transformed the commercial sex trade" by facilitating online trafficking transactions and allowing criminals to evade law enforcement and maximize profits. SAC ¶¶ 25–26.[1] The SAC alleges that, when G.G. was a minor, she was among the victims of this online trafficking "hub." *Id.* ¶¶ 26, 44. She ran away from home and was picked up by a trafficker, who after several months "began advertising her on Backpage." *Id.* ¶ 45. G.G. "was trafficked through Backpage advertisements consistently placed on Backpage's website." *Id.* G.G.'s mother searched for G.G. and found an ad for her on Backpage's Escort Page. *Id.* She asked Backpage to remove the ad, but "Backpage's only response" was to refer her to the National Center for

---

[1] Although it is immaterial to the resolution of this motion, Salesforce notes that the SAC's allegation that 99% of Backpage's revenue between 2013 and 2015 could be traced to "online sex trafficking" is not supported by the declaration cited in, and therefore incorporated by reference into, the SAC. *See* SAC ¶ 26 & n.3. The 99% revenue figure referenced in the declaration is for all "adult services" advertisements generally, and not specifically sex trafficking. *See* Linsley Decl., Ex. F (Decl. of Brian Fichtner at 2, 11); *see also* Salesforce's Request for Judicial Notice.

Missing and Exploited Children. *Id.* Notably, the SAC does not assert any claim against Backpage or any other person who allegedly had direct contact with G.G.

As against Salesforce, the SAC alleges violations of the federal sex trafficking statutes contained in the TVPA, on the theory that Salesforce sold its CRM software to a Backpage affiliate. SAC ¶ 48. It also asserts state-law claims for negligence and gross negligence, recklessness, and willful and wanton conduct, all based on the same theory. *Id.* ¶¶ 52, 55, 59. As shown below, these claims fail as a matter of law and should be dismissed.

## LEGAL STANDARD

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "[N]aked legal conclusions" are not facts. *Id.* at 696. After stripping away "conclusory statements," the Court must decide whether the remaining factual allegations "raise a right to relief above the speculative level," *Twombly*, 550 U.S. at 555, so as to justify the costs and burdens of discovery. Factual allegations that "do not permit the court to infer more than the mere possibility of misconduct" are insufficient. *Taha v. Int'l Bhd. of Teamsters, Local 781*, 947 F.3d 464, 469 (7th Cir. 2020) (quoting *Iqbal*, 556 U.S. at 679).

## ARGUMENT

## I.    Section 230 Bars Plaintiffs' Claims Against Salesforce

CDA 230 provides that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1). As the Seventh Circuit has explained, "[w]hat § 230(c)(1) says is that an online information system must not 'be treated as the publisher or speaker of any information provided by' someone else." *Craigslist*, 519 F.3d at 671. CDA 230 covers "causes

of action of all kinds." *Marshall's Locksmith Serv. Inc. v. Google, LLC*, 925 F.3d 1263, 1267 (D.C. Cir. 2019); *accord Doe v. MySpace*, *Inc.*, 528 F.3d 413, 418 (5th Cir. 2008) (CDA 230 applies "to Web-based service providers for all claims stemming from their publication of information created by third parties"). CDA 230 bars Plaintiffs' claims because Salesforce is a provider of an interactive computer service and Plaintiffs seek to hold it liable for online classified ads posted by third parties. That is the exact conclusion that a California court recently reached in assessing a substantially similar lawsuit against Salesforce. Cal. Order at 5.

Although CDA 230 was amended in 2018 to limit its application to certain claims, the amendments on their face do not apply to most of Plaintiffs' claims. There is one exception, as the 2018 amendments do purport retroactively to eliminate CDA 230 protection for civil TVPA violations that also constitute criminal sex trafficking under 18 U.S.C. § 1591. But Plaintiffs do not even come close to pleading facts showing Salesforce engaged in criminal sex trafficking, and even if they had, any attempt to impose retroactive liability for such a violation would violate the Ex Post Facto Clause. Plaintiffs' entire action must be dismissed on this ground alone.

## A. Salesforce Is a Provider of an "Interactive Computer Service"

Under CDA 230, an "interactive computer service" is "any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server." 47 U.S.C. § 230(f)(2). In turn, "access software provider" means "a provider of software (including client or server software) or enabling tools" that perform functions such as filtering, analyzing, and displaying content, among other functions. *Id.* § 230(f)(4). These definitions of "interactive computer service" are "construed broadly," *Stayart v. Yahoo! Inc.*, 651 F. Supp. 2d 873, 884 (E.D. Wis. 2009), *aff'd*, 623 F.3d 436 (7th Cir. 2010), and have been held to cover business products, such as antivirus software, used by websites that host third-party content. *See,*

*e.g.*, *Zango, Inc. v. Kaspersky Lab, Inc.*, 568 F.3d 1169, 1175–76 (9th Cir. 2009).

Salesforce is an "interactive computer service" in two respects. First, it is an "access software provider." The SAC alleges that Salesforce provided Backpage with access to cloud-based internet functionalities that allowed Backpage to store, filter, analyze, and organize its user data. SAC ¶ 37 ("Salesforce's technology was used by Backpage to actively obtain and monitor data …."); *id.* ¶ 49(g) (alleging that "through the sale … of the CRM" Salesforce "provid[ed] … a secure cloud storage database for Backpage to store [its data]"). This makes Salesforce an "access software provider" under CDA 230, and thus an "interactive computer service," as the California court specifically held. *See* Cal. Order at 4–5 (holding Salesforce meets this "broad statutory definition[]" as shown by allegations that its CRM "tools" allowed Backpage "to create platforms … to contact and procure customers").

