**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**CHICAGO DIVISION**

| | | |
|---|---|---|
| G.G., A MINOR, AND DEANNA ROSE, | § | |
| PARENT AND GUARDIAN OF G.G., | § | |
| | § | |
| Plaintiffs, | § | CIVIL ACTION NO. 20-CV-02335 |
| | § | |
| v. | § | Honorable Andrea R. Wood |
| | § | |
| SALESFORCE.COM, INC., | § | |
| | § | |
| Defendant. | § | |

**PLAINTIFFS' RESPONSE TO DEFENDANT SALESFORCE.COM, INC.'S**
**MOTION TO DISMISS SECOND AMENDED COMPLAINT**

## TABLE OF CONTENTS

*Page*

Table of Authorities ..................................................................................................... iii

Statement of Facts ..........................................................................................................1

    A.    Sex trafficking is a worldwide epidemic that has been magnified through the use of internet tools ............................................................................1

    B.    Salesforce knowingly benefitted from facilitating Backpage's sex trafficking operation for years ....................................................................1

    C.    G.G. was trafficked through Backpage during its partnership with Salesforce ....................................................................................................3

Standard of Review ........................................................................................................4

Summary of Argument ...................................................................................................4

Argument ........................................................................................................................5

  I.    Plaintiffs Have Adequately Pleaded A Claim For Beneficiary Liability Under Federal Anti-Sex Trafficking Law ..........................................................5

    A.    Plaintiffs have adequately alleged a claim under Section 1595 ..........................5

        1.    Salesforce participated in a venture with Backpage ................................5

        2.    Salesforce knowingly benefitted from participating in the venture .........7

        3.    Salesforce should have known that the venture violated Section 1591 ....................................................................................................8

    B.    Plaintiffs are not required to establish that Salesforce would be criminally liable under Section 1591 in order to recover against Salesforce under Section 1595 ..............................................................10

  II.    Section 230 Of The CDA Does Not Preempt Plaintiffs' Claims ..................12

    A.    Section 230 preempts only a narrow category of claims ....................13

    B.    Plaintiffs' claims are not inconsistent with the federal sex trafficking statute ..........................................................................................14

    C.    FOSTA's language reinforces the lack of preemption ......................15

    D.    Plaintiffs' state law claims do not treat Salesforce as a publisher or speaker ..........................................................................................17

*Page*

     E.     Salesforce bears the heavy burden of establishing preemption ..........................18

     F.     FOSTA's exemption of claims does not violate the Ex Post Facto clause.........19

III.    Plaintiffs Have Adequately Alleged Negligence Under Illinois Law ...........................21

     A.     Salesforce owes a duty to exercise ordinary care, and a duty not to assist Backpage in performing criminal acts .................................................................21

     B.     Salesforce caused harm to Plaintiffs ...................................................................23

PRAYER .............................................................................................................................................25

CERTIFICATE OF SERVICE .........................................................................................................27

# **TABLE OF AUTHORITIES**

*Page(s)*

**Cases**

*A.B. v. Marriott Int'l, Inc.*,
 No. CV 19-5770, 2020 WL 1939678 (E.D. Pa. Apr. 22, 2020) ................................6-7, 10-12

*Barnes ex rel. Estate of Barnes v. Koppers, Inc.*,
 534 F.3d 357 (5th Cir. 2008) ................................................................................................19

*Bates v. Dow Agrosciences, LLC*,
 544 U.S. 431 (2005)..............................................................................................................19

*Cipollone v. Liggett Grp., Inc.*,
 505 U.S. 504 (1992)..............................................................................................14, 16, 18

*City of Chi., Ill. v. StubHub!, Inc.*,
 624 F.3d 363 (7th Cir. 2010) ................................................................................................18

*Crosby v. Twitter, Inc.*,
 921 F.3d 617 (6th Cir. 2019) ................................................................................................25

*District of Columbia v. Heller*,
 554 U.S. 570 (2008)..............................................................................................................17

*Doe S.W. v. Lorain-Elyria Motel, Inc.*,
 No. 2:19-CV-1194, 2020 WL 1244192 (S.D. Ohio Mar. 16, 2020)......................................10

*Doe v. GTE Corp.*,
 347 F.3d 655 (7th Cir. 2003) ..........................................................................................18, 25

*Fields v. Twitter, Inc.*,
 881 F.3d 739 (9th Cir. 2018) ................................................................................................25

*Fla. Dep't of Revenue v. Piccadilly Cafeterias, Inc.*,
 554 U.S. 33 (2008)................................................................................................................16

*Forsythe v. Clark USA, Inc.*,
 864 N.E.2d 227 (Ill. 2007) ..............................................................................................21, 23

*H.H. v. G6 Hosp., LLC*,
 No. 2:19-CV-755, 2019 WL 6682152 (S.D. Ohio Dec. 6, 2019) ........................................ 7-8

*J.B. v. G6 Hosp., LLC*,
 No. 19-cv-07848-HSG, 2020 WL 4901196 (N.D. Cal. Aug. 20, 2020)............................6, 15

*Page(s)*

*Linton v. Smith & Wesson, a Div. of Bangor Punta Corp.,*
    469 N.E.2d 339 (Ill. App. Ct. 1984) ....................................................................23

*M.A. v. Wyndham Hotels & Resorts, Inc.,*
    425 F. Supp. 3d 959 (S.D. Ohio 2019) ...................................................5-7, 9-11

*Medtronic, Inc. v. Lohr,*
    518 U.S. 470 (1996).............................................................................. 15, 18-19

*Ray v. Cock Robin, Inc.,*
    310 N.E.2d 9 (Ill. 1974) ..................................................................................24

*Ricchio v. Bijal, Inc.,*
    424 F. Supp. 3d 182 (D. Mass. 2019) ............................................................9, 20

*Rice v. Santa Fe Elevator Corp.,*
    331 U.S. 218 (1947).........................................................................................19

*Riordan v. Int'l Armament Corp.,*
    477 N.E.2d 1293 (Ill. App. Ct. 1985) .............................................................23

*Rowe v. State Bank of Lombard,*
    531 N.E.2d 1358 (Ill. 1988) .......................................................................24-25

*S.Y. v. Naples Hotel Co.,*
    No. 2:20-CV-118FtM-29MRM, 2020 WL 4504976 (M.D. Fla. Aug. 5, 2020) .......................7

*Simmons v. Homatas,*
    925 N.E.2d 1089 (Ill. 2010) ............................................................................22

*Smith v. Doe,*
    538 U.S. 84 (2003)...........................................................................................20

*Stanphill v. Ortberg,*
    129 N.E.3d 1167 (Ill. 2018) ........................................................................23-24

*United States v. Afyare,*
    632 F. App'x 272 (6th Cir. 2016) ....................................................................12

*Vesely v. Armslist LLC,*
    762 F.3d 661 (7th Cir. 2014) .......................................................................21-23

*Yates v. United States,*
    135 S. Ct. 1074 (2015)....................................................................................17

*Page(s)*

***Statutes***

18 U.S.C. § 1591...................................................................................5-6, 8-13, 19, 21

18 U.S.C. § 1595...................................................................................5-6, 8-15, 19-21

18 U.S.C. § 2421A.......................................................................................................14

47 U.S.C. § 230.................................................................................................... 5, 11-20

Allow States and Victims to Fight Online Sex Trafficking Act of 2017,
Pub. L. No. 115-164, 132 Stat. 1253 (2018)......................................13, 15-17, 19-20

Telecommunications Act of 1996, Pub. L. 104-104, § 509, 110 Stat. 56.....................19

***Legislative Materials***

141 Cong. Rec. H8468-72 ...........................................................................................19

Cong. Rsch. Serv., *Ex Post Facto Implications of the Allow States and Victims to
Fight Online Sex Trafficking Act of 2017 (H.R. 1865)* (Mar. 7, 2018) ..................20

H.R. 1865, 115th Cong. § 3(a)(2)(C) (as introduced in House, Apr. 3, 2017) .......17, 20

H.R. Rep. No. 115-572 (2018)....................................................................................17

## STATEMENT OF FACTS

A.    ***Sex trafficking is a worldwide epidemic that has been magnified through the use of internet tools.***

Sex trafficking is an epidemic with tens of millions of victims worldwide.  Dkt. 39 ¶ 25. The internet has transformed and expanded the sex trafficking industry.  *Id.*  The majority of sex trafficking now occurs online.  *Id.* ¶ 26.  The internet, and in particular online advertising of trafficking victims, facilitates sex trafficking and allows sex traffickers to maximize profits by reaching new audiences and evading law enforcement detection.  *Id.* ¶¶ 25-26.