Second, Salesforce is a "provider" of an "interactive computer service" because it "enables computer access by multiple users"—customers and their employees—"to a computer server"— the servers on which Salesforce's cloud-based tools are hosted. 47 U.S.C. § 230(f)(2). For example, "as many other courts have found, Google qualifies as an 'interactive computer service' provider because it 'provides or enables computer access by multiple users to a computer server.'" *Bennett v. Google, LLC*, 882 F.3d 1163, 1167 (D.C. Cir. 2018). Similarly, Salesforce is an interactive computer service because it allows its subscribers access to its cloud-based servers.

### B. Plaintiffs' Claims Seek to Hold Salesforce Liable for Third-Party Content Posted on Backpage.com

CDA 230 bars any claim that seeks to hold an interactive computer service liable based on content posted on the internet "by someone else." *Craigslist*, 519 F.3d at 671 (quotation mark omitted). This protection is not limited "only or primarily to defamation cases," *Dart v. Craigslist, Inc.*, 665 F. Supp. 2d 961, 967 n.7 (N.D. Ill. 2009), citing *Craigslist*, 519 F.3d at 671, and "is

implicated not only by claims that explicitly point to third party content but also by claims which, though artfully pleaded to avoid direct reference, implicitly require recourse to that content to establish liability." *Cohen v. Facebook, Inc.*, 252 F. Supp. 3d 140, 156 (E.D.N.Y. 2017), *aff'd in relevant part*, 934 F.3d 53 (2d Cir. 2019).

Here, Plaintiffs' claims are barred by CDA 230 because the only link between G.G.'s injuries and Salesforce is through the classified ads for G.G. that Plaintiffs allege were posted on Backpage.com by a third party—the unidentified criminal trafficker. *See, e.g.*, SAC ¶ 22 ("G.G. was trafficked in Illinois as a result of Backpage ads posted in Illinois."); *id.* ¶ 45 ("The trafficking of G.G. was made possible and facilitated by advertisements for sexual services on Backpage, facilitated by Salesforce's CRM … ."). These claims "treat [Salesforce] as the publisher of the information" because Salesforce "can only be liable if it is linked to these advertisements." Cal. Order at 5. And where third-party content (in this case, classified ads) is a necessary part of the events giving rise to a plaintiff's claim, CDA 230 bars the claim. *Craigslist*, 519 F.3d at 671; *see also Pennie v. Twitter, Inc.*, 281 F. Supp. 3d 874, 889–90 (N.D. Cal. 2017). As the Seventh Circuit stated in *Craigslist*, a plaintiff may sue the author of the classified ad, or the person who committed legal violations based on the ad, but it "cannot sue the messenger" (here, allegedly, Salesforce) simply because "the message" (here, the classified ads with G.G.) reveals a third party's plan to engage in unlawful conduct. 519 F.3d at 672.

## C. The 2018 Amendments to CDA 230 Expressly Do Not Apply to Most of Plaintiffs' Claims

That CDA 230 bars Plaintiffs' core legal theories is confirmed by amendments to CDA 230 that Congress passed in 2018, through the Allow States and Victims to Fight Online Sex Trafficking Act of 2017 ("FOSTA"), Pub. L. 115-164, 132 Stat. 1253 (2018). The FOSTA amendments exempted three types of claims from CDA 230: (1) civil claims under 18 U.S.C. § 1595, the TVPA

9

civil remedies provision, but *only* to the extent that "the conduct" underlying the civil claim "constitutes a violation" of 18 U.S.C. § 1591, the criminal sex trafficking prohibition; (2) state criminal prosecutions where the conduct would "constitute a violation" of 18 U.S.C. §§ 1591 or 2421A; and (3) state AG enforcement actions brought under § 1591. Pub. L. 115-164 §§ 4(a) & 6(a). Thus, with the single exception of a civil sex trafficking claim that also establishes a criminal violation of 18 U.S.C. § 1591—a theory that, as shown below, Plaintiffs have nominally pled but utterly failed to support—the FOSTA exemptions do not apply to the claims alleged here, namely state-law civil claims and a federal claim under the separate "should have known" provision of 18 U.S.C. § 1595 that is not also included in § 1591.

As for state-law claims, the text of FOSTA on its face does not exempt any state-law *civil* claims from CDA 230. The exemption for state-law claims covers only *criminal* prosecutions under state law where the conduct would violate federal criminal trafficking laws. As the California court held in dismissing similar claims against Salesforce, "[n]othing in the text of [FOSTA] exempted private civil state law claims from immunity." Cal. Order at 6. Where, as here, Congress has chosen to enact limited and defined sets of exemptions, that means it intends to enact **only** those exemptions, and courts cannot create additional, unwritten exemptions not in the text. *See, e.g.*, *Jennings v. Rodriguez*, 138 S. Ct. 830, 844 (2018) (express exemption "implies that there are no other[s]"); *Law v. Siegel*, 571 U.S. 415, 424 (2014) (a "meticulous … enumeration of exemptions … confirms that courts are not authorized to create additional" exemptions). That is especially true here because, in enacting FOSTA, Congress *considered and rejected* an exemption to CDA 230 for civil state-law claims. *See* Linsley Decl., Ex. C (H.R. 1865 115th Cong., § 3 (a)(2)(C) (as introduced in the House, Apr. 3, 2017)).[2] "Few principles of statutory

---

[2] Salesforce is concurrently filing a request for judicial notice of the cited legislative history.

construction are more compelling than the proposition that Congress does not intend *sub silentio* to enact statutory language that it has earlier discarded in favor of other language." *INS v. Cardozo-Fonseca*, 480 U.S. 421, 442–43 (1987) (quotation marks and citation omitted).