The website Backpage was the leading online marketplace for sex trafficking in the United States.  *Id.* ¶ 26.  Backpage earned nearly all of its revenue from sex trafficking.  *Id.* ¶¶ 26, 43.  By 2008, law enforcement and government officials had publicly identified Backpage as the largest sex trafficking website in the United States and a "hub" for the trafficking of minors.  *Id.* ¶ 26.

B.    ***Salesforce knowingly benefitted from facilitating Backpage's sex trafficking operation for years.***

Backpage sought out a partnership with a technology company to reach its growth objectives and move its operations offshore to evade law enforcement.  *Id.* ¶ 31.  Beginning in 2013, Backpage signed contracts with Salesforce under which Salesforce provided technology, services, and ongoing support.  *Id.* ¶¶ 31, 38.  Salesforce is a technology company that drives its customers' business growth by assisting its clients in customer relationship management and marketing.  *Id.* ¶ 32.  When Salesforce began providing services to Backpage, it had long been reported that Backpage was a sex trafficking hub.  *Id.* ¶¶ 26, 33 & n.7.  Salesforce knew or should have known about Backpage's illegal business.  *Id.* ¶¶ 26, 34, 36, 45.  Despite this knowledge, Salesforce chose to profit by facilitating Backpage's sex trafficking operation.  *Id.*

Salesforce developed, sold, and supported solutions tailored for Backpage's business and operational needs.  *Id.* ¶ 35.  Salesforce's process of designing and implementing solutions and

providing support to customers like Backpage is complex and must be personalized to the needs of each business. *Id.* ¶¶ 5, 35. Indeed, Salesforce could not have provided effective assistance to Backpage if it did not understand the nature of Backpage's business. *Id.* ¶¶ 26, 31, 33, 35.

Salesforce's services were essential in helping Backpage to operate and grow its sex trafficking operations. *Id.* ¶¶ 3, 36. Salesforce provided Backpage with its Customer Relationship Management (CRM) system that gave Backpage automation power and allowed Backpage to integrate with credit card processors, text past and potential future clients, and market itself. *Id.* ¶¶ 3, 49. Salesforce's tools and support facilitated Backpage's sex trafficking operation by allowing Backpage to recruit more traffickers and trafficking victims, significantly increasing Backpage's ability to manage its customer base, and giving Backpage the ability to accept payments from traffickers. *Id.* ¶¶ 3-4, 21, 41, 49. Salesforce's technology was the sole monitoring mechanism that allowed Backpage to track the effectiveness of its marketing efforts, gather data and information related to sex traffickers, and develop its operations and outreach campaigns. *Id.* ¶¶ 37, 39, 49. Salesforce's technology served an integral role in Backpage's strategy to solicit sex traffickers and their victims. *Id.* ¶¶ 40, 49. Salesforce even sold a Backpage-related entity in Amsterdam a duplicate copy of the Backpage system and helped Backpage move its operations offshore in response to intense law enforcement scrutiny of Backpage. *Id.* ¶¶ 36, 40, 49.

Through providing these essential services to support Backpage's sex trafficking business, Salesforce succeeded in growing Backpage from a small Dallas-based company with a few employees to an international powerhouse with over 250 employees. *Id.* ¶ 43. Backpage's revenue exploded with Salesforce's assistance, increasing from $71 million in 2012 to $346 million between January 2013 and May 2015, $340 million of which came from online sex trafficking. *Id.*

Backpage's use of Salesforce's technology to facilitate sex trafficking was never a secret

from Salesforce. *Id.* ¶¶ 3-4, 31, 33-37, 45. Salesforce continued working with Backpage and profiting from its relationship despite several nationwide law enforcement efforts against Backpage, civil suits against Backpage, a United States senate hearing on Backpage's conduct, and the arrest of Backpage's CEO. *Id.* ¶¶ 3-4, 41, 33-37, 42-43, 45. Salesforce's relationship with Backpage ended only when Backpage was seized by the U.S. government in 2018. *Id.* ¶¶ 42-43. During the relationship, scores of victims, including G.G., were trafficked through the efforts of Backpage, substantially enhanced with the tools and support provided by Salesforce. Both reaped substantial benefits from their role in Backpage's trafficking venture. *Id.* ¶¶ 31, 43.

<h3 style="text-align:center">C. <em>G.G. was trafficked through Backpage during its partnership with Salesforce.</em></h3>

Between 2015 and 2016, G.G. was trafficked through advertisements on Backpage after she ran away from home and was picked up by a sex trafficker. *Id.* ¶ 44. G.G. was forced to engage in unlawful sex acts with adults, often multiple times per day. *Id.* At the time, G.G. was only 13 and 14 years old. *Id.* Plaintiff Deanna Rose, G.G.'s mother, searched aggressively for G.G. and ultimately found an advertisement for G.G. on Backpage's escort page. *Id.* ¶ 45. Rose alerted Backpage that her child was being advertised for sex on its website, but it would not pull down the advertisement. *Id.* The trafficking of G.G. was made possible by advertisements for sexual services on Backpage that were facilitated by Salesforce's provision of its CRM and related services and support to Backpage. *Id.* ¶¶ 3, 21, 31-38, 41, 45. Through its involvement with Backpage, Salesforce knew that it was facilitating and benefitting from the sex trafficking of women and children, but it chose to work with Backpage anyway. *Id.* ¶¶ 3-4, 31, 33-37, 45. The inevitable result of Salesforce's actions was the sex trafficking of children like G.G. *Id.* ¶ 45. As a result of being sex trafficked as a minor through the actions of Backpage and Salesforce, G.G. sustained significant physical and emotional injuries. *Id.* ¶¶ 46, 66. G.G. and Rose sued Salesforce for violation of the Trafficking Victims Protection Act and Illinois law. *Id.* ¶¶ 47-64.

## STANDARD OF REVIEW

To avoid dismissal under Rule 12(b)(6), a complaint must "state a claim to relief that is plausible on its face" such that the facts "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citations omitted). While the plaintiff's claim to relief must be plausible, it need not be probable. *Id.* In reviewing the complaint, the court "view[s] it in the light most favorable to the plaintiff, taking as true all well-pleaded factual allegations and making all possible inferences from the allegations in the plaintiff's favor." *AnchorBank, FSB v. Hofer*, 649 F.3d 610, 614 (7th Cir. 2011). Review is "necessarily a limited one. The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Id.* (citation omitted).