FOSTA's only exemption from CDA 230 applicable to federal civil claims is, on its face, also inapplicable here. FOSTA did not exempt from CDA 230 all federal civil TVPA claims under 18 U.S.C. § 1595, the civil remedies provision, but only claims under § 1595 to the extent "the conduct underlying the claim constitutes a violation of section 1591." Pub. L. 115-164 § 4. This means that the additional provision of § 1595 that imposes civil liability based on a "should have known" standard—and that forms the heart of Plaintiffs' federal sex trafficking claim, *see* SAC ¶¶ 48, 50—was *not* exempted from CDA 230 because such "should have known" allegations do not establish a violation of the separate criminal provisions of § 1591.

The effect of this FOSTA exemption is confirmed by its legislative history. As initially proposed, FOSTA would have exempted from CDA 230 *all* civil TVPA claims "or any other federal or state law providing causes of action, restitution, or other civil remedies" to sex trafficking victims. Linsley Decl., Ex. C (H.R. 1865, 115th Cong. § 3(a)(5) (as introduced in the House, Apr. 3, 2017)). A later version struck any mention of civil claims. *Id.*, Ex. D (H.R. 1865, 115th Cong § 4 (as reported to the House, Feb. 20, 2018)). What Congress ultimately enacted was a compromise with a limited CDA 230 exemption for civil TVPA claims *only* if "the conduct underlying the claim constitutes a violation of [18 U.S.C. §] 1591." Pub. L. 115-164 § 4(a).

As the text and history of FOSTA establish, there is no general exemption from CDA 230 for all civil TVPA claims under § 1595, but only a narrow exemption for civil TVPA violations that also constitute criminal sex trafficking under § 1591. That exemption cannot help Plaintiffs because (1) even if Plaintiffs could show a violation of that provision, the retroactive removal of

11

the CDA 230 defense for such a claim would violate the Ex Post Facto Clause; and (2) as detailed below, Plaintiffs have not alleged, and cannot allege, facts that even come close to establishing that Salesforce engaged in criminal sex trafficking under § 1591.

> **D. Retroactive Elimination of the Protections of CDA 230 for TVPA Claims Constituting Criminal Sex Trafficking Violates the Ex Post Facto Clause**

FOSTA's narrow exemption from CDA 230 for civil TVPA claims that also establish criminal sex trafficking under § 1591 can apply in this case only if Plaintiffs can establish such a criminal violation by Salesforce, and only if the exemption can apply retroactively, as FOSTA was enacted in April 2018 and the alleged wrongful conduct occurred in 2016 and earlier. *See* SAC ¶ 44. In fact, FOSTA does purport to apply this exemption "regardless of whether the conduct alleged occurred, or is alleged to have occurred, before" its "date of enactment." Pub. L. 115-164 § 4(b). As shown below, Plaintiffs have not come close to pleading facts that would establish a criminal violation of § 1591, and the Court therefore need not reach the constitutionality of the retroactive application of this FOSTA exemption. *See, e.g.*, *ISI Int'l, Inc. v. Borden Ladner Gervais LLP*, 256 F.3d 548, 552 (7th Cir. 2001) ("[F]ederal courts are supposed to do what they can to avoid making constitutional decisions, and strive doubly to avoid making unnecessary constitutional decisions."). But if the Court were to find that Plaintiffs have alleged a plausible violation of § 1591, then it should hold that the claim is still barred under CDA 230 because retroactive application of this FOSTA exemption violates the Ex Post Facto Clause.

The Constitution directs that "[n]o … ex post facto Law shall be passed." U.S. Const., art. 1, § 9, cl. 3. A law violates this prohibition if "it imposes a retroactive punishment." *Belleau v. Wall*, 811 F.3d 929, 941 (7th Cir. 2016). Although usually applied in criminal cases, the clause applies to laws that create civil liability where "the law imposes a punishment." *Id.* at 942. Under the established two-step framework, a court evaluates whether the legislature "intended to impose

a punishment." *Id.* (citing *Smith v. Doe*, 538 U.S. 84, 92 (2003)). If so, "that ends the inquiry." *Smith*, 538 U.S. at 92. If not, the court then determines "whether the statutory scheme is 'so punitive either in purpose or effect as to negate [the legislature's] intention' to deem it 'civil.'" *Id.* (citations omitted).[3]

By retroactively removing CDA 230 protection for conduct constituting a criminal law violation, FOSTA "'inflicted punishment' for past criminal conduct that" previously "did not trigger any such liability." *Stogner v. California*, 539 U.S. 607, 613 (2003). Before FOSTA, CDA 230 would have barred any type of civil claim under the TVPA. Now, Congress has sought to impose potentially substantial retroactive civil liability for conduct that violates the TVPA's criminal provisions. That exemption is functionally punitive, not only because it imposes retroactive monetary sanctions for criminal law violations, but also because Plaintiffs seek punitive damages for that alleged violation. SAC ¶ 67. As the Supreme Court has stated, "[r]etroactive imposition of punitive damages … raise[s] a serious constitutional question." *Landgraf v. USI Film Prods.*, 511 U.S. 244, 281 (1994). By imposing potentially significant penalties, including punitive damages, based on conduct occurring *before* FOSTA's enactment, the law would impose retroactive punishment contrary to the Ex Post Facto Clause. *See Smith*, 538 U.S. at 92.