## SUMMARY OF ARGUMENT

Plaintiffs adequately pleaded that Salesforce, in violation of Section 1595, knowingly benefitted through contracts with its customer Backpage, under which it provided technology and services to support Backpage's sex trafficking operation. At the time, Backpage had long been publicly identified as the largest sex trafficking platform in the United States. Although Salesforce should have known that Backpage was engaged in violations of sex trafficking law, Salesforce continued to profit from its relationship with Backpage despite the cost to trafficking victims.

Section 230 cannot preempt Plaintiffs' state law claims because they are fully consistent with the statute's exemption for Section 1595 claims. Moreover, Plaintiffs' claims fall far outside the proper scope of Section 230, which prevents certain internet companies from being treated as a "publisher or speaker" of third-party content. Here, Plaintiffs' claims do not treat Salesforce as a publisher of any content, but instead seek recovery for Salesforce's conduct in knowingly benefitting from a sex trafficking operation. Section 230 has no application to these allegations, and Plaintiffs' state law claims are otherwise adequately pleaded.

<u>**ARGUMENT**</u>

**I.**     <u>**Plaintiffs Have Adequately Pleaded A Claim For Beneficiary Liability Under Federal Anti-Sex Trafficking Law.**</u>

   **A.**     ***Plaintiffs have adequately alleged a claim under Section 1595.***

Section 1595(a) provides that "[a]n individual who is a victim of a violation of this chapter may bring a civil action against the perpetrator (or whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter)." Thus, the plaintiff effectively must allege three requirements: "(1) the person or entity must 'knowingly benefit[ ], financially or by receiving anything of value,' (2) from participating in a venture, (3) that the 'person knew or should have known has engaged in an act in violation of this chapter.'" *M.A. v. Wyndham Hotels & Resorts, Inc.,* 425 F. Supp. 3d 959, 964 (S.D. Ohio 2019).[1]

   **1.**     <u>Salesforce participated in a venture with Backpage.</u>

The complaint contains ample allegations that Salesforce "participated in a venture" with Backpage by assisting Backpage in engaging in sex trafficking through its website. Salesforce provided Backpage with assistance that supported Backpage's sex trafficking operations. Among other things, Salesforce facilitated trafficking through Backpage by:

- assisting Backpage in its marketing efforts that allowed Backpage to solicit sex traffickers and their victims;

- providing Backpage with mechanisms to communicate with past and potential sex traffickers;

- gathering and managing information about sex traffickers to enhance Backpage's ability to market itself;

- providing Backpage with technology to integrate with credit card processors so

---

[1] Salesforce argues that a claim under Section 1595 is "clearly barred by CDA 230." Dkt. 40 at 19. But Section 230(e)(5)(A) explicitly exempts claims under Section 1595 from the preemptive scope of Section 230 where the underlying conduct constitutes a violation of Section 1591.

that Backpage could accept payments from sex traffickers; and

- duplicating Backpage's system so that Backpage could move its operations overseas to evade law enforcement.

*See, e.g.*, Dkt. 39 ¶¶ 3-4, 21, 36-41, 49.  Salesforce directly participated in a venture with Backpage by providing these and other services to support Backpage's sex trafficking business, services that were essential to Backpage's operation and that greatly expanded Backpage's business.  *See also id.* ¶¶ 3, 36, 43.  Salesforce had a continuous business relationship with Backpage for years, signing its first contract with Backpage in 2013 and doing business with it until it was seized.  *Id.*  ¶¶ 31, 38, 42-43; *M.A.*, 425 F. Supp. 3d at 970 ("continuous business relationship" with trafficker shows tacit agreement establishing participation in the venture).[2]  G.G. was abducted by a sex trafficker and trafficked through advertisements for sexual services on Backpage that were facilitated by the technology and support Salesforce provided to Backpage.  *Id.* ¶¶ 3, 21, 31-38, 41, 44-45.

Salesforce argues, however, that Plaintiffs fail to sufficiently allege that Salesforce participated in a venture because the participation must be "participation in a *sex-trafficking venture*."  Dkt. 40 at 17-18.  Salesforce judges its conduct against the standards in Section 1591.  But Plaintiffs need not show that Salesforce itself violated the criminal provision in Section 1591 in order to state a violation of Section 1595.  *See infra* Part I.B.  Multiple courts have rejected the application of the criminal participation standard in Section 1591(e)(4) to claims under Section 1595.  *M.A.*, 425 F. Supp. 3d at 969; *A.B. v. Marriott Int'l, Inc.*, No. CV 19-5770, 2020 WL 1939678, at *10-11, 13, 15-16 (E.D. Pa. Apr. 22, 2020).  While liability under Section 1591 may require participation in a sex trafficking venture, "liability under § 1595 can attach when an

---

[2] These facts are easily distinguishable from those in *J.B. v. G6 Hosp., LLC*, No. 19-cv-07848-HSG, 2020 WL 4901196 (N.D. Cal. Aug. 20, 2020).  There, the court rejected the notion that Craigslist had a tacit agreement with all of the anonymous posters on its website.  *Id.* at *9.  Here, Salesforce had a contractual relationship with Backpage through which Salesforce provided personalized services for years.  Dkt. 39 ¶¶ 5, 31, 34-35, 38, 41-43.

individual participates in a venture that *is not specifically a sex trafficking venture* and participation is not direct participation in the sex trafficking." *M.A.*, 425 F. Supp. 3d at 969 (emphasis added); *see also S.Y. v. Naples Hotel Co.*, No. 2:20-CV-118FtM-29MRM, 2020 WL 4504976, at *2-3 (M.D. Fla. Aug. 5, 2020); *A.B.*, 2020 WL 1939678, at *13.

2.   <u>Salesforce knowingly benefitted from participating in the venture.</u>

Backpage was a Salesforce customer for years, beginning in 2013.  Dkt. 39 ¶¶ 31, 34, 38, 41-43.  Salesforce knew that it had these paying contracts with Backpage and was receiving a benefit through assisting Backpage in conducting its sex trafficking operation.  Salesforce had an ongoing interest in Backpage's continued success and growth—resulting in more business for Salesforce—and continued to profit from its relationship with Backpage for years.

Salesforce argues that Plaintiffs do not "allege that any profit was gained specifically *because* of alleged facilitation of Backpage's sex-trafficking ad business."  Dkt. 40 at 18.  This is not the proper standard.  *See M.A.*, 425 F. Supp. 3d at 964-65 (rejecting "knowing benefit" standard and collecting cases that "have not required such a specific definition of 'benefit'"); *H.H. v. G6 Hosp., LLC,* No. 2:19-CV-755, 2019 WL 6682152, at *2 (S.D. Ohio Dec. 6, 2019) ("The statutory language requires that Defendant knowingly benefit financially, not that the perpetrator compensate Defendant 'on account of' the sex trafficking.").  It is sufficient that Salesforce received a benefit through selling its services to Backpage; the benefit need not have been provided "because of" Salesforce's facilitation of sex trafficking.  *See M.A.*, 425 F. Supp. 3d at 964-65 (defendant benefitted by renting rooms to the trafficker; plaintiff was not required to show that the trafficker "provided any of those benefits to [Defendants] because of [Defendants'] facilitation of [the trafficker's] sexual misconduct"); *see also S.Y.*, 2020 WL 4504976, at *3 (same principle); *A.B.*, 2020 WL 1939678, at *15 (same principle).

Salesforce also argues that the "benefit" it received was simply the revenue from its sales,

but it received that same benefit from all of its customers. Dkt. 40 at 18. Backpage was not a legitimate customer—it was a sex trafficker, and Salesforce knew or should have known that Backpage was engaged in sex trafficking. The fact that Salesforce also received payments from legitimate customers does not absolve Salesforce from liability for entering into a partnership with a known sex trafficker. Salesforce "knowingly benefit[ted], financially," 18 U.S.C. § 1595(a), through contracting with Backpage to support its sex trafficking operation.