In fact, DOJ told Congress during FOSTA deliberations that making the exemptions to CDA 230 retroactive would violate the Ex Post Facto Clause. As DOJ explained, making the exemptions retroactive would be "unconstitutional" and "raise[] a serious constitutional concern"

---

[3] Seven factors guide this inquiry. The "factors are: (1) whether the sanction involves an affirmative restraint; (2) whether it has been historically regarded as a punishment; (3) whether it is tied only to a finding of scienter; (4) whether its operation promotes retribution and deterrence; (5) whether it applies to criminal behavior; (6) whether it is rationally connected to a nonpunitive purpose; and (7) whether it appears excessive in relation to the alternative purpose." *U.S. v. Vasquez*, 576 F. Supp. 2d 928, 943 (N.D. Ill. 2008) (citing *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168–69 (1963)).

as the legislation "would 'impose[] a punishment for an act which was not punishable at the time it was committed' or 'impose[] additional punishment to that then prescribed.'" Linsley Decl., Ex. E (164 Cong. Rec. S1869 (daily ed. Mar. 21, 2018) (letter from Asst. A.G. Stephen Boyd)).

Even if this aspect of FOSTA was not *meant* to be punitive, it has a significant punitive *effect* that precludes retroactive application. Application of the FOSTA exemption for civil TVPA claims necessarily depends on a finding of criminal scienter, as the exemption applies only where the civil claim "constitutes a violation" of the criminal prohibition on sex trafficking under § 1591. The FOSTA exemption promotes retribution and deterrence because "punitive damages … are aimed at deterrence and retribution." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 416 (2003). And it is not rationally connected to a non-punitive purpose because "[a]lthough punitive damages have the concomitant effect of encouraging aggrieved persons to sue for their compensatory damages, the primary import of punitive damages is to punish and deter." *Roman Catholic Bishop v. Superior Court*, 128 Cal. App. 4th 1155, 1172 (Cal. Ct. App. 2005). Because FOSTA's retroactive removal of the CDA 230 defense to civil TVPA claims based on criminal conduct is effectively punitive, applying it here would violate the Ex Post Facto Clause.

## II. Plaintiffs Have Failed to Allege Any Plausible Claims

As shown above, CDA 230 is fatal to all of Plaintiffs' claims because they depend on third-party content posted on the internet, and the sole claim that is nominally exempted from CDA 230 cannot be invoked retroactively. But even apart from CDA 230, Plaintiffs do not come close to pleading a cognizable claim on the merits. Their claim that Salesforce engaged in federal criminal sex trafficking under § 1591—the only claim potentially exempted from CDA 230—borders on frivolous, given that their sole basis for such a claim is the sale of off-the-shelf business software that Salesforce has sold to tens of thousands of businesses. Nor do Plaintiffs allege facts sufficient to support any of their other claims.

14

### A. Plaintiffs Have Failed Adequately to Allege a TVPA Claim Constituting Criminal Sex Trafficking in Violation of 18 U.S.C. § 1591

Plaintiffs have not come close to alleging facts that would establish that Salesforce violated the federal criminal sex trafficking provisions of 18 U.S.C. § 1591. *See* Pub. L. 115-164 § 4(a). Section 1591 creates two distinct criminal prohibitions. First, § 1591(a)(1) imposes criminal liability on a person directly involved in the trafficking of an individual victim, meaning someone who "recruits, entices, harbors, transports, provides, obtains, advertises, maintains, patronizes, or solicits by any means a person … knowing … that means of force, threats of force, fraud, coercion … , or any combination of such means will be used to cause the person to engage in a commercial sex act, or that the person has not attained the age of 18 years and will be caused to engage in a commercial sex act." 18 U.S.C. § 1591(a)(1). Although the SAC labels Salesforce a sex-trafficking "perpetrator," it does not allege that Salesforce trafficked, or helped to traffic, G.G. and does not even directly allege that Salesforce violated § 1591(a)(1). SAC ¶ 48.

Second, § 1591(a)(2) builds on § 1591(a)(1) to impose criminal liability on those who participate in a sex-trafficking venture involving a specific victim. Specifically, it provides that a person who "knowingly benefits … from participation in a venture which has engaged in an act described in violation of [§ 1591(a)(1)] … knowing … that means of force, threats of force, fraud, coercion … , or any combination of such means will be used to cause the person to engage in a commercial sex act, or that the person has not attained the age of 18 years and will be caused to engage in a commercial sex act." 18 U.S.C. § 1591(a)(2).[4] The statute defines "participation in a venture" to mean "*knowingly* assisting, supporting, or facilitating a violation of § 1591(a)(1)."

---

[4] The statute allows a lesser form of scienter—"reckless disregard of the facts"—when the acts do not involve "advertising," but advertising is the only act even potentially connected to Salesforce—namely, the classified ads which posted G.G. on Backpage.com. 18 U.S.C. § 1591(a)(2).

*Id.* § 1591(e)(4) (emphasis added). And for a *civil* claim under TVPA § 1595 based on a violation of § 1591(a)(2), there must be allegations that the defendant "*knowingly* benefit[ed], financially or by receiving anything of value from participation in a venture which that person knew or should have known ha[d] engaged in an act in violation of [the TVPA]." *Id.* § 1595(a) (emphasis added).