3. <u>Salesforce should have known that the venture violated Section 1591.</u>

Finally, Section 1595 requires that Salesforce "knew or should have known" that the venture "has engaged in an act in violation of [Section 1591]."

a. *The venture committed underlying violations of Section 1591.*

Plaintiffs are not required to show that *Salesforce* itself could be held liable for a *criminal* violation of Section 1591. *See infra* Part I.B. A plaintiff sufficiently establishes an underlying violation to support a claim under Section 1595 where the plaintiff alleges that she was a victim of sex trafficking under Section 1591. *See, e.g.*, *H.H.*, 2019 WL 6682152, at *2.

Here, G.G.'s trafficker and Backpage committed underlying violations of Section 1591 against G.G. Section 1591 can be violated in two ways. First, a direct perpetrator of sex trafficking, such as one who knowingly recruits or advertises a sex trafficking victim knowing that the person is a minor, is liable under Section 1591(a)(1). Second, a person who is not a direct perpetrator of sex trafficking can be held liable under Section 1591(a)(2) where that person knowingly benefits from "participation in a venture" that violates Section 1591(a)(1).

Plaintiffs adequately allege that underlying violations of Section 1591(a)(1) occurred. The trafficker abducted and transported G.G and advertised G.G. on Backpage so that adult men would pay to perform sex acts with her while she was only 13 to 14 years old. Dkt. 39 ¶¶ 44-45. Backpage advertised G.G. on its website, even though G.G. was a minor. *Id.* Backpage allowed G.G. to be

advertised for sex even though G.G.'s mother explicitly informed Backpage that G.G. was a minor who was being advertised for sex on Backpage's website. *Id.* Despite knowing that a minor was being trafficked through its website, Backpage refused to remove the advertisement for G.G. *Id.*

Backpage also violated Section 1591(a)(2) because it benefitted financially through facilitating the trafficker's actions by providing the tools to advertise G.G., a minor, for sale through Backpage's website—in fact, sex traffickers were the paying customers that Backpage sought out and made nearly all of its money from. *Id.* ¶¶ 26, 33, 35, 39-40, 43-45, 49. Plaintiffs sufficiently allege that G.G. was a victim of sex trafficking as a result of the violations of Section 1591 by her trafficker and by Backpage. Thus, a "qualifying 'predicate act'" occurred that constitutes an underlying violation for the purposes of Section 1595. *M.A.*, 425 F. Supp. 3d at 964.

> b. *Salesforce knew or should have known that the venture had engaged in violations of sex trafficking law.*

Plaintiffs have alleged facts sufficient to establish that Salesforce "should have known" that the venture involving Backpage was engaged in violations of sex trafficking law. The "knew or should have known" requirement in Section 1595(a) essentially imposes a negligence standard. *See Ricchio v. Bijal, Inc.*, 424 F. Supp. 3d 182, 193 (D. Mass. 2019); *see also M.A.*, 425 F. Supp. 3d at 965-66. Here, "Backpage, as early as 2008, had been publicly identified by law enforcement, [state] Attorneys General and every United States Governor as the biggest and most notorious sex trafficking and pimping website in the United States." Dkt. 39 ¶ 26. It was widespread knowledge that Backpage was a hub for the human trafficking of minors. *Id.* Thus, by the time Salesforce began doing business with Backpage in 2013, it had been widely reported news for years that Backpage was a notorious sex trafficker. *Id.* ¶¶ 26, 31, 33, 38. Further, Salesforce researched customers like Backpage to personalize its services. *Id.* ¶ 35. Backpage was also the subject of several law enforcement efforts, including the arrest of Backpage's CEO, while Salesforce was

working with Backpage. *Id.* ¶¶ 42-43. Under these facts, Salesforce either knew or should have known that Backpage had engaged in violations of sex trafficking law. *Id.* ¶¶ 34, 36, 46.

Salesforce, however, argues that *Section 1591* requires that the defendant have knowledge with respect to the specific victim—i.e., that Salesforce was specifically aware of G.G.'s trafficking. Dkt. 40 at 15-17. As explained below, Section 1595 does not require Plaintiffs to prove that Salesforce itself violated Section 1591, so any knowledge requirements applicable to Section 1591 are inapplicable here. *See infra* Part I.B; *see A.B.*, 2020 WL 1939678, at *10-16. Section 1595(a) requires only that Salesforce knew or should have known the venture was "engaged in an act in violation of this chapter." *See also M.A.*, 425 F. Supp. 3d at 968-69 (knowledge requirements from Section 1591 cannot be imported into Section 1595 without voiding the language in Section 1595). Nothing in Section 1595 suggests that a defendant must have knowledge as to the specific victim. *See Doe S.W. v. Lorain-Elyria Motel, Inc.*, No. 2:19-CV-1194, 2020 WL 1244192, at *5 (S.D. Ohio Mar. 16, 2020) (rejecting arguments that plaintiff was required to allege that defendant "knew of the Plaintiff's situation" because Section 1595 required allegations under a negligence standard); *M.A.*, 425 F. Supp. 3d at 971 ("Defendants need not have actual knowledge of the sex trafficking…otherwise the 'should have known' language in § 1595(a) would be meaningless."). If that were a requirement, companies that facilitate sex trafficking could immunize themselves from liability as long as they did not learn about the specific details of a particular victim's sex trafficking. Such a reading cannot be squared with the broad remedial intent behind the statute. *See M.A.*, 425 F. Supp. 3d at 969. Plaintiffs' complaint contains ample allegations that Salesforce's conduct satisfies every requirement of Section 1595.

### B.     *Plaintiffs are not required to establish that Salesforce would be criminally liable under Section 1591 in order to recover against Salesforce under Section 1595.*

Salesforce's motion relies heavily on the erroneous notion that Salesforce can only be held

liable civilly under Section 1595 if it would also be liable criminally under Section 1591.  *See, e.g.*, Dkt. 40 at 14-18.  Section 1595 provides that "[a]n individual who is a victim of a violation of this chapter may bring a civil action against the perpetrator (or whoever knowingly benefits…from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter)."  18 U.S.C. § 1595(a).  Section 1595 therefore requires only that the plaintiff be a *victim* of a criminal violation and that Salesforce have participated in a *venture* that it should have known has engaged in a violation of sex trafficking law.  And Section 230(e)(5) provides that claims under Section 1595 are exempt from Section 230's preemptive scope where the underlying "violation of this chapter" is a violation of Section 1591.  47 U.S.C. § 230(e)(5).  Thus, while it is necessary that an underlying violation of Section 1591 have occurred, Section 1595 does not require Plaintiffs to prove that Salesforce committed a violation of Section 1591.  *See M.A.*, 425 F. Supp. 3d at 964 (TVPA creates civil liability both for those who face criminal liability and those who do not).

Salesforce cites exclusively to decisions that appear to require the defendant have committed both a violation of Section 1595 and Section 1591.  Dkt. 40 at 16-18.  The plaintiffs in these cases seemingly alleged that the defendants violated Section 1591 without challenging whether such a showing was actually necessary to establish a claim under Section 1595.  Salesforce ignores that there are a number of cases that disagree with the analysis set forth in these cases.