As another court recently summarized, a plaintiff seeking to establish criminal sex trafficking must establish "three separate types of knowledge with respect to th[e] venture: (1) knowledge as to a benefit received from trafficking; (2) knowledge as to 'assisting, supporting or facilitating' trafficking; and (3) knowledge that Plaintiff was either a minor or subject to force." *Doe 3 v. Red Roof Inns, Inc.*, No. 1:19-CV-03843-WMR, 2020 WL 1872333, at \*3 (N.D. Ga. Apr. 13, 2020). The SAC alleges no facts to show that Salesforce had any role in a criminal sex-trafficking venture with respect to G.G., much less with any of these three types of knowledge.

First, the SAC does not and cannot allege that Salesforce knew that force or coercion was being used to cause G.G. to enter into a commercial sex venture or that G.G. was under 18. 18 U.S.C. § 1591(a)(2). There are no facts even suggesting that Salesforce had contact with, or knew anything about, G.G. or the person(s) who allegedly trafficked her, much less that Salesforce had "personal knowledge … that this venture (or someone within the venture) caused a child to engage in a commercial sex act." *United States v. Afyare*, 632 F. App'x 272, 285 (6th Cir. 2016). The SAC alleges only that Plaintiff Rose found a classified ad for G.G. on Backpage and "sent an email to Backpage alerting them to the fact that G.G., a child, was being advertised on their Escort Page." SAC ¶ 45. The SAC does not allege that Salesforce knew about this contact.

Nor does the SAC allege facts showing that Salesforce was aware of the specific content of classified ads posted on Backpage, much less the specific ads relating to G.G. They allege that "a simple google search would have indicated Backpage was not a general online marketplace, but

a center for unlawful conduct" (SAC ¶ 33), but that type of general assertion cannot substitute for actual knowledge of any such "unlawful conduct" toward G.G. specifically. As such, the inference that Salesforce knowingly participated in trafficking "cannot be reasonably drawn from Plaintiffs' well-pleaded factual allegations." *Silha v. ACT, Inc.,* 807 F.3d 169, 175 (7th Cir. 2015). And there is no effort to allege that Salesforce could or should have learned about the ads for G.G. or any other circumstances of her alleged trafficking. Because the broad, generalized allegations about knowledge "are not pleaded with enough facts to cross the line from speculative to plausible" as to the specific harm to G.G., the claim fails on this basis alone. *Alarm Detection Sys., Inc. v. Vill. of Schaumburg*, 930 F.3d 812, 819 (7th Cir. 2019).

Second, the SAC fails to allege that Salesforce knowingly participated in a venture—*i.e.*, knowingly took steps to "assist[], support[] or facilitate[]"—with the criminals who allegedly trafficked G.G. 18 U.S.C. § 1591(e)(4). "The participation giving rise to the benefit must be participation *in a sex-trafficking venture*, not participation in other activities." *Geiss v. Weinstein Co. Holdings LLC*, 383 F. Supp. 3d 156, 169 (S.D.N.Y. 2019). This is a high standard that the SAC is worlds away from meeting. The SAC does not even allege that there was a venture between Backpage and the persons who posted G.G.'s advertisements. And more significantly, the SAC does not allege that Salesforce "knowingly" took any steps to help such a sex-trafficking venture between Backpage and G.G.'s traffickers. Instead, the SAC alleges only that Salesforce provided Backpage with CRM "tools," which were then used by Backpage to organize its customer data and grow its business. *See, e.g.*, SAC ¶¶ 3–4, 21, 54–55. According to the SAC, Salesforce's software was "used by Backpage" (*id.* ¶¶ 35, 37, 39, 40), for instance, to "obtain and monitor data" (*id.* ¶ 37), "develop[] direct outreach campaigns" (*id.* ¶ 39), and "solicit sex traffickers and their victims" (*id.* ¶ 40). Plaintiffs do not allege that *Salesforce itself* was involved in any of these

activities, much less had knowledge of what Backpage allegedly was doing with its software.  Nor does the SAC even try to connect the dots between Backpage's use of Salesforce's software and the trafficking of G.G. or the classified ads relating to her.

In the end, Plaintiffs' federal sex-trafficking claim rests on the unsustainable proposition that Salesforce knowingly participated in a sex-trafficking venture of G.G. simply because it sold widely used business software to an affiliate of Backpage, which in turn operated the website that hosted classified ads posted by persons who allegedly trafficked G.G.  If that theory were sufficient, countless business software providers would be deemed to have knowingly participated in a sex-trafficking venture.  That is not and cannot be the law.  *See, e.g.*, *Red Roof Inns*, 2020 WL 1872333, at *3 ("Association alone cannot establish liability; instead, knowledge and 'some participation in the sex trafficking act itself must be shown.'" (citation omitted)).

Third, the SAC fails to allege facts showing that Salesforce "knowingly" received a "benefit" from its participation in a sex-trafficking venture relating to G.G.  18 U.S.C. § 1595(a).  Under the TVPA, any "benefit" must derive from "participation in the sex trafficking act itself," such that there is a causal relationship between the benefit attained and the facilitation of the underlying sex-trafficking conduct.  *Noble v. Weinstein*, 335 F. Supp. 3d 504, 524 (S.D.N.Y. 2018).  And under the "knowing benefit" requirement, "there must be actual … knowledge of that causal relationship."  *Geiss*, 383 F. Supp. 3d at 169.  Here, the SAC broadly alleges that "Salesforce chose profits" despite supposedly "learn[ing]" about Backpage's general practices.  SAC ¶ 34.  But it does not and cannot allege that any profit was gained specifically *because* of alleged facilitation of Backpage's sex-trafficking ads business, much less ads specifically posted as part of a venture to traffic G.G.  Ultimately, the only "benefit" that the SAC alleges is revenue from Salesforce's sale of the CRM software subscription, but that is the same benefit that Salesforce derives from all of its customers.