The split of authority is discussed in detail in *A.B.*, 2020 WL 1939678, at *8-16.  There, the court rejected the reasoning set forth in Salesforce's cited cases that "essentially required the victim of sex trafficking seeking a civil remedy to first prove a criminal violation of section 1591(a)(2)."  *Id.* at *13.  The court explained that it "disagree[d] with the reasoning in *Noble*, adopted by the judge in the Red Roof cases, requiring a victim seeking a civil remedy under section

-11-

1595 must first prove the criminal offense. We do not read the language of section 1595 to impose such a burden nor do we interpret the Act as Congress intended such a restrictive reading of the remedial nature of section 1595." *Id.*; *see also id.* at *16 (distinguishing *Geiss*). The court emphasized that those cases relied on *United States v. Afyare*, 632 F. App'x 272 (6th Cir. 2016)— a case cited by Salesforce here—that was decided in the criminal context and therefore was inapplicable to civil liability under Section 1595. *A.B.*, 2020 WL 1939678, at *10-12, 15.

Relatedly, the court rejected Salesforce's argument that a claim for civil liability under Section 1595 depends on a finding of criminal scienter where the underlying violation is a violation of Section 1591. Dkt. 40 at 14. The court explicitly refused to apply the definition of "participation in a venture" in Section 1591, which requires a showing of criminal scienter, to civil claims under Section 1595. *A.B.*, 2020 WL 1939678, at *13-14. The court noted that Section 1595 contains a "should have known" standard—akin to a negligence standard—whereas Section 1591 imposes a "knowing" or "reckless disregard" standard. *Id.* at *7, 13. The court explained that imputing the state of mind requirement from Section 1591 to claims under Section 1595 would require the court to ignore the "should have known" language in Section 1595, and held it would not "ignore language Congress specifically included allowing a civil action against facilitators who should have known about a sex trafficking venture." *Id.* at *14. The court's reasoning built on several well-reasoned opinions rejecting the same argument. *Id.* at *8-14 (citing cases). Accordingly, Salesforce's lengthy discussion regarding whether it violated Section 1591 is irrelevant.

## II.     Section 230 Of The CDA Does Not Preempt Plaintiffs' Claims.

Salesforce argues that Plaintiffs' claims are preempted by Section 230 of the Communications Decency Act ("CDA"). Dkt. 40 at 6-14. Salesforce's arguments cannot be squared with the text of the CDA, its purpose, or the strong presumption against preemption.

### A. *Section 230 preempts only a narrow category of claims.*

There are three provisions of the CDA that are critical to the preemption analysis. First,

Section 230(c)(1) states:

> No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider.

47 U.S.C. § 230(c)(1).

Second, Section 230(e)(3) contains a savings clause and the preemption clause:

> Nothing in this section shall be construed to prevent any State from enforcing any State law that is consistent with this section. No cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section.

47 U.S.C. § 230(e)(3). By choosing to preempt only "inconsistent" state law, Congress made clear

that it intended to preempt only a subset of state law, not the entire field of state law generally.

Both clauses establish that any state law that is not inconsistent with Section 230 is not preempted.

Therefore, Congress deliberately chose a narrow preemptive scope for Section 230.

Third, Section 230(e)(5)—added in 2018 in the Allow States and Victims to Fight Online

Sex Trafficking Act (FOSTA) amendment—clarified that Section 230 has no effect on sex

trafficking law. Although the CDA did not intend to preempt state law civil sex-trafficking claims,

the FOSTA amendment reemphasized that intent in light of the large body of federal cases that

erroneously held the CDA barred many civil and criminal cases against internet companies.

FOSTA amended Section 230 by adding subsection (e)(5), entitled "No effect on sex

trafficking law." It states that nothing in Section 230 "shall be construed to impair or limit":

- Civil claims under the federal sex trafficking act, 18 U.S.C. § 1595, for facilitating sex trafficking if the underlying conduct violates 18 U.S.C. § 1591;

- Criminal prosecutions under state law for conduct that violates the federal sex trafficking statute, 18 U.S.C. § 1591; or

- Criminal prosecutions under the federal statute criminalizing the facilitation of online prostitution, 18 U.S.C. § 2421A.

47 U.S.C. § 230(e)(5).

Salesforce claims that it is a provider of an "interactive computer service" entitled to protection under Section 230(c)(1). Dkt. 40 at 7-8. Salesforce is not a provider of an "interactive computer service" and here does not qualify as an "access software provider." Salesforce is a technology company that sells, supports, and implements business tools to help businesses grow. Plaintiffs are not complaining of an information content provider's use of the interactive computer service, but are complaining of Salesforce assisting Backpage with its internal development, growth, and targeting of sex traffickers (and victims), and Salesforce providing Backpage with a credit card interface to build its infrastructure. Salesforce knowingly benefitted from helping a sex trafficking business grow. This is not protected conduct under Section 230 and does not require Salesforce to be treated as a publisher or speaker of any information. As explained below, even assuming that Salesforce is an interactive computer service provider, there are multiple independent reasons why Section 230 does not bar Plaintiffs' claims.

## B.    *Plaintiffs' claims are not inconsistent with the federal sex trafficking statute.*

Any analysis of Section 230's preemptive scope must consider the import of the 2018 FOSTA amendments in Section 230(e)(5). *See Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 520-21 (1992) (statute had different preemptive scope after amendment). The FOSTA amendment explicitly exempted claims under the federal sex trafficking statute, 18 U.S.C. § 1595, from Section 230's preemptive scope. 47 U.S.C. § 230(e)(5). And only state law "that is inconsistent" with Section 230 is preempted. 47 U.S.C. § 230(e)(3). Thus, state laws that are not inconsistent with the Section 230(e)(5) exemptions, such as the exemption for claims under Section 1595, are not preempted. Plaintiffs' state law negligence claims seek to hold Salesforce liable for knowingly

benefiting from the facilitation of sex trafficking.  Dkt. 39 ¶¶ 51-64.  These claims are fully consistent with the federal provision in Section 1595, which imposes liability for the same conduct. *See* 18 U.S.C. § 1595.  Because there is no inconsistency between Plaintiffs' state law claims and the Section 1595 claims that Congress protected against preemption in Section 230(e)(5), Plaintiffs' claims cannot be preempted. [3]

### C.    *FOSTA's language reinforces the lack of preemption.*

FOSTA's express language repeatedly confirms that Congress intended to remove *all* obstacles in the CDA to fighting human trafficking, including those that prevented victims from asserting civil claims under state law.  *First*, Congress clearly stated its purpose for amending Section 230 in FOSTA's enacting clause: to clarify that section 230 does not prohibit the enforcement of "Federal and *State* criminal and *civil* law relating to sexual exploitation of children or sex trafficking."  FOSTA, Pub. L. No. 115-164, 132 Stat. 1253, 1253 (2018) (emphasis added). A statutory preamble or statement of purpose is a valid means of supporting a narrow scope of preemption.  *See Medtronic, Inc. v. Lohr*, 518 U.S. 470, 474, 487, 490 (1996).

Section 2 of FOSTA further states the "sense of Congress" that Section 230 "was never intended to provide legal protection to…websites that facilitate traffickers in advertising the sale of unlawful sex acts with sex trafficking victims" and that "clarification of [Section 230] is warranted to ensure that [it] does not provide such protection to such websites."  Sec. 2, 132 Stat. at 1253.  Again, Congress did not distinguish between state or federal claims.

*Second*, state civil law is expressly included in the title of the FOSTA section amending

---

[3] A federal court in California recently addressed the interaction between sex trafficking claims and FOSTA, and concluded that the plaintiff's state civil law claims in that case were barred by Section 230.  *J.B.*, 2020 WL 4901196, at *3-7.  In that case, however, the court did not consider or rule on Plaintiffs' argument here that their state law claims are exempt from preemption because they are consistent with the exemption in FOSTA for federal claims under Section 1595.  Thus, in addition to being non-binding, that opinion does not resolve a central issue presented in this case.