*See id.* ¶ 3.  For this reason, also, any claim that Salesforce violated the criminal provisions of 18 U.S.C. § 1591 fails as a matter of law.

## B.    Plaintiffs Have Not Alleged Any Other Violation of the TVPA

As shown above, CDA 230 bars any other TVPA claim that Plaintiffs might assert, so the Court need not even address those claims on the merits.  But even without CDA 230, it is clear that Plaintiffs cannot establish any other TVPA claim.

Plaintiffs first assert a claim under § 1595, which allows a plaintiff who is a victim of a sex-trafficking violation to bring a civil action against a defendant who "knowingly benefits" from "participation" in a sex-trafficking venture where the defendant "knew or should have known" of the violation.  18 U.S.C. § 1595(a).  This claim clearly is barred by CDA 230, as shown above, but in any event the SAC does not and cannot allege facts showing any connection between Salesforce and the criminals who allegedly trafficked or exploited G.G.  Plaintiffs allege only that Salesforce provided CRM software to a Backpage affiliate and that Backpage used that software to manage data about its customers, some of whom, Plaintiffs allege, were traffickers.  But that does not equate with Salesforce knowingly participating in and benefiting from a sex-trafficking "venture" with any of those customers, much less a venture that specifically injured G.G.

Plaintiffs next assert that Salesforce violated 18 U.S.C. § 1590(a) (*see* SAC ¶ 48), but the SAC alleges no facts to establish such a violation.  Section 1590(a) criminalizes "knowingly recruit[ing], harbor[ing], transport[ing], provid[ing], or obtain[ing] by any means, any person for labor or services in violation of [the TVPA]."  18 U.S.C. § 1590(a).  Put another way, § 1590(a) "prohibits human trafficking to further forced labor."  *Nunag-Tanedo v. E. Baton Rouge Par. Sch. Bd.*, 790 F. Supp. 2d 1134, 1146 (C.D. Cal. 2011).  Plaintiffs have not alleged that Salesforce knowingly did anything covered by § 1590(a), with respect to G.G. or anyone else, nor have they

alleged that Salesforce knowingly benefited from participation in a venture that Salesforce "knew or should have known" committed such a violation. *See* 18 U.S.C. § 1595(a).[5]

## C.     Plaintiffs Have Failed to Allege Adequately Any Violation of Illinois Law

Even if Plaintiffs' state-law claims were not barred by CDA 230, those claims fail as a matter of law. A negligence claim requires facts setting forth a duty of care, a breach of that duty, and an injury proximately caused by the breach. *Thompson v. Gordon*, 241 Ill. 2d 428, 438 (2011). Under Illinois law, there is no separate tort of gross negligence, recklessness, or willful and wanton conduct, *Maglaya v. Kumiga*, No. 14-CV-3619, 2015 WL 4624884, at *9–10 (N.D. Ill. Aug. 3, 2015), so the claim based on these theories merges with the negligence claim. And all of these claims fail because Salesforce had no legal duty to prevent the criminal acts that injured G.G, nor was any act by Salesforce the legal or factual cause of those injuries.

### 1.     *Duty*

The liability theory alleged in the SAC fails to establish any legally cognizable duty on Salesforce's part. Under Illinois law, "[t]here can be no recovery in tort for negligence unless the defendant has breached a duty owed to the plaintiff." *Turner v. N. Illinois Gas Co*., 401 Ill. App. 3d 698, 704 (2010). Whether such a duty exists is a question of law. *Id.*

The SAC alleges that "Salesforce had a duty to the general public and to persons affected by its products, … to take reasonable steps to protect them from the foreseeable dangers of its products as related to human trafficking." (SAC ¶ 52.) But Illinois law does not recognize any such duty. Illinois courts repeatedly hold that there is no duty to control the distribution of a non-defective product to the general public, *even if* (unlike here) the product is dangerous such as a handgun. *See, e.g.*, *Riordan v. Int'l Armament Corp.*, 132 Ill. App. 3d 642, 646 (1985) (no duty

---

[5]  The SAC also fails adequately to allege a violation of § 1593A of the TVPA (which is invoked in the SAC at ¶ 48) for the same reasons that they have not alleged a violation of § 1591.

for manufacturers and distributors of handguns to prevent sale to persons reasonably likely to cause harm to the public); *Linton v. Smith & Wesson*, 127 Ill. App. 3d 676, 678 (1984) (same). Under these cases, Salesforce has no duty to monitor the downstream use of its software—which, in any event, is *not* inherently dangerous, has no unique utility for sex trafficking, and is simply a general business tool used by many legitimate businesses. Linsley Decl., Ex. B; SAC ¶ 35.

The lack of legal duty here is especially clear given that the SAC seeks to hold Salesforce liable for alleged criminal acts of third parties. "Ordinarily, a party owes no duty of care to protect another from the harmful or criminal acts of third persons." *MacDonald v. Hinton*, 361 Ill. App. 3d 378, 382 (2005). Although there are specific exceptions to this rule—"(1) when the parties are in a special relationship … and the harm is foreseeable; (2) when an employee is in imminent danger and this is known to the employer; (3) when a principal fails to warn his agent of an unreasonable risk of harm involved in the agency; and (4) when any party voluntarily or contractually assumes a duty to protect another from the harmful acts of a third party"—none applies here. *Aidroos v. Vance Uniformed Prot. Servs., Inc.*, 386 Ill. App. 3d 167, 172 (2008).