Section 230 and is tied directly to the amendments.  As explained below, Salesforce argues that the language in FOSTA cannot create an exemption for civil state law claims because Congress considered and removed an exemption for state law claims that appeared in an earlier version of the bill that became FOSTA.  Dkt. 40 at 11; *see infra* at 17.  But when Congress changed the language of the proposed addition to Section 230 (Section 230(e)(5)) in the drafting process, it amended the title to FOSTA Section 4 to delete the reference to "Sexual Exploitation of Children," but *left in* the reference to "State…Civil Law":

> SEC. 4. ENSURING ABILITY TO ENFORCE FEDERAL AND STATE CRIMINAL AND CIVIL LAW RELATING TO SEX TRAFFICKING.

Sec. 4, 132 Stat. at 1254.  So it is clear that even after Congress removed the proposed exemption for "any…State law," Congress still recognized there would be *some* exemption for civil state law claims because it kept the reference to "State…Civil Law" in the title.  It is settled law that "statutory titles and section headings are tools available for the resolution of a doubt about the meaning of a statute."  *Fla. Dep't of Revenue v. Piccadilly Cafeterias, Inc.*, 554 U.S. 33, 47 (2008).

FOSTA also contains its own savings clause in Section 7 which makes clear that nothing in FOSTA preempts any claim that was not already preempted under Section 230.  Sec. 7, 132 Stat. at 1255.  Importantly, the language Congress used specifically refers to civil actions under state law and confirms that they are not preempted.  *Id.*

*Third*, FOSTA's legislative history reinforces the lack of preemption.  Courts must interpret the statutory text "against the backdrop of regulatory activity undertaken by state legislatures and [the] federal [government]."  *Cipollone*, 505 U.S. at 519.  In 1996, human trafficking was not a recognized legal concept.  By 2018, every state had enacted criminal laws prohibiting human trafficking and most had enacted civil remedies.  Congress also knew that websites had "become one of the primary channels of sex trafficking" and had been improperly

shielded by the CDA. FOSTA Committee Report, H.R. Rep. No. 115-572, at 3-4 (2018).

To support its position, Salesforce relies on the fact that, in the drafting process, Congress deleted an initial proposal that, *inter alia*, exempted state civil claims from preemption. Dkt. 40 at 11. But examining what was left on the cutting-room floor as an aid to interpret the text that was actually adopted is a disfavored means of discerning legislative intent. *See District of Columbia v. Heller*, 554 U.S. 570, 590 (2008) ("It is always perilous to derive the meaning of an adopted provision from another provision deleted in the drafting process."). And for good reason. Here, the proposal that was discarded would have gone beyond sex trafficking to cover *any* sexual exploitation of children. H.R. 1865, 115th Cong. § 3(a)(2)(C) (as introduced in House, Apr. 3, 2017). This would have been a sweeping change far broader than the sex trafficking exemptions that were ultimately added. As for the proposal's reference to state civil law claims, the CDA already preserved "any State or local law that is not inconsistent [with Section 230]," and the FOSTA amendment's title referenced "STATE CRIMINAL AND CIVIL LAW RELATING TO SEX TRAFFICKING." The fact that Congress failed to adopt H.R. 1865 has nothing to do with the intent to preserve consistent state law civil claims that was expressed in the legislation that was enacted.

### D. *Plaintiffs' state law claims do not treat Salesforce as a publisher or speaker.*

Claims that are not inconsistent with those found in Section 230(e)(5) are not preempted regardless of whether they treat an internet company as the publisher of third-party content. *See supra* Part II.B. As a result of FOSTA, the inquiry should end here. But even if that provision did not apply, Plaintiffs' claims would still not be preempted because they do not treat Salesforce as the publisher of third-party content under a proper construction of Section 230(c)(1).

The CDA does not define "publisher" or "speaker," so the words must be given their ordinary meaning by examining the context, legislative history, and judicial constructions of the words in other contexts. *See Yates v. United States*, 135 S. Ct. 1074, 1081-85 (2015). Properly

construed in light of the legislative history, this is the language of defamation law.  The context in which the words are used concerns liability for information provided online by third parties.

In this context, to treat an internet company as a "publisher or speaker" is to impose liability on it (1) for defamatory content provided by a third party (2) of which it had no knowledge (3) because it acted as a "Good Samaritan" by screening objectionable material.  Plaintiffs' claims do not allege or implicate defamation.  Plaintiffs' claims are not based on Salesforce's decision to publish or alter content; they are based on Salesforce knowingly benefitting from providing services to facilitate sex trafficking at the expense of trafficking victims.  Dkt. 39 ¶¶ 51-64.

Even if the protections afforded by Section 230(c)(1) are broader than Congress expressed, nothing indicates an intent to give the word "publisher" a broader meaning than it has in defamation law.  Section 230 does not convey a "clear and manifest purpose" by Congress to preempt anything other than defamation and similar claims for which publication is an essential element.  *Medtronic,* 518 U.S. at 485; *see Doe v. GTE Corp.*, 347 F.3d 655, 660 (7th Cir. 2003) ("Why should a law designed to eliminate [an internet company's] liability to the creators of offensive material end up defeating claims by the victims of tortious or criminal conduct?"); *see also City of Chi., Ill. v. StubHub!, Inc.*, 624 F.3d 363, 366 (7th Cir. 2010) (obscenity and copyright infringement might also be covered).  By expanding protections beyond defamation, courts extend a privilege to ignore laws that every other communications business must follow.

### E.    *Salesforce bears the heavy burden of establishing preemption.*

In determining whether federal law preempts state law, the "ultimate touchstone" of the analysis is Congressional intent.  *Cipollone*, 505 U.S. at 516.  Congressional intent is primarily discerned from the statutory language and framework.  *Medtronic*, 518 U.S. at 486.  There is a strong presumption against preemption, particularly in fields which the states have traditionally occupied.  *Id.* at 485.  Thus, the preemption analysis "start[s] with the assumption that the historic

-18-

police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947). The presumption against preemption also applies to "the *scope* of its intended invalidation of state law." *Medtronic*, 518 U.S. at 485. "[E]ven if its alternative were just as plausible as [Plaintiff's] reading of that text—[the Court] would nevertheless have a duty to accept the reading that disfavors pre-emption." *Bates v. Dow Agrosciences, LLC*, 544 U.S. 431, 449 (2005).

The CDA was enacted to protect minors from obscene materials on the internet. 110 Stat. at 137-39. It was adopted to overrule a case that imposed defamation liability on a website for attempting to screen obscene material from its system. 141 Cong. Rec. H8468-72. FOSTA made clear that Section 230 was never intended to protect websites that facilitate sex trafficking or to have any effect on claims designed to combat sex trafficking. *See supra* Part II.C.

Congress did not intend to prevent sex trafficking victims from pursuing non-defamation claims against internet companies whose services facilitated their victimization. To the extent this Court finds there is any ambiguity with respect to Congress's preemptive intent, the presumption against preemption requires this Court to favor a finding of "limited preemption" that counsels against a finding that any of Plaintiffs' claims are preempted here. *Barnes ex rel. Estate of Barnes v. Koppers, Inc.*, 534 F.3d 357, 363 (5th Cir. 2008).