Nor can Plaintiffs establish duty based on the theory that Salesforce assisted a third party who, in turn, committed the criminal act. As the Seventh Circuit held in *Vesely v. Armslist LLC*, 762 F.3d 661, 666 (7th Cir. 2014), even allegations that Armslist "design[ed] its website to encourage its users to circumvent existing gun laws" cannot establish the level of "assistance" necessary to create a duty to protect individuals potentially harmed by those users. Here, there are no allegations that Salesforce "designed" its software for an unlawful purpose or "encourage[d]" its customers to violate the law. Plaintiffs not only fail to allege these facts, but specifically *removed* such "customization" allegations from their complaint after Salesforce sent its Rule 11 letter. And even the removed "customization" allegations would be inadequate as a matter of law

21

because "enabling consumers to use a legal service is far removed from encouraging them to commit an illegal act." *Id.* In short, selling a general software product does not create a duty for the seller to monitor how it is used.

### 2. Causation

The SAC also fails to allege any causation between Salesforce's alleged conduct—the provision of CRM software to Backpage—and the harm to G.G. Under Illinois law, "there are two requirements for a showing of proximate cause: cause in fact and legal cause." *Crumpton v. Walgreen Co.*, 375 Ill. App. 3d 73, 79 (2007). Causation "cannot be based on mere conjecture or speculation as to what possibly happened to cause the injury." *Majetich v. P.T. Ferro Const. Co.*, 389 Ill. App. 3d 220, 227 (2009). Here, the facts alleged cannot establish either causation requirement because the allegations reveal an insurmountable chasm between the alleged acts of Salesforce and the actions of independent third-party criminals who caused Plaintiffs' injuries.

The facts alleged in the SAC do not come close to establishing that anything Salesforce allegedly did was a "cause in fact" of G.G.'s injuries, all of which were allegedly caused by a third-party trafficker and individuals who answered the trafficker's classified ads. "A defendant's conduct is a cause in fact of the plaintiff's injury only if that conduct is a material element and a substantial factor in bringing about the injury." *First Springfield Bank & Tr. v. Galman*, 188 Ill. 2d 252, 258 (1999). As the SAC makes clear, G.G.'s injuries resulted from her being trafficked and offered for sale through classified ads posted on Backpage.com, allegedly facilitated by Backpage's content policies. SAC ¶¶ 44–45. There is no allegation that Salesforce had a role in abducting G.G., assisting her trafficker in doing so, creating or facilitating classified ads geared toward trafficking, or contributing to Backpage's policies and practices regarding such ads, much less establishing that Salesforce was a "substantial factor" in causing G.G.'s injuries. Salesforce is alleged only to have provided its CRM tool that it marketed generally to businesses seeking to

improve and streamline the way they manage their customer data.  SAC ¶¶ 3–4, 21, 25.

At most, the SAC alleges that (1) traffickers advertised G.G. on Backpage.com, and (2) Backpage—not Salesforce—used Salesforce's CRM software in generally managing its business and customer data.  These allegations are insufficient to meet Plaintiffs' burden of "affirmatively and positively show[ing] that the defendant's alleged negligence caused the injuries for which the plaintiff seeks to recover."  *Keating v. 68th & Paxton, L.L.C.*, 401 Ill. App. 3d 456, 473 (2010) (quotation marks and citation omitted).  In fact, the SAC does not allege that Salesforce's CRM software was essential to Backpage allowing sex traffickers to post on its site, much less that the traffickers would not have exploited G.G. but for Salesforce's software.  Indeed, even assuming that some type of CRM software was essential to Backpage's operations, the SAC offers no facts that Backpage could not have found another vendor for such software.

Even if Salesforce's sale of software to Backpage could be considered a "cause in fact" of G.G.'s injury, it clearly was not the *legal* cause, meaning something that "produces an injury through a natural and continuous sequence of events unbroken by any effective intervening cause." *Kleen v. Homak Mfg. Co.*, 321 Ill. App. 3d 639, 641 (2001); *see also Merlo v. Pub. Serv. Co.*, 381 Ill. 300, 316–17 (1942) (test is whether a party "might have reasonably anticipated the intervening cause as a natural and probable result" of its action).  Again, the core theory of the SAC is that Salesforce sold off-the-shelf software to an affiliate of Backpage, which then allowed traffickers to post classified ads on its website.  The SAC does not even allege any direct or plausible link between the software that Salesforce provided and the classified ads posted on the site, much less that *Salesforce itself* had anything to do with those ads.  In fact, Salesforce is ***two*** steps removed from G.G.'s alleged traffickers:  G.G.'s injuries were caused by independent intervening criminal acts of unidentified third parties (her traffickers), and facilitated by the actions of yet another third

party (Backpage).  Salesforce's provision of software to Backpage, *at most*, "d[id] nothing more than furnish a condition which ma[de] an injury possible," but Illinois courts have made clear that that is insufficient.  *Lane v. City of Harvey*, 178 Ill. App. 3d 270, 275 (1988).  Accordingly, there can be no legal cause as to Salesforce.