F.    ***FOSTA's exemption of claims does not violate the Ex Post Facto clause.***

FOSTA added Section 230(e)(5)(A) stating that Section 230 will not impair or limit certain claims, including civil claims under Section 1595 where the underlying conduct is a violation of Section 1591. Salesforce is wrong in arguing that the retroactive exemption of civil Section 1595 claims from preemption under Section 230 violates the Ex Post Facto Clause. Dkt. 40 at 11-14. The Ex Post Facto Clause is usually applied in criminal cases, and the Supreme Court has stated that "[b]ecause we 'ordinarily defer to the legislature's stated intent,' 'only the clearest proof' will

suffice to override legislative intent and transform what has been denominated a civil remedy into a criminal penalty." *Smith v. Doe*, 538 U.S. 84, 92 (2003).

First, federal law has criminalized sex trafficking conduct since the original passage of the TVPA in 2000. *See Ricchio*, 424 F. Supp. 3d at 193. The TVPRA as enacted in 2008 amended Section 1595 "to allow a victim to bring a civil action against 'whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation' of the act." *Id.* Thus, the underlying conduct at issue here was illegal under federal criminal law long before the 2018 passage of FOSTA, and was not retroactively made criminal. FOSTA ensured that certain civil claims brought against a particular subset of defendants—based on conduct that the law in Section 1595 had prohibited for ten years—were not erroneously barred by Section 230.

Second, Salesforce suggests that the DOJ stated that the exemptions to Section 230 in FOSTA would be "unconstitutional." Dkt. 40 at 13-14. The DOJ was not taking the extraordinary position that the retroactive *civil* provisions of FOSTA violated the Ex Post Facto clause. A fair reading of the DOJ's statement indicates that the statement refers to the *criminal* provisions of FOSTA. That position is confirmed by a subsequent letter from the DOJ on this topic in which the DOJ restated its constitutional concerns and proposed a solution: "State prosecutors can avoid this constitutional infirmity by pursuing only newly prosecutable criminal conduct that takes place after the bill is enacted." *See* Letter from Department of Justice at 1, *Woodhull Freedom Found. v. United States*, 334 F. Supp. 3d 185 (D.D.C. 2018) (No. 18-cv-01552), ECF No. 15-1. Moreover, the Congressional Research Service determined that the civil provisions of FOSTA did not violate the Ex Post Facto clause. Cong. Rsch. Serv., *Ex Post Facto Implications of the Allow States and Victims to Fight Online Sex Trafficking Act of 2017 (H.R. 1865)* 15 (Mar. 7, 2018).

Third, Salesforce's argument erroneously assumes that Plaintiffs can recover under Section 1595 "only if Plaintiffs can establish…a criminal violation [under Section 1591] by Salesforce." Dkt. 40 at 12-13. As explained above, while G.G. must have been the victim of an underlying violation of Section 1591, Section 1595 does not require that Salesforce have committed a violation of Section 1591. *See supra* Part I.B. Similarly, Salesforce is incorrect that Section 1595 "necessarily depends on a finding of criminal scienter" where the underlying violation is a violation of Section 1591. Dkt. 40 at 14. Section 1595(a) imposes a "should have known" standard, not a standard of criminal scienter. *See supra* at 9-10, 12.

## III. Plaintiffs Have Adequately Alleged Negligence Under Illinois Law.

### A. *Salesforce owes a duty to exercise ordinary care, and a duty not to assist Backpage in performing criminal acts.*

Salesforce argues that it "had no legal duty to prevent the criminal acts that injured G.G" in the absence of a special relationship between the parties. Dkt. 40 at 20-21. Plaintiffs, however, are not alleging that Salesforce had a duty to intervene to prevent criminal conduct, but that Salesforce had a duty not to facilitate a sex trafficking operation. *See, e.g.*, Dkt. 39 ¶¶ 52-54. In other words, Plaintiffs are alleging that Salesforce had a duty to exercise ordinary care in the operation of its own business, including by not doing business with known sex traffickers like Backpage. *See Forsythe v. Clark USA, Inc.*, 864 N.E.2d 227, 238 (Ill. 2007) ("[I]t is 'axiomatic that every person owes to all others a duty to exercise ordinary care to guard against injury which naturally flows as a reasonably probable and foreseeable consequence of his act.'").

Further, Salesforce had a duty not to assist Backpage in performing criminal acts. *Vesely v. Armslist LLC*, 762 F.3d 661, 666 (7th Cir. 2014). The court in *Vesely* explained that "[o]ne certainly has a duty to refrain from 'affirmative conduct' that creates a risk of harm to others…. And '[i]f a plaintiff can demonstrate that the defendant did not merely fail to act, but also assisted

-21-

the third party, then the requirement of a special relationship no longer applies.'" 762 F.3d at 666 (quoting *Simmons v. Homatas*, 925 N.E.2d 1089, 1100 (Ill. 2010)); *see also Simmons*, 925 N.E.2d at 1110 ("Although one does not have a duty to prevent the criminal acts of a third party, one does have a duty to refrain from assisting and encouraging such tortious conduct.").

Salesforce argues that, like in *Vesely*, it did not provide the level of assistance necessary to create a duty. Dkt. 40 at 21-22. But in *Vesely*, the defendant provided a website through which persons could sell guns, and a third party purchased a gun that was used to murder the plaintiff's sister. 762 F.3d at 663-64. Some users could circumvent existing guns laws that prohibited the sale of a firearm to a resident of another state or country. *Id.* at 663-66. There, the sale of the gun was illegal because the seller and purchaser were not residents of the same state. *Id.* at 663-64.

These facts are not comparable to the facts here. The website in *Vesely* merely allowed the posting of guns for sale, which was not illegal as a general matter. The conduct became illegal only because the purchaser and user did not reside in the same state. Here, the action that Salesforce was facilitating—sex trafficking—was always illegal, and Salesforce knew that Backpage was a sex trafficker. Dkt. 39 ¶¶ 26, 34, 36, 42-43, 45. And Salesforce provided assistance to Backpage's sex trafficking operation that was tailored to Backpage's needs—i.e., the operation and expansion of its sex trafficking business. *Id.* ¶¶ 5, 35. Salesforce did not merely provide a platform through which illegal conduct could theoretically occur like in *Vesely*. Salesforce knowingly assisted Backpage's illegal conduct and owed a duty not to knowingly assist Backpage in conducting the criminal sex trafficking enterprise through which G.G. was injured.

Finally, Salesforce argues that "there is no duty to control the distribution of a non-defective product to the general public" and "no duty to monitor the downstream use of its software." Dkt. 40 at 20. But Plaintiffs are alleging that Salesforce had a duty to control its *own*

conduct by not actively supporting and facilitating Backpage's sex trafficking operation. This is not comparable to cases where a defendant sells a handgun to an unrelated third party who later uses it to harm the plaintiff. *See Vesely*, 762 F.3d at 663-66; *Riordan v. Int'l Armament Corp.*, 477 N.E.2d 1293, 1295 (Ill. App. Ct. 1985); *Linton v. Smith & Wesson, a Div. of Bangor Punta Corp.*, 469 N.E.2d 339, 340 (Ill. App. Ct. 1984). Salesforce was *itself* engaged for years in the misuse of its own products to grow Backpage's sex trafficking business. Dkt. 39 ¶¶ 3-4, 31, 33-43, 49.

### B. *Salesforce caused harm to Plaintiffs.*

A negligence claim requires a showing that the defendant's breach proximately caused the plaintiff's injury. *Forsythe*, 864 N.E.2d at 232. Proximate cause "has two components: cause in fact and legal cause." *Stanphill v. Ortberg*, 129 N.E.3d 1167, 1176 (Ill. 2018). Notably, proximate cause generally "is a factual question for the jury to decide." *Id.* Plaintiffs have sufficiently alleged that Salesforce's actions were a proximate cause of injury to G.G.