Nor were the actions of G.G.'s trafficker reasonably foreseeable as a natural and probable consequence of Salesforce's sale of business software to a Backpage affiliate, even if such foreseeability were sufficient to show legal causation.  Even assuming Backpage misused the software, which the SAC does not allege, Salesforce cannot reasonably anticipate all the ways that its tens of thousands of customers might use or misuse its software.  Under Plaintiffs' theory, vendors of other common business tools or services—cellphone service providers, computer manufacturers, web-hosting companies, and others—also proximately caused G.G.'s injuries, because Backpage used many of these products while conducting illicit activity.  But courts have rejected such limitless theories, which would extend the concept of proximate cause beyond recognition.  *See Doe v. GTE Corp.*, 347 F.3d 655, 659 (7th Cir. 2003) ("That web hosting services likewise may be used to carry out illegal activities does not justify condemning their provision whenever a given customer turns out to be crooked."); *Craigslist*, 519 F.3d at 672 ("If craigslist 'causes' the discriminatory [ads], then so do phone companies and courier services (and, for that matter, the firms that make the computers and software that owners use to post their notices online) …").  The SAC's theory would cause the very outcome that proximate cause rules seek to avoid. *See Rodriguez v. Glock, Inc.*, 28 F. Supp. 2d 1064, 1072 (N.D. Ill. 1998) ("The law declines to hold a manufacturer liable for every injury connected with its product …  [because] [t]o do so would make the manufacturer an insurer of its product, a position rejected by the Illinois Supreme Court."); *see also Vesely*, 762 F.3d at 666; *Dart*, 665 F. Supp. 2d at 968–69.

24

Federal courts have reached similar conclusions regarding liability for internet platforms used by terrorists. In *Crosby v. Twitter, Inc.*, 921 F.3d 617, 620–21 (6th Cir. 2019), the Sixth Circuit affirmed the dismissal of claims premised on allegations that Twitter, Google, and Facebook "allow[ed] ISIS to reach a global audience, attracting new recruits and inspiring 'lone actor attacks'" that allegedly led to the Orlando nightclub shooting. Although the plaintiffs alleged that these companies knew of ISIS's use of their platforms and "ignore[d] requests to block ISIS," the Sixth Circuit held that the plaintiffs' claims failed for lack of proximate cause, noting that "the content did not compel [the shooter's] actions." *Id.* at 620, 624–27. And in *Fields v. Twitter, Inc.*, 881 F.3d 739 (9th Cir. 2018), the Ninth Circuit rejected as insufficient allegations that Twitter's knowing provision to ISIS of a forum and secure messaging service that allowed ISIS to grow and gain strength proximately caused the terrorist attacks that ISIS ultimately committed or inspired, even though the plaintiffs alleged that Twitter knew that ISIS was using its site and refused to change its content rules to prevent such use. *Id.* at 742–43.

Likewise, here, the SAC alleges no facts suggesting that Salesforce *itself* had any role in collecting or managing any of the customer data, or conducting direct marketing to customers. The provider of a computer network or phone system does not "cause" harm to third parties when a customer using those products directs its business to wrongful ends. But even if the SAC sufficiently alleged that Salesforce knew about the illicit nature of Backpage's business *and* that Backpage had *no* legitimate aspect to its business (which it has not), that *still* does not mean that actions allegedly helping Backpage to "grow" suffice to establish proximate causation. Indeed, such allegations were insufficient in both *Crosby* and *Fields*.

## CONCLUSION

For all of the above reasons, the Court should dismiss this action with prejudice.

DATED:  July 17, 2020                    Respectfully submitted,


                                         */s/ Patricia Brown Holmes*

                                         Patricia Brown Holmes
                                         Lucas T. Rael
                                         RILEY SAFER HOLMES & CANCILA LLP
                                         70 W. Madison St., Ste. 2900
                                         Chicago, Illinois 60602
                                         Telephone: (312) 472-8700
                                         Facsimile: (312) 471-8701
                                         pholmes@rshc-law.com
                                         lrael@rshc-law.com

                                         Kristin A. Linsley (admitted *pro hac vice*)
                                         GIBSON, DUNN & CRUTCHER LLP
                                         555 Mission Street
                                         San Francisco, CA 94105-0921
                                         Telephone: 415.393.8395
                                         Facsimile: 415.374.8471
                                         klinsley@gibsondunn.com

                                         Bradley J. Hamburger (admitted *pro hac vice*)
                                         GIBSON, DUNN & CRUTCHER LLP
                                         333 South Grand Avenue
                                         Los Angeles, CA 90071-3197
                                         Telephone: 213.229.7658
                                         Facsimile: 213.229.6658
                                         bhamburger@gibsondunn.com

                                         Veronica S. Lewis (admitted *pro hac vice*)
                                         Andrew LeGrand
                                         GIBSON, DUNN & CRUTCHER LLP
                                         2001 Ross Avenue, Suite 2100
                                         Dallas, TX 75201
                                         Telephone: 214.698.3100
                                         Facsimile:  214.571.2900
                                         vlewis@gibsondunn.com
                                         alegrand@gibsondunn.com

                                         *Counsel for Defendant salesforce.com, inc.*

26

## CERTIFICATE OF SERVICE

I hereby certify that on the 17th day of July, 2020, the foregoing document was filed using the Court's CM/ECF system.  In addition, (1) the filing is available for viewing and downloading via the CM/ECF system, and (2) the CM/ECF system will send notification of this filing to all attorneys of record who have registered for CM/ECF updates.

/s/ *Patricia Brown Holmes*
Patricia Brown Holmes