First, Salesforce's conduct was a cause in fact of G.G.'s harm. Contrary to Salesforce's suggestions, Dkt. 40 at 23, Salesforce's technology was essential in enabling Backpage to operate and function as a hub for human trafficking. Dkt. 39 ¶¶ 3, 36. Salesforce ensured that Backpage could continue operating by moving its operations overseas to escape law enforcement scrutiny. *Id.* ¶¶ 31, 36, 49. Further, Salesforce's tailored tools and dedicated support are what allowed Backpage to solicit traffickers and victims and to accept traffickers' payments. *Id.* ¶¶ 3-4, 21, 41, 35-39, 40-41, 49. G.G.'s trafficking was made possible because of advertisements on Backpage that were facilitated by Salesforce providing its services and support to Backpage. *Id.* ¶¶ 3, 19, 21, 31-38, 41, 45. Salesforce's supporting and expanding Backpage caused the sex trafficking of children like G.G and caused significant injury to G.G. *Id.* ¶¶ 3, 19, 36, 43, 45, 56-57, 63-65.

Salesforce argues that it did not have any direct role in abducting G.G. or creating the advertisement through which G.G. was trafficked. Dkt. 40 at 22. Salesforce is not absolved from

liability for negligence merely because other actors also had a significant role in injuring G.G. The law requires only that Salesforce's conduct was a *substantial factor* in bringing about G.G.'s injury, not that it was the only cause. *Id.*; *Stanphill*, 129 N.E.3d at 1176.

Second, Plaintiffs have adequately alleged legal cause because the injury to G.G. was "reasonably foreseeable." *Stanphill*, 129 N.E.3d at 1176. At the time Salesforce began doing business with Backpage, it had been widely reported news for years that Backpage was a hub for human trafficking. *See supra* Part I.A.3.b. Although Salesforce knew or learned that Backpage was engaged in trafficking, it chose to profit from doing business with Backpage, and provided technology and support that facilitated Backpage's sex trafficking business. *Id.* ¶¶ 3-5, 21, 34-41, 43, 46, 49. Salesforce could anticipate that a known sex trafficker would use Salesforce's services to conduct sex trafficking when nearly all of Backpage's business involved sex trafficking. *See* Dkt. 39 ¶¶ 26, 43. It was foreseeable that Salesforce's services allowing Backpage to operate its sex trafficking operation would injure victims like G.G.

Salesforce suggests that its actions cannot be the legal cause of G.G.'s injury because there were "independent intervening criminal acts" performed by G.G.'s trafficker. Dkt. 40 at 23-24. While the intervening criminal act of a third party can relieve a negligent party of liability in an appropriate case, "[t]here is an exception where the defendant's acts or omissions create a condition conducive to a foreseeable intervening criminal act. If the criminal act is reasonably foreseeable at the time of the negligence, the causal chain is not necessarily broken by the intervention of such an act." *Rowe v. State Bank of Lombard*, 531 N.E.2d 1358, 1368 (Ill. 1988). This exception applies squarely here. Given that Backpage was a well-known sex trafficking operation that had victimized many minors in the past, it was foreseeable that criminal acts would occur through Backpage. *See, e.g.*, Dkt. 39 ¶¶ 26, 33; *see also Ray v. Cock Robin, Inc.*, 310 N.E.2d

-24-

9, 11-12 (Ill. 1974). By assisting Backpage in operating and expanding its sex trafficking operation, Salesforce "create[d] a condition conducive to a foreseeable intervening criminal act." *Rowe*, 531 N.E.2d at 1368. The law does not permit Salesforce to escape liability merely because its efforts to facilitate criminal activity through Backpage worked.

Salesforce also argues that Plaintiffs' theory of liability would effectively create liability for any business, including computer manufacturers or cellphone service providers. Dkt. 40 at 24. Salesforce is wrong in arguing that it only sold "off-the-shelf software to an affiliate of Backpage." Dkt. 40 at 23. Salesforce provided tailored solutions to respond to the needs of Backpage's business, even though it knew that business was sex trafficking. *See supra* at 1-2. This conduct cannot be compared to a vendor who sells a computer out of the box without knowledge of the customer's business. Salesforce's cited cases do not control on these facts. *See, e.g.*, *Crosby v. Twitter, Inc.*, 921 F.3d 617, 619, 625-26 (6th Cir. 2019) (no allegation of any direct connection or material support between social media companies and wrongdoer to support proximate cause under Anti-Terrorism Act); *Fields v. Twitter, Inc.*, 881 F.3d 739, 744-50 (9th Cir. 2018) (no allegations connecting wrongdoer to defendant to show causation under Anti-Terrorism Act, which required showing under "direct relationship" test rather than "substantial factor" and foreseeability tests); *Doe*, 347 F.3d at 659 (no allegations that defendant had reason to know customer had no legitimate use for service or that service provided was specialized to unlawful activities). Salesforce cannot claim that it was ignorant of Backpage's activities or had no reason to foresee that injury to sex trafficking victims like G.G. would result.

## PRAYER

Plaintiffs request that Salesforce's motion to dismiss be denied. In the alternative, Plaintiffs request the opportunity to file an amended complaint.

Respectfully submitted,

   /s/  *Kenneth T. Fibich*
Kenneth T. Fibich (Pro Hac Vice)
(TX Bar No. 06952600)
Sara J. Fendia  (Pro Hac Vice)
(TX Bar No. 06898800)
FIBICH, LEEBRON, COPELAND, BRIGGS
1150 Bissonnet Street
Houston, Texas 77005
Telephone:  (713) 751-0025
Facsimile:   (713) 751-0030
tfibich@fibichlaw.com
sfendia@fibichlaw.com

Peter J. Flowers (IL # 06210847)
MEYERS AND FLOWERS, LLC
3 North Second Street, Suite 300 St.
Charles, Illinois  60174
Telephone:  (630) 232-6333
Facsimile:   (630) 845-8982
pjf@meyers-flowers.com

Warren W. Harris (Pro Hac Vice)
(TX Bar No. 09108080)
BRACEWELL LLP
711 Louisiana Street, Suite 2300
Houston, Texas 77002
Telephone:  (713) 221-2300
Facsimile:   (800) 404-3970
warren.harris@bracewell.com

Attorneys for Plaintiffs

## CERTIFICATE OF SERVICE

I certify that a copy of Plaintiffs' Response to Defendant Salesforce.com, Inc.'s Motion to Dismiss Second Amended Complaint was served on the following by eFile on the 31st day of August 2020.

Patricia Brown Holmes
pholmes@rshc-law.com
Lucas T. Rael
lrael@rshc-law.com
RILEY SAFER HOLMES & CANCILLA LLP
70 W. Madision St., Suite 2900
Chicago, Illinois 60602
Telephone: (312) 472-8700
Facsimile: (312) 471-8701

Bradley J. Hamburger
bhamburger@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, California 90071-3197
Telephone: (213) 229-7658
Facsimile: (213) 229-6658

Kristin A. Linsley
klinsley@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
555 Mission Street
San Francisco, California 94105-0921
Telephone: (415) 393-8395
Facsimile: (415) 374-8471

Veronica S. Lewis
vlewis@gibsondunn.com
Andrew LeGrand
alegrand@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Avenue, Suite 2100
Dallas, Texas 75201
Telephone: (214) 698-3100
Facsimile: (214) 571-2900

Attorneys for Defendant


*/s/ Warren W. Harris*
Warren W. Harris