**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| G.G. (a minor), et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | No. 20-cv-02335 |
| v. | ) | |
| | ) | Judge Andrea R. Wood |
| SALESFORCE.COM, INC., | ) | |
| | ) | |
| Defendants. | ) | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

When G.G. was thirteen years old, she ran away from home and fell into the hands of a

sex trafficker. The trafficker posted advertisements for sex with G.G. on the classified ad website

run by Backpage.com ("Backpage").[1] As alleged in the complaint, Backpage did not just allow

but encouraged these types of illegal ads, to the point of becoming a dominant force in online sex

trafficking. Beginning in 2013, Backpage contracted with Defendant Salesforce.com, Inc.

("Salesforce") to provide it with customer relationship management ("CRM") business software

and support. That relationship allegedly helped grow Backpage's operations, including promoting

the business of sex traffickers. G.G. and her mother, Deanna Rose, (together, "Plaintiffs") have

now sued Salesforce pursuant to 18 U.S.C. § 1595, alleging that, through its contracts with

Backpage, Salesforce violated the federal anti-trafficking laws by knowingly benefiting from and

participating in a venture that it knew, or should have known, was engaged in illegal sex

trafficking. Salesforce has filed a motion to dismiss the complaint in its entirety pursuant to

---

[1] The Third Amended Complaint, which is the operative complaint, includes Backpage as a defendant. Before Backpage answered the Third Amended Complaint, however, the Court granted Plaintiffs' motion voluntarily to dismiss Backpage from this suit. (Dkt. No. 101.)

Federal Rule of Civil Procedure 12(b)(6). (Dkt. No. 63.) For the reasons given below, the Court grants the motion.

## BACKGROUND

For purposes of Salesforce's motion to dismiss, the Court accepts as true all well-pleaded facts in the Third Amended Complaint ("TAC") and views those facts in the light most favorable to Plaintiffs as the non-moving parties. *Killingsworth v. HSBC Bank Nev., N.A.*, 507 F.3d 614, 618 (7th Cir. 2007). The TAC alleges as follows.

Backpage was established in 2004 as an online marketplace for various goods and services. (TAC ¶ 16, Dkt. No. 62.) Among other things, Backpage allowed classified ads for sex. (*Id.*) In 2008, Backpage's primary competitor, Craigslist, made it harder for users to post ads for sex on its platform. Capitalizing on the displaced ad volume, Backpage entered into a period of explosive growth, soon becoming the most popular online classified site for adult advertisements and deriving the vast majority (up to 99%) of its revenue from such ads. (*Id.* ¶¶ 16, 23–24.)

Salesforce is the world's top CRM platform, selling software to help companies manage their relationships with customers, improve profitability, and streamline processes. (*Id.* ¶¶ 29–30.) Specifically, Salesforce sells "software as a service" ("SaaS") technology consisting of a set of applications that, among other things, can help businesses manage sales and marketing functions, assist with customer service and support, provide customer data integration and support, permit both internal communications and communications with customers, offer business intelligence analytics, and process other forms of data. (*Id.* ¶ 31.) The Salesforce platform also has a "customer org"—that is, a portal that serves as a point of interaction between Salesforce and its customers. (*Id.* ¶ 32.) The customer org is confidential to each Salesforce customer and consists of

that customer's users, data, and automation. (*Id.*) Additionally, to help its customers achieve their business goals, Salesforce also provides personalized support. (*Id.* ¶ 33.)

As Backpage grew, it required more support and better CRM tools and capabilities to keep up with customer demand and scale its platform. (*Id.* ¶ 35.) To meet this need, Backpage contracted with Salesforce in 2013. (*Id.* ¶ 37.) As set forth in the Master Service Agreements between Salesforce and Backpage, Salesforce retained the right to delete or restrict access to Backpage's customer org if Backpage's actions or content was tortious. (*Id.* ¶ 47.) During their negotiations in November 2013, Backpage's Chief Executive Officer ("CEO") Carl Ferrer and another high-level executive met with a certified Salesforce Consulting Partner to assess Backpage's needs and goals as a business and to determine how Salesforce could help. (*Id.* ¶ 53.) An in-house Salesforce account executive continued those conversations, which eventually culminated in a deal between the companies. (*Id.* ¶ 54.) Over the next five years, Salesforce sold Backpage access to several products, including the premium "Enterprise Edition" of its CRM software. (*Id.*) An in-house Salesforce executive recommended the Enterprise Edition, which is described as "fully customizable." (*Id.* ¶ 45.) And, in 2015, Salesforce provided the technological infrastructure for Backpage to move its business overseas, allegedly to help it evade law enforcement scrutiny in the United States. (*Id.* ¶ 46.) Overall, Backpage purchased a new application, requested support, or renewed a contract with Salesforce on at least five occasions. (*Id.* ¶ 48.) Each of those times, Backpage consulted with Salesforce about how best to assess and meet its operational needs. (*Id.*)

Using the sophisticated CRM tools, as well as platform support, provided by Salesforce, Backpage was able to scale its operations and expand its business. (*Id.* ¶¶ 39–42.) The nature of those operations—and Salesforce's knowledge of them—are at the center of the present lawsuit.

Plaintiffs allege that Backpage was primarily (or even solely) a sex-trafficking business. As early as 2008, Backpage had been publicly identified by law enforcement and state and federal officials as being associated with sex trafficking. (*Id.* ¶ 18.) And over the next decade, Backpage faced calls to remove its adult services section by, among others, a group of state attorneys general. Backpage refused, resisting efforts to shut down its site on First Amendment grounds. (*Id.* ¶ 21.) Yet, even in the midst of persistent controversy and allegations regarding sex trafficking on Backpage, Salesforce continued to provide software and support to Backpage throughout this period. (*Id.* ¶ 50.)

Eventually, Backpage and its corporate leadership faced federal criminal charges. (*Id.* ¶¶ 25–26.) Backpage's CEO pleaded guilty to charges that he conspired to facilitate prostitution using a facility in interstate or foreign commerce and engaged in money laundering, while the corporation pleaded guilty to conspiring to engage in money laundering. (*Id.* ¶¶ 25 n.17, 26 n.18; *see also* Plea Agreement, *United States v. Ferrer*, No. 2:18-cr-00464-DJH (D. Ariz. Apr. 5, 2018); Plea Agreement, *United States v. Backpage*, No. 2:18-cr-00465-DJH (D. Ariz. Apr. 5, 2018.) As part of its plea agreement with the government, Backpage admitted to having operated as a site for the sale of illegal sex and to receiving benefits from the sex trafficking of minors. (*Id.* ¶¶ 26–27.)

G.G. was one of those sex-trafficking victims. In 2016, when she was thirteen years old, G.G. ran away from home and was soon picked up by her trafficker. (*Id.* ¶¶ 74, 76.) While searching for her daughter, Rose found an ad featuring G.G. on Backpage's Escort Page. (*Id.*) Rose notified Backpage that G.G., a child, was being advertised for sex on their website and requested that the ads be taken down. (*Id.*) Backpage, however, did not remove the ads and instead merely referred Rose to the National Center for Missing and Exploited Children. (*Id.*)

Although G.G. is no longer under the control of her trafficker, she suffered significant physical and emotional injuries as a result of her tragic ordeal and still suffers from the effects of being trafficked at such a young age. (*Id.* ¶ 79.)

## DISCUSSION

To survive a Rule 12(b)(6) motion, a complaint must contain sufficient factual allegations to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). In evaluating a motion to dismiss, the Court accepts as true all well-pleaded facts and draws all reasonable inferences from those facts in the plaintiff's favor. *Bell v. City of Country Club Hills*, 841 F.3d 713, 716 (7th Cir. 2016). While a complaint need not contain detailed factual allegations, there "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 545. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft*, 556 U.S. at 678.

Federal law provides for both criminal sanctions against sex traffickers and civil remedies for victims of sex trafficking. Relevant to this case, 18 U.S.C. § 1591 creates both primary and secondary liability for the sex trafficking of minors, and 18 U.S.C. § 1595 allows any victim of such trafficking to sue for damages. Specifically, § 1595 allows victims of sex trafficking violations under § 1591 to "bring a civil action against the perpetrator (or whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of [§ 1591]." 18 U.S.C. § 1595(a). Beyond the requirement that there be an underlying violation of § 1591, a plaintiff seeking to impose liability under § 1595 must establish that the defendant (1) knowingly benefited

5

from (2) participating in a venture that (3) the person knew or should have known violated § 1591. *See M.A. v. Wyndham Hotels & Resorts, Inc.*, 425 F. Supp. 3d 959, 969 (S.D. Oh. 2019).

Here, Plaintiffs seek to hold Salesforce liable under § 1591 for the trafficking of G.G. by her trafficker as facilitated by Backpage. Specifically, Plaintiffs allege that a sex trafficker used ads on Backpage to traffic G.G., a minor, in violation of § 1591. Plaintiffs further allege that Backpage facilitated and assisted the use of its site by sex traffickers such as the one who trafficked G,G., and that Salesforce, in turn, helped Backpage expand its business with those sex traffickers. Salesforce asks this Court to dismiss Plaintiffs' complaint against it for two reasons: first, Salesforce contends that Plaintiffs' claims are barred by the affirmative defense to liability under § 1595 provided by § 230 of the Communications Decency Act ("CDA"), 47 U.S.C. § 230; and second, Salesforce argues that Plaintiffs have failed to state an actionable claim under 18 U.S.C. § 1595. As the defense under § 230, if applicable, is determinative and would warrant dismissal with prejudice, the Court begins its analysis there.

## I.     Section 230

Section 230 acts as a bar against liability for certain types of claims against certain defendants—specifically, it provides that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1). Thus, so long as a defendant can establish that it is (1) a provider or user of an interactive computer service and (2) the claims against it seek to treat it as a publisher of a third party's content, § 230 will bar those claims. *See Chi. Lawyers' Comm. for Civ. Rights Under Law, Inc. v. Craigslist, Inc.*, 519 F.3d 666, 671 (7th Cir. 2008) (explaining that "[w]hat § 230(c)(1) says is that an online information system must not 'be treated as the publisher or speaker of any information provided by' someone else" for purposes of establishing liability).

Specifically in the context of sex trafficking claims, including under § 1595, courts have found that § 230 precludes liability where the allegations are predicated on the posting of user content—that is, the advertisements trafficking the plaintiffs. *See, e.g.*, *M.A. ex rel. P.K. v. Vill. Voice Media Hldgs, LLC*, 809 F. Supp. 2d. 1041, 1052, 1056 (holding that § 230 barred claims against Backpage because there was "no allegation that Backpage was responsible for the development of any portion of the **content** of the [sex trafficker's] posted ads or specifically encouraged the development of the offensive nature of that content."). Section 230's protection against such claims, however, is not absolute—as relevant here, Congress amended § 230 through the Allow States and Victims to Fight Online Sex Trafficking Act ("FOSTA") to explicitly exempt certain kinds of sex trafficking claims. FOSTA, Pub. L. No. 115-164, 132 Stat. 1253 (2018). As a result, § 230(e)(5)(A) now clarifies that "nothing in this section . . . shall be construed to impair or limit any claim in a civil action brought under [§ 1595], if the conduct underlying the claim constitutes a violation of [§ 1591]."

Section 230 functions as an affirmative defense. *See, Doe v. GTE Corp.*, 347 F.3d 655, 657 (7th Cir. 2003); *Bonilla v. Ancestry.com Operations, Inc.*, No. 20-C-07390, 2021 WL 5795306, at *4 (N.D. Ill. 2021). Typically, the existence of a potential affirmative defense does not "render the claim for relief invalid," and "courts should usually refrain from granting Rule 12(b)(6) motions" on that basis. *Brownmark Films, LLC v. Comedy Partners*, 682 F.3d 687, 690 (7th Cir. 2012). However, "[a]n exception applies when the allegations of the complaint set forth everything necessary to satisfy the affirmative defense." *Hyson USA, Inc. v. Hyson 2U, Ltd.*, 821 F.3d 935, 939 (7th Cir. 2016) (internal quotation marks omitted). And courts often address the question of § 230's applicability on a motion to dismiss. *See, e.g.*, *Marshall's Locksmith Serv. Inc. v. Google, LLC*, 925 F.3d 1263, 1267 (D.C. Cir. 2019) (affirming dismissal of a complaint on

§ 230 grounds and citing cases in which courts had acted similarly). As the D.C. Circuit explained in *Marshall's Locksmith Service, Inc.*, invocation of § 230 immunity in a Rule 12(b)(6) motion is "[c]onsistent with Congress' intent to confer broad immunity for the re-publication of third-party content." *Id.*; *see also Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 254 (4th Cir. 2009) ("Section 230 immunity, like other forms of immunity, is generally accorded effect at the first logical point in the litigation process."). Still, for a defendant to raise the defense at the motion to dismiss stage successfully, "plaintiff[s] must affirmatively plead [themselves] out of court." *Hyson USA*, 821 F.3d at 939 (internal quotation marks omitted). Salesforce contends that Plaintiffs here have done just that, arguing that the allegations of the TAC unambiguously establish that § 230 precludes Plaintiffs' claims against it and that no exception to § 230's protections apply.

## A.     Salesforce as an Interactive Computer Service

First, Salesforce asserts that it qualifies for § 230's protections because it is a provider of an "interactive computer service." Section 230 defines "interactive computer service" as "any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server, including specifically a service or system that provides access to the Internet." 47 U.S.C. § 230(f)(2). Salesforce argues that it falls under the definition of "access software provider," which is defined as "a provider of software (including client or server software) or enabling tools which do any one or more of the following: (a) filter, screen, allow, or disallow content; (b) pick, choose, analyze, or digest content; or (c) transmit, receive, display, forward, cache, search, subset, organize, reorganize, or translate content." 47 U.S.C. § 230(f)(4).

Indeed, applying the plain language of the statutory definition to the allegations in the TAC, Salesforce plainly qualifies as an "interactive computer service." At oral argument on this

motion, Plaintiffs conceded that Salesforce is a software company, and the complaint alleges that "Backpage paid the money that it earned from trafficking to Salesforce in exchange for the Salesforce technology and support necessary for Backpage to operate and expand its business." (TAC ¶ 77.) Looking further into details of the complaint, the support Salesforce provided Backpage involved the provision of technological capabilities—specifically, software that allowed Backpage employees to analyze and digest customer data as well as applications providing for the transmission of both internal employee communications and external customer outreach and support.[2] Plaintiffs' claims can best be summarized thusly: "Salesforce provided support to Backpage in the use of [Salesforce's sophisticated software and related] technologies and had knowledge of the manner in which Backpage operated with these enhanced capabilities."

---

[2] The following allegations are representative of how Plaintiffs' claims against Salesforce are predicated upon capabilities provided by Salesforce's software. Plaintiffs allege that Salesforce acted:

> By "[p]roviding, assisting, supporting, and facilitating Backpage with capabilities and support for direct marketing campaigns, coupled with information gathering such as tracking clicks and tracking internet activity of the sex traffickers." (TAC ¶ 87(c).)

> By "[p]roviding, assisting, supporting, and facilitating more personalized outreach with automation using 'dynamic content' and automated messaging to target traffickers and sex buyers." (*Id.* ¶ 87(d).)

> By "[p]roviding, assisting, supporting, and facilitating account planning including customer follow up, account reminders, modification of marketing and sales plans, and cross-function customer service capabilities to improve outreach and services to traffickers." (*Id.* ¶ 87(h).)

> By "[p]roviding, assisting, supporting, and facilitating a custom Application Programming Interface (API) for use by Backpage employees, which is a software intermediary that allows two applications to talk to each other. This capability was for use by Backpage and did not enable computer access by the public or non-Backpage personnel." (*Id.* ¶ 87(i).)

> By "[p]roviding, assisting, supporting, and facilitating efficiency enhanced with automation, such as cutting the time it takes to email and nurture leads, scoring leads using customer parameters set by the customer using artificial intelligence (AI) and handling customer questions using automation such as chatbots." (*Id.* ¶ 87(o).)

What all these allegations have in common is that they describe capabilities provided by Salesforce's software and utilized by Backpage rather than actions taken by Salesforce itself.

(TAC ¶ 87(b).) Put differently, Salesforce, through its software, provided multiple users access to a set of enabling tools that allow those users to analyze, organize, arrange, transmit, and display content provided by a third-party (here, Backpage). This description, which aligns with the statutory definition, unambiguously establishes that Salesforce is an "interactive computer service."

Nonetheless, Plaintiffs argue that Salesforce has not established that it is an interactive computer service because it was not involved in the management of content posted to Backpage. Instead, Plaintiffs contend, Salesforce only managed relationships between Backpage and its customers—most of whom, Plaintiffs maintain, were sex traffickers. But managing those relationships did require Salesforce to analyze content—content provided *by Backpage* about its customers. (*See, e.g.*, TAC ¶ 87(f) (alleging that Salesforce "provid[ed], assist[ed], support[ed], and facilitat[ed] surveillance and analysis of customer and user activity with regard to access to ads").)

To avoid this result, Plaintiffs ask the Court to read an additional requirement into the statutory definition of interactive service provider. Specifically, Plaintiffs appear to take the position that § 230 only covers providers who host publicly accessible platforms. Salesforce's applications, of course, were only available internally to Backpage employees. But nothing in either the statutory text or case law supports this view. It is true, as Plaintiffs note, that § 230 most commonly has been applied to bar liability for defendants who host public platforms. *See, e.g.*, *Bennett v. Google, LLC*, 882 F.3d 1163, 1167–68 (D.C. Cir. 2018) (applying § 230 to bar claims against a public internet search engine); *Klayman v. Zuckerberg*, 753 F.3d 1354, 1356–58 (D.C. Cir. 2014) (applying § 230 to bar claims against a social networking website). But the mere fact that the defendants that have successfully involved § 230 to avoid liability have been publicly

accessible does not mean that such accessibility is a statutory requirement. *See, e.g.*, *Fields v. Twitter, Inc.*, 217 F. Supp. 3d 1116, 1128 (N.D. Cal. 2016) ("[A] number of courts have applied the CDA to bar claims predicated on a defendant's transmission of nonpublic messages, and have done so without questioning whether the CDA applies in such circumstances." (citing cases)), *aff'd on other grounds*, 881 F.3d 739 (9th Cir. 2018)).

  *Zango v. Kaspersky Lab, Inc.*, 568 F.3d 1169 (9th Cir. 2009), to which both Plaintiffs and Salesforce cite, is instructive. In *Zango*, the plaintiff "propose[d] a gloss on 'interactive computer service' that would construe a computer service as 'interactive' only if it enables people to access the Internet or access content found on the Internet." *Id.* at 1175. Based on that construction, the defendant, which distributed malware software, would not fall under § 230's definition. *Id.* at 1172. The Ninth Circuit, however, "decline[d] to read the statute so narrowly," explaining that, "[a]s written, § 230 does not limit the definition of 'interactive computer service' to services that provide access to the Internet; rather, its singular requirement is for 'access by multiple users to a computer server.'" *Id.* at 1175–76 (quoting § 230(f)(2)). The Court finds this analysis persuasive. After all, if an interactive computer service is defined as "***including*** specifically a service or system that provides access to the Internet," it is not necessarily limited to such services. 47 U.S.C. § 230(f)(2). And in any event, as alleged, Salesforce does provide access to its applications through the Internet. (*See* TAC ¶ 45 n.20 (citing to "Sales Cloud Pricing" when describing the software edition used by Backpage).)

  Still, Plaintiffs insist that because Salesforce was not involved in managing the content underlying their claims—the ads posted on Backpage by G.G.'s sex trafficker—§ 230's protections cannot apply to Salesforce. According to Plaintiffs' reading, § 230's references to "content" must be understood not as content generally but rather as the content underlying the

claim against the defendant. Using this logic, Backpage, as the actual host of the content in question, would be considered a provider of interactive computer services, while Salesforce, whose applications supported Backpage's internal operations, would not. But the text of § 230 imposes no such requirement—an interactive computer service must simply permit users to interact with content, without any reference to *what* content. Without a textual basis or supporting case law, the Court declines to impose unilaterally a requirement that whether a defendant is an "interactive computer service" under § 230 depends on the nature of the claims against it.

Plaintiffs further assert that, at the very least, it is too soon to decide the issue of whether Salesforce qualifies as an interactive computer service. Plaintiffs contend that even if the Court is unable to hold that Salesforce is *not* an interactive computer service as a matter of law, discovery is still necessary to resolve the question of whether Salesforce in fact *is* one. But the allegations of the complaint make clear that Salesforce's technology allows users (Backpage employees) to manipulate content in a variety of ways, including by analyzing and organizing customer data and transmitting messages between Backpage and potential customers. When questioned during oral argument about the benefits of allowing limited discovery on this issue, Plaintiffs suggested that it could provide more insight into what Salesforce's software was doing. Yet the Plaintiffs already have provided a thorough overview of Salesforce's technology in the TAC, suggesting that they are already well-acquainted with the capabilities of the software. Similarly, the TAC contains detailed factual allegations regarding discussions between Salesforce and Backpage executives, including quotations from emails between Backpage and individuals associated with Salesforce. Given the detailed allegations already contained within the complaint, as well as Plaintiffs inability to specify how discovery would shift the analysis, the Court finds it possible to rule on this issue without further inquiry.

Accordingly, for the reasons discussed above, the Court holds that, as a matter of law based on the allegations of the TAC, Salesforce is an interactive computer service.

### B.     Salesforce as a Publisher

Section 230 does not, however, provide a complete defense for any type of claim against an interactive computer service. *Craigslist*, 519 F.3d at 669–70 (explaining that "§ 230(c) as a whole cannot be understood as a general prohibition of civil liability for web-site operators and other online content hosts," and noting, as an example, that defendants may be liable for claims like "contributory infringement if their system is designed to help people steal music"). But if Salesforce can be liable only in a capacity as a publisher, then § 230 applies. *Id.*; *see also City of Chi. v. StubHub! Inc.*, 624 F.3d 363, 366 (7th Cir. 2010) (finding that a claim seeking a judgment that a ticket reseller was responsible for collecting state taxes did not implicate § 230 because the tax in question "[did] not depend on who 'publishes' any information or is a 'speaker'"). Whether a claim treats a defendant as the publisher of third-party content "does not depend on the form of the asserted cause of action; rather, it depends on whether the cause of action necessarily requires that the defendant be treated as the publisher or speaker of content provided by another." *Jane Doe No. 1 v. Backpage.com LLC*, 817 F.3d 12, 19 (1st Cir. 2016) (citing cases); *see also Cohen v. Facebook, Inc.*, 252 F. Supp. 3d 140, 156 (E.D.N.Y. 2017) (explaining that § 230 "is implicated not only by claims that explicitly point to third party content but also by claims which, though artfully pleaded to avoid direct reference, implicitly require recourse to that content to establish liability or implicate a defendant's role, broadly defined, in publishing or excluding third party [c]ommunications").

Here, Plaintiffs seek to hold Salesforce liable for harm caused to G.G. by her trafficking via ads posted on Backpage. In Salesforce's view, this is a straightforward example of a claim

treating a defendant as a publisher; after all, Plaintiffs are attempting to hold Salesforce responsible for the harmful effects of third-party content posted online. For their part, Plaintiffs argue that because Salesforce, even if it is an interactive computer service, did not make any decisions regarding the editing, monitoring, or publishing of the harmful advertisements, it is not being treated as a publisher. Plaintiffs suggest that Salesforce should have monitored Backpage's use of Salesforce's tools and deleted or restricted access to its software in response to illegal activity—in other words, that Salesforce acted as publisher regarding Backpage's content on Salesforce's own applications. (*See* TAC ¶ 47.) And at least some of Plaintiffs' claims relate to Backpage's use of Salesforce's CRM software to engage in online marketing communications with sex traffickers to expand Backpage's customer base. (*See* TAC ¶¶ 87(c), (g), (h), (k).) But those claims would also treat Salesforce as a publisher, as courts have consistently found that § 230 bars imposing liability on a provider of messaging or e-mail services for content and activities conducted via those services. *See Fields*, 217 F. Supp. 3d at 1127–29.

Plaintiffs' remaining allegations can be summed up thusly: Backpage, far from acting as a neutral platform for advertisements, actively sought out sex traffickers. To do so, Backpage worked with the sex traffickers to ensure that the advertisements, including those featuring G.G., were "sanitized" to hide their illegality. And Salesforce, even though it was aware that Backpage's business model was based on sex trafficking, provided tools and support for those tools to help Backpage expand its customer base. But while Plaintiffs, perhaps recognizing that the claims at their core rest upon the publication of an advertisement, repeatedly emphasize Salesforce's actions in their briefing, the TAC itself does not suggest that Salesforce ever took any actions regarding the harmful advertisements or the sex traffickers. (*See* TAC ¶ 40 ("Salesforce provided personalized support for the technological tools and instruments that made

it possible **for Backpage** to engage in the internet based on-line selling of sex, sex trafficking, and compelled prostitution.") (emphasis added).)[3] Put simply, Plaintiffs seek to hold Salesforce liable for the fact that Backpage used Salesforce software to cultivate sex traffickers as customers and grow the website's reach among sex traffickers, ultimately resulting in the posting of the advertisement featuring G.G. This is a quintessential claim covered by § 230: it seeks to impose liability on an interactive computer service for third-party content that was published on an online platform.

The Court's finding does not, as Plaintiffs suggest, abandon the statutory language of § 230 by asking not whether the claims treat Salesforce as the "publisher or speaker" of third-party content but whether the third-party content is a "necessary part" of the facts. Plaintiffs rely on *Doe v. Internet Brands* for the proposition that "the CDA does not provide a general immunity against all claims derived from third-party content." 824 F.3d 846, 853 (9th Cir. 2016). But *Internet Brands* itself makes clear that applying § 230 to Plaintiffs' claims does not contradict this principle. In *Internet Brands*, the defendant was the operator of a networking website for models. *Id.* at 848. Somehow, through an outside source, the defendant became aware of two men that were using the site to prey on women. *Id.* at 849. The plaintiff, one of the women victimized by those men, sued the website owner for failing to warn users about the presence of predators on its site and the risk of being victimized. *Id.* In finding that § 230 did not apply to preclude liability, the Ninth Circuit emphasized that, while the publishing of the plaintiff's data on the networking website was a but-for cause of her injuries, in many ways "publishing activity is a but-for cause of

---

[3] It might be the case that Backpage should be held "liable for creating and posting, inducing another to post, or otherwise actively participating in the posting" of the harmful statement. *Huon v. Denton*, 841 F.3d 733, 742 (7th Cir. 2016). But there is no allegation that **Salesforce** ever solicited advertisements, or edited them, or took any action to participate in the posting of G.G.'s advertisement.

just about everything" with which the defendant website was involved. *Id.* at 853. Because the plaintiff's claims were not for any content posted on the website, but rather for a failure to warn in which the duty breached did not require the defendant to take any action with regards to third-party content posted on its site, the claims did not treat the defendant as a publisher or speaker of such content. *Id.* at 851.

But here, Plaintiffs seek to hold Salesforce liable for the fact that G.G. was trafficked via advertisements placed on Backpage by her trafficker. Although Plaintiffs try to frame their claims in terms of Salesforce's actions (namely, helping Backpage expand the site on which G.G.'s trafficker would eventually place the advertisements trafficking G.G.), Plaintiffs do not contend that they would have a claim against Salesforce regardless of what was posted to Backpage. *See Jane Does 1–50 v. Salesforce.*, No. A159566 at 13–14 (Cal. Ct. App. Dec. 30, 2021) (not designated for publication) (holding that plaintiffs, alleging they "were injured by online advertising, placed on Backpage by pimps and traffickers, that caused them to enter sex trafficking and be sexually exploited," brought claims that "seek to treat Salesforce as the publisher of ads created by a third party" and are barred by § 230). Nor can Plaintiffs point to any distinct duty that Salesforce owed to Plaintiffs untethered from the third-party content. C*ompare Lemmon v. Snap, Inc.*, 995 F.3d 1085, 1092 (9th Cir. 2021) (explaining that claims for negligent product-design against a mobile app developer sought to "hold [the defendant] liable for its role in violating its distinct duty to design a  reasonably safe product.") In effect, Salesforce could not satisfy its "alleged obligation" to Plaintiffs without altering either the content generated by Backpage by monitoring the use of its software and forbidding its use in certain ways, or by insisting that Backpage only hosted certain content on its own site. In other words, Plaintiffs

claims are predicated on the notion that Salesforce should be held responsible for the existence of third-party content, her advertisements—that is, they treat Salesforce as a publisher.

Plaintiffs protest what they deem an "overbroad" interpretation of § 230. But as the Seventh Circuit has recognized, "Section 230(c)(1) is general," and "a law's scope often differs from its genesis." *Craigslist*, 519 F.3d at 671–72 (applying § 230 to bar claims brought against an online service provider for allegedly violating the Fair Housing Act by posting discriminatory notices). And other courts have applied § 230 to bar claims similar to those here, including claims directly against Backpage for sex trafficking on the basis that Backpage's decisions about various posting requirements were done with the express purpose of facilitating sex trafficking. *See Jane Doe No. 1*, 817 F.3d at 20–22 (holding that, although the plaintiffs tried to argue that § 230 did not apply "by claiming Backpage's decisions about what measures to implement deliberately attempt to make sex trafficking easier, this is a distinction without a difference" and finding that the claims "necessarily treat[ed] the website as a publisher or speaker of content provided by third parties, and, thus, are precluded by section 230(c)(1)").

In fact, it is the very breadth of § 230's coverage that motivated Congress to pass FOSTA for the express purpose of preserving claims such as these by exempting them from the protections of § 230. *See* FOSTA, Pub. L. No. 115-164, 132 Stat. 1253, 1253 (2018) (explaining that "clarification" of § 230 was "warranted to ensure" that § 230 did not provide protection to websites that unlawfully promote and facilitate sex traffickers). That Congress felt the need to amend § 230 to include express exemptions for certain sex trafficking claims suggests that such claims would otherwise be covered by § 230. Put simply, courts have coalesced around an understanding of § 230 that "grant[s] sweeping protection."[4] *Malwarebytes, Inc. v. Enigma*

---

[4] In advocating for a narrower reading of § 230, Plaintiffs cite a non-precedential statement by Justice Thomas in connection with a denial of certiorari in which he suggests that, in an appropriate case, the

*Software Grp. USA, LLC*, 141 S. Ct. 13, 15 (2020) (statement of Thomas, J., respecting the denial

of certiorari). It may be, as Plaintiffs argue, that their claims against Salesforce fall under this

exemption. But, to be exempt, a claim must first be otherwise covered by the statute. And, for the

reasons discussed above, Plaintiffs' claims do fall under § 230's coverage.

### C.    FOSTA Amendments

In 2018, Congress amended § 230 through FOSTA, adding three exemptions for sex

trafficking claims, including one exempting "any claim in a civil action brought under section

1595 of title 18, if the conduct underlying the claim constitutes a violation of section 1591 of that

title."[5] 47 U.S.C. § 230(e)(5)(A). Here, the parties dispute the scope of this exemption—namely,

whether the provision exempts a "claim in a civil action brought under" § 1595 ***only*** to the extent

that "the conduct underlying the claim" (*i.e.*, the conduct of the defendant in the civil action)

constitutes a violation of § 1591 (*i.e.*, the criminal statute), or, as Plaintiffs propose, "the conduct

underlying the claim" refers simply to the criminal conduct of the venture in which a defendant is

participating and from which they are benefiting. In other words, must Plaintiffs show that

Salesforce's own actions violated § 1591, or is it enough that someone (here, Backpage or G.G.'s

trafficker) committed the § 1591 violation underlying the claim? Resolving this issue is a matter

---

Supreme Court should consider reexamining the prevailing understanding of § 230. *Malwarebytes*, 141 S.
Ct. at 14. But, as Justice Thomas himself acknowledges, his proposed interpretation of § 230 does not
reflect the existing state of the law. Accordingly, courts that have been asked to adopt Justice Thomas's
suggestion have declined to do so. *See, e.g.*, *In re Facebook, Inc.*, 625 S.W.3d 80, 91 (Tex. 2021) (stating
that Justice Thomas's "more restrictive view of section 230 was articulated in a statement respecting the
denial of certiorari, not in the decision of a case, and every existing judicial decision interpreting section
230 takes the contrary position"); *J.B. v. G6 Hosp., LLC*, No. 19-cv-07848-HSG, 2020 WL 7260057, at
*1 (N.D. Cal. Dec. 10, 2020) (denying a motion for reconsideration brought in light of Justice Thomas's
statement as Justice Thomas's statement "simply stated his opinion" and was "far from showing a change
in or clarification of controlling law meriting reconsideration").

[5] The remaining two exemptions relate to state criminal charges where the "conduct underlying the charge
would constitute a violation of" § 1591 or 18 U.S.C. § 2421A (another federal sex-trafficking statute). 47
U.S.C. § 230(e)(5)(B)-(C).

of statutory interpretation, and courts have reached different conclusions. *Compare Doe v. Kik Interactive, Inc.*, 482 F. Supp. 3d 1242, 1249 (S.D. Fla. 2020) (holding that "[t]he plain language of the statute removes immunity only for conduct that violates 18 U.S.C. § 1591") *with Doe v. Twitter, Inc.*, 555 F. Supp. 3d 889, 920–22 (N.D. Cal. 2021) (holding that FOSTA created an exemption for any claim brought under § 1595 so long as it involved a claim predicated on civil sex trafficking under § 1591, regardless of whether the civil defendant themselves committed that violation). For the reasons discussed below, the Court agrees with those which find that, by the plain language of the statute, § 230(e)(5)(A) exempts claims brought under § 1595 only in circumstances in which the defendant's conduct constitutes a violation of § 1591.

The Court first turns to the text of the FOSTA exemption. Section 230(e)(5)(A) exempts "**any claim in a civil action** brought under section 1595 of Title 18, if the **conduct underlying the claim constitutes a violation of section 1591** of that title." (emphasis added). Applying the "normal rule of statutory construction that identical words used in different parts of the same act are intended to have the same meaning," the Court finds that the "claim in a civil action" and the "claim" which the conduct must underlie are the same. *C.I.R. v. Lundy*, 516 U.S. 235, 250 (1996) (internal quotation marks omitted); *see also Univ. of Chi. v. United States*, 547 F.3d 773, 782 (7th Cir. 2008) (explaining that the "sensible approach" is to read identical terms in a statute as having the same meaning). Indeed, here the words are used not just within the same act, but within the same sentence. Thus, the "most straightforward reading" of this provision requires an exemption only "if the civil defendant's conduct amounts to a violation of section 1591." *J.B. v. G6 Hospitality, LLC*, No. 19-cv-07848-HSG, 2021 WL 4079207, at *6; *see also Doe v. Reddit*, No. 8:21-cv-00768, 2021 WL 5860904, at *7 (C.D. Cal. Oct. 7, 2021).

This reading is further confirmed by reading the exemption in conjunction with the two other exemptions within § 230(e)(5). "The plainness or ambiguity of statutory language is determined" not just "by reference to the language itself," but also by reference to "the specific context in which that language is used." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 342 (1997). Here, § 230(e)(5) contains two additional provisions stating that § 230 shall not apply to "any charge in a criminal prosecution brought under State law if the conduct underlying the charge would constitute a violation of" either § 1591 or 18 U.S.C. § 2421A. 47 U.S.C § 230(e)(5)(B)–(C). "In the context of a criminal charge, the underlying conduct necessarily refers to the conduct of the criminal defendant"—that is, the named defendant, not someone else must have committed the conduct underlying the charge. *J.B.*, 2021 WL 4079207, at *6.[6] Although civil claims and criminal charges have obvious differences, the Court agrees with the *J.B.* court that the fact "that Congress included nearly identical language in the same subsection, at the same time, strongly suggests that it intended to give the 'conduct underlying' phrases the same meaning."[7] *Id.* (citing

---

[6] The Court is not persuaded by the explanation offered by the *Twitter* court as to why these parallel exemptions should not guide the statutory analysis. The *Twitter* court pointed out that there was no authority determining whether subsection (B) "permits a state law criminal prosecution for sex trafficking to be brought against an ICS provider under a statute with a less stringent *mens rea* requirement than has been found to apply in § 1591(a) claims." *Twitter*, 555 F. Supp. 3d at 921 n.4. But this analysis elides the main point—that even if the charge had a lower *mens rea* requirement, the underlying charge is still against the named defendant.

[7] While the *Twitter* court correctly noted that there are exceptions to the "general presumption" regarding identical words in the same statute, here the Court does not see any reason to deviate from the presumption. *Twitter*, 555 F. Supp. 3d at 921 n.4. This "presumption does not apply where 'there is such variation in the connection in which the words are used as reasonably to warrant the conclusion that they were employed in different parts of the act with different intent.'" *M.A. v. Wyndham Hotels & Resorts, Inc.*, 425 F. Supp. 3d 959, 969 (S.D. Oh. 2019) (quoting *Atl. Cleaners & Dyers v. United States*, 286 U.S. 427, 433 (1932)). Yet the only variation between how the phrase "conduct underlying the charge or claim" is used between subsection (A) and subsections (B) and (C) is that (A) refers to a civil claim and (B) and (C) refer to a criminal charge. Given the parallel structure, as well as the fact that this phrase is used within the same part of the act, the Court does not find that the difference between civil and criminal liability qualifies as such a "variation" so as to rebut this general presumption.

*Powerex Corp. v. Reliant Energy Servs., Inc.*, 551 U.S. 224, 232 (2007) (explaining that the "maxim" that "identical words and phrases within the same statute should normally be given the same meaning" is "doubly appropriate" where the phrase in question is inserted into two provisions "at the same time")). Put simply, even assuming that a statute is "remedial," the Court must first turn to the text of the statute. *See Walton v. United Consumers Club, Inc.*, 786 F.2d 303, 310 (7th Cir. 1986) ("Courts should confine their attention to the purposes Congress sought to achieve by the words it used."). And here, the text, both by its plain terms and statutory structure, is clear that the FOSTA exemption applies only where the civil defendant's actions violated § 1591.

This conclusion does not, as Plaintiffs contend, "eviscerate" the civil negligence standard in § 1595. To begin, § 230 only applies in limited circumstances—when the defendant is an interactive computer service and the claims seek to treat the defendant as a publisher of third-party content. This interpretation of the exemption has no impact on claims that do not meet those criteria, such as claims commonly brought by plaintiffs against hotels who rent rooms to sex traffickers. Moreover, Plaintiffs' position misunderstands the interaction between § 230 and the FOSTA Amendments. Before the FOSTA Amendments, *any* claim against a defendant that met § 230's requirements, including those for sex trafficking under § 1595, would be completely barred. Under the Court's reading of the plain language of the statute, the FOSTA exemptions created a limited exemption to that otherwise broad protection for certain kinds of (but not all) § 1595 claims. It is true that the outcome here results in a situation in which "a sex trafficking victim who seeks to impose civil liability on an ICS [interactive computer service] provider on the basis of beneficiary liability faces a higher burden than a victim of sex trafficking who seeks to impose such liability on other types of defendants." *Twitter*, 555 F. Supp. 3d at 920. But § 230

21

inherently places higher burdens on plaintiffs seeking to impose liability on interactive computer services providers by barring certain types of claims altogether.[8]

Looking to the legislative history confirms that the FOSTA exemption was not meant to encompass fully every possible claim under § 1595. The original version of the bill that became FOSTA would have provided that § 230 "shall not be construed to impair the enforcement or limit the application of (A) section 1595 of title 18, United States Code." H.R. 1865, 115th Cong. § 3(a)(5) (as introduced in the House, Apr. 3, 2017). Under this language, **any** violation of § 1595 would be enough to exempt the claim from § 230—exactly the interpretation Plaintiffs now propose for the enacted version. But, as discussed in depth by the *J.B.* court, during legislative hearings on the bill, several witnesses raised concerns that § 1595's "knew or should have known" language was too expansive and risked encouraging litigation against law-abiding intermediaries. *J.B.*, 2021 WL 4079207 at *7–11 (providing a thorough analysis of the various drafts and revisions of the FOSTA amendment to § 230, including contemporaneous comments from stakeholders expressing apprehension about § 1595's knowledge standard being imported into § 230 given challenges in showing a website's knowledge). In response, Congress added the limiting language requiring that the "conduct underlying the claim" be a violation of § 1591. *Id*. at *11. Thus, the final bill reflected a "compromise by including a narrowed federal civil sex

---

[8] The Court also notes that in both *Twitter* and *Doe v. Mindgeek*, 558 F. Supp. 3d 828, 836 (C.D. Cal. 2021), the courts stated that they were adopting the reasoning of the court in an earlier ruling in *J.B. v. G6 Hospitality, LLC*, No. 19-cv-07848-HSG, 2020 WL 4901196 (N.D. Cal. Aug. 8, 2020), in finding that any claim under § 1595 was covered by the FOSTA exemptions. But the earlier ruling by the *J.B.* court did not directly address whether "conduct underlying the claim" required the plaintiff to allege that the named defendant violated § 1591. Rather, the court first addressed whether § 230(e)(5) exempts **state** law civil claims, and second, the knowledge standard for a claim under § 1595 generally, without reference to the impact on claims implicating § 230. *Id.* at *4–5, 8.

trafficking carve-out that requires plaintiffs to show the civil defendant's knowing assistance, support, or facilitation" of sex trafficking. *Id.*.

Accordingly, to state a claim that is exempted from § 230's coverage, Plaintiffs must allege Salesforce engaged in conduct that would violate § 1591. Plaintiffs do not dispute that they are unable to do so. Section 1591 creates two types of offenses: a primary liability offense under § 1591(a)(1) and a secondary liability offense under § 1591(a)(2). As to primary liability under § 1591(a)(1), there is no allegation that Salesforce "recruit[ed], entice[d], harbor[ed], transport[ed], provide[d], obtain[ed], advertise[d], maintain[ed], patronize[d], or solicit[ed]" any person while knowing (or in reckless disregard of the fact) that the person "will be caused to engage in a commercial sex act" and is either under the age of 18 or is subject to force, coercion or threats. Instead, the complaint makes clear that G.G.'s trafficker engaged in these trafficking violations. 18 U.S.C. § 1591(a)(1). As to secondary liability, § 1591(a)(2) criminalizes "benefit[ing], financially or by receiving anything of value, from participation in a venture which has engaged in a violation of" § 1591(a)(1). For purposes of § 1591(a)(2), "participation in a venture" is defined as "knowingly assisting, supporting, or facilitating a violation of subsection (a)(1)." 18 U.S.C. § 1591(e)(4). Accordingly, a secondary actor under § 1591(a)(2) must actively and knowingly assist or facilitate a primary trafficking violation, which is tied to a specific victim. But Plaintiffs have not alleged that Salesforce knew of G.G.'s circumstances or in any way assisted, supported, or facilitated the primary trafficking violation. Accordingly, the Court finds (and the parties do not dispute) that Plaintiffs have not pleaded that Salesforce itself violated § 1591.

Thus, because a claim brought under § 1595 must allege conduct of the defendant that would violate § 1591, and Plaintiffs have failed to allege that Salesforce committed any criminal

sex trafficking violation, the FOSTA exemption does not apply. Accordingly, § 230 precludes Plaintiffs' claims against Salesforce.

## II.    Failure to State a Claim

Even if their claim were not barred by § 230, Plaintiffs' claim could not proceed as currently pleaded because they have failed to state a claim. As noted above, in addition to the requirement of an underlying violation of § 1591, there are three elements to a § 1595 claim: the plaintiff must allege that the defendant (1) knowingly benefited from (2) participating in a venture that (3) the person knew or should have known violated § 1591. *See M.A. v. Wyndham Hotels & Resorts, Inc.*, 425 F. Supp. 3d 959, 969 (S.D. Oh. 2019).[9] The Court addresses each element in turn.

### A.    Knowingly Benefit

The Court first considers what it means to "knowingly benefit" from a violation of § 1591. The law as to the knowledge element for a § 1595 violation is currently unsettled, with the parties here unsurprising urging the Court to adopt the standard most in their favor

"Knowledge" means simply to have "[a]n awareness or understanding of a fact or circumstance; a state of mind in which a person has no substantial doubt about the existence of a fact." *Knowledge*, Black's Law Dictionary (11th ed. 2019). So, pursuant to § 1595, a defendant must have an awareness or understanding that it was receiving some benefit, be it financial or some other form of value, from participating in the venture. Salesforce suggests that the Court should read "benefited" in conjunction with the phrase "from participation in a venture" to require that any benefit derived must be the specific result of that venture. In other words, any benefit

---

[9] The parties do not dispute that G.G. was trafficked by her sex trafficker in violation of § 1591, satisfying § 1595's requirement of a "qualifying predicate act." *M.A*, 524 F. Supp. 3d at 964.

received by Salesforce would have to, essentially, be a form of "profits" from Backpage's sex trafficking venture. The cases to which Salesforce cites in support of this interpretation, however, do not go so far as to require that the "benefits" be "profits." Instead, those case simply stand for the proposition that there must be some "causal relationship between the [defendant's] participation in sex trafficking and their purported benefit." *Geiss v. Weinstein Co. Hldgs. LLC*, 383 F. Supp. 3d 156, 169 (S.D.N.Y. 2019) ("The controlling question, however, is whether [the sex trafficker] provided any of those benefits to [the defendant] ***because of*** [the defendant's] facilitation of [the sex trafficking]."). This Court thus understands § 1595 to require a plaintiff to plead only that the defendant knew that it was receiving benefits (financial or otherwise) because of its participation in a venture that violated § 1591. *See B.M. v. Wyndham Hotels & Resorts, Inc.*, No. 20-cv-00656-BLF, 2020 WL 4368214, at *4 (N.D. Cal. July 30, 2020) (finding that the rental of a room (or a franchisor's receipt of royalties for that rental) "constitutes a financial benefit from a relationship with the trafficker sufficient to meet this element").

## B.       Participate in a Venture

The Court next considers what it means to "participate in a venture." There is no current consensus among courts to have considered the issue as to whether the second element incorporates the definition of "participation in a venture" from the criminal provisions in § 1591. *See A.B. v. Hilton Worldwide Hldgs, Inc.*, 484 F. Supp. 3d 921, 937 (D. Or. 2020) (collecting cases). Under § 1591(e)(4), "the term 'participation in a venture' means knowingly assisting, supporting, or facilitating a violation of subsection (a)(1)." Courts importing § 1591's definition have stated that the "participation giving rise to the benefit must be participation ***in a sex-trafficking venture***, not participation in other activities." *Geiss*, 383 F. Supp. 3d at 169 (citing to *United States v. Afyare*, 632 F. App'x 272, 286 (6th Cir. 2016)). In other words, "some

participation in the sex trafficking act itself must be shown." *Noble v. Weinstein*, 335 F. Supp. 3d 504, 524 (S.D.N.Y. 2018). But § 1591 states that these definitions apply "[i]n this section," not throughout the entire statute. 18 U.S.C. § 1591(e). And, as courts that have declined to take this approach have explained, reading "participate in a venture" to require "knowingly assisting, supporting, or facilitating" would render other statutory language in § 1595 nonsensical. *See Doe #1 v. Red Roof Inns, Inc.*, 21 F.4th 714, 724 (11th Cir. 2021). This is because applying the criminal definition, which requires participation to be knowing, would essentially void the "should have known" language contained in the civil remedy. *A.B. v. Marriott Int'l, Inc.*, 455 F. Supp. 3d 171, 186 (E.D. Pa. 2020); *Red Roof Inns*, 21 F.4th at 724 ("In other words, the [defendants'] formulation requires a plaintiff to prove that the defendant knowingly facilitated a violation, making the 'should have known' language superfluous.")

This Court interprets "participation" as the majority of courts do and finds that "actual 'participation in the sex trafficking itself' is not required to state a claim under section 1595." *S.Y. v. Naples Hotel Co.*, 476 F. Supp. 3d 1251, 1256 (M.D. Fl. 2020). Thus, "liability under § 1595 can attach when an individual participates in a venture that is not specifically a sex trafficking venture and participation is not direct participation in the sex trafficking." *M.A.*, 425 F. Supp. 3d at 970 (finding that the plaintiff alleged sufficient facts to show participation in a venture under § 1595 by "alleging that [the defendants] rented rooms to people it knew or should have known where [sic] engaged in sex trafficking"). Put another way, the venture need only be one that violated sex trafficking law and the defendant need not directly participate in that violation. Still, "the ordinary understanding of culpable assistance to a wrongdoer [] requires a desire to promote the wrongful venture's success." *GTE*, 347 F.3d at658. And the term "participation" itself requires more than just passive facilitation, but some level of active engagement. *See Participation*,

*Black's Law Dictionary* (11th ed. 2019) ("The act of taking part in something"); *Participate*,

*Oxford English Dictionary Online*,

https://www.oed.com/view/Entry/138244?rskey=JNFUDz&result=2&isAdvanced=false#eid (last

visited May 5, 2022) ("To take part; to have a part or share with a person").

      Thus, in cases where there is no alleged "direct association" between the beneficiary and

the trafficker, courts have "required 'a showing of a continuous business relationship between the

trafficker and the [defendant] such that it would appear that the trafficker and the [defendant] have

established a pattern of conduct or could be said to have a tacit agreement'" as to the venture

which the defendant knew, or should have known, involved sex trafficking. *J.B. v. G6 Hospitality,*

*LLC*, No. 19-cv-07848-HSG, 2020 WL 4901196, *9 (N.D. Cal. Aug. 20, 2020) (quoting *M.A.*,

425 F. Supp. 3d at 970). For example, courts have found that such a business relationship existed

between a defendant hotel and a sex trafficker where the defendants themselves rented rooms to

those they knew, or should have known, were engaged in sex trafficking. *See, e.g.*, *H.H. v. G6*

*Hospitality, LLC*, No. 2:19-CV-755, 2019 WL 6682152, at *5 (S.D. Oh. Dec. 6, 2019). But a

plaintiff must "connect the dots" between their trafficking and the specific defendant. In cases

involving hotel franchisors, for instance, claims that branded hotels rented rooms to people they

knew or should have known were engaged in sex trafficking may be "sufficient to state a

plausible claim against the specific hotels where [the plaintiff] was trafficked, [but] they do not

make a plausible claim that [the franchisors] directly participated in a venture that ***trafficked [the***

***plaintiff]***." *B.M.*, 2020 WL 4368214, at *5; *see also Red Roof Inns*, 21 F.4th at 726–27 (finding

that defendant hotel franchisors who owned, supervised, and controlled the renting of rooms, as

well as "read online reviews mentioning prostitution and crime occurring generally at the hotels,

and controlled the training of managers and employees who were allegedly involved in facilitating

sex trafficking at the hotels," merely "financially benefited" from the renting of hotel rooms to sex traffickers, not that they "participated in an alleged common undertaking or enterprise with the [plaintiffs'] sex traffickers or others at the hotel who violated the statute").

### C.    Knowledge that the Venture Violated § 1951

Lastly, the Court turns to the third element, which requires a defendant to have "known or should have known" the venture violated § 1591. Put another way, it requires a defendant to have actual or constructive knowledge that the venture violated § 1591. *Red Roof Inns*, 21 F.4th at 725. Courts interpreting § 1595 regularly describe the "knew or should have known" language as establishing a negligence standard. *See id.* (defining constructive knowledge as "knowledge which 'one using reasonable care or diligence should have'" (quoting *Constructive Knowledge*, Black's Law Dictionary (11th ed. 2019))); *see also Doe S.W. v. Lorain-Elyria Motel, Inc.*, No. 2:19-CV-1194, 2020 WL 1244192, at *5 (S.D. Ohio Mar. 16, 2020) ("[T]he plain text of § 1595(a) makes clear that the standard under this section is a negligence standard of constructive knowledge.").

Although it is clear that § 1595 allows for either actual or constructive knowledge, however, courts have reached different conclusions on whether a defendant must "satisf[y] the knowledge element as to a ***particular*** sex trafficking venture." *S.J. v. Choice Hotels Int'l*, 473 F. Supp. 3d 147, 154 (E.D.N.Y. 2020). In other words, is it enough that the defendant knew or should have known that the venture has violated § 1591 by engaging in sex trafficking generally? Or must the defendant have known or should have known that the venture is engaged in a violation of § 1591 as to the specific plaintiff? For purposes of this case, the Court must decide whether Plaintiffs can successfully plead a claim under § 1595 by alleging that Salesforce knew or should have known that Backpage was violating sex trafficking laws, or if Plaintiffs must allege

that Salesforce knew or should have known that G.G. in particular was being trafficked using the site. The Court concludes it is the latter.

Section 1595 requires that the venture engage in an act in violation of § 1591, which requires knowledge *as to a specific victim*. *See* 18 U.S.C. § 1591(a)(1) (criminalizing knowingly recruiting, enticing, harboring, transporting, providing, obtaining, advertising, maintaining, patronizing, or soliciting by any means *a person*) (emphasis added); 18 U.S.C. § 1591(a)(2) (criminalizing benefiting from participation in a venture that has violated § 1591(a)(1) where the defendant knows that "means of force, threats of force, fraud, coercion . . . or any combination of such means will be used to cause *the person* to engage in a commercial sex act, or that *the person* has not attained the age of 18 years and will be caused to engage in a commercial sex act") (emphasis added). And "[t]he statutory text speaks in singular terms—'participation in *a* venture which that person . . . should have known *has* engaged in *an* act in violation of this chapter.'" *S.J.*, 473 F. Supp. 3d at 154 (quoting 18 U.S.C. § 1595(a) (emphasis in original)). Accordingly, a claim under § 1595 requires that "the defendant must have either actual or constructive knowledge that the venture—in which it voluntarily participated and from which it knowingly benefited—violated [§ 1591] *as to the plaintiff*." *Red Roof Inns, Inc.*, 21 F.4th at 726 (emphasis added).

Plaintiffs suggest that this interpretation improperly imports the knowledge requirements of § 1591 into § 1595. But Plaintiffs confuse the knowledge requirement for what it means to "participate in a venture" with the knowledge requirement as to the nature of the venture itself. Thus, while a plaintiff need not allege that a defendant "knowingly assisted" a venture engaged in a violation of § 1591 to "participate" in that venture, the plaintiff does need to allege that the defendant knew (or should have known) about the *specific* sex trafficking venture—that is, the

venture tied to the underlying § 1591 violation **of the plaintiff**. *See B.M.*, 2020 WL 4368214, at

*5 (dismissing a complaint for being "devoid of any facts linking these Defendants . . . to the sex

trafficking of this Plaintiff" (emphasis added)). *A.B.*, which Plaintiffs cite as holding that § 1595

does not require a defendant to have knowledge of the specific victim, provides a useful

illustration. There, in finding that the plaintiffs adequately pleaded a § 1595 claim, the court

emphasized that, had the complaint only contained general allegations as to the problem of sex

trafficking, efforts to combat that issue, and incidents involving other victims and other hotels, it

"may [have] agree[d]" with the defendant that the allegations were insufficient. 455 F. Supp. 3d at

193. However, the *A.B.* court noted that the plaintiff had alleged facts that did establish

defendant's knowledge of her own trafficking—among other allegations, that the traffickers had

used defendant's hotels, multiple men an evening entered the hotels creating a "voluminous and

obvious constant stream of male visitors" to her rooms, her trafficker "repeatedly" paid for rooms

at the hotels in advance and with prepaid cards, and staff at the hotels observed the plaintiff with

visible signs of injury multiple times. *Id* at 193–94.

This approach is consistent with the majority view of the courts to have considered such

cases. *See, e.g.*, *S.Y.*, 476 F. Supp. 3d at 1257 (holding that defendant hotels knew or should have

known of the venture that sex trafficked the plaintiffs the complaint alleged that the traffickers

requested rooms by exit doors, paid in cash, excessive condoms were present in the rooms, hotel

staff observed the plaintiffs be escorted by traffickers into the hotels, hotel staff heard plaintiffs'

screams, the sex trafficking ventures operated out of the same hotel room for days in succession,

and multiple men came and went from plaintiffs' rooms without luggage or personal possessions);

*M.L. v. Craigslist Inc.*, No. C19-6153 BHS-TLF, 2020 WL 6434845, at *6 (W.D. Wash. Apr. 17,

2020) (denying a motion to dismiss by the defendant website where "the complaint alleges that

[the defendant website] not only knew that human trafficking was occurring on its website, but that [the defendant website] was part of an active conspiracy with plaintiff's traffickers ***to traffic plaintiff***," and denying a similar motion to dismiss by the defendant hotel where the complaint alleged that hotel staff contacted the plaintiff to request that she be more discrete with her activities and that police had spoken with the hotel regarding the plaintiff being a minor (emphasis added)); *compare Lundstrom v. Choice Hotels Int'l, Inc.*, No. 21-cv-00619-PAB-SKC, 2021 WL 5579117, at *8–9 (D. Colo. Nov. 30, 2021) (finding that allegations that a defendant hotel franchisor was "on notice about the prevalence of sex trafficking generally at its hotels and in the hotel industry" was "not sufficient to show that the defendant should have known about what happened to [the] plaintiff" and thus could not sustain § 1595 claim).

In short, to bring a claim for liability under § 1595, a plaintiff must plausibly allege that a defendant (1) knowingly benefited, either financially or otherwise, from (2) participation in a venture, although such participation need not necessarily be direct participation in the sex trafficking, and that (3) the person knew or should have known violated § 1591 as to the plaintiff.

### D. Application to Plaintiffs' Claims Against Salesforce

With this understanding of the elements for a beneficiary claim under § 1595 in mind, the Court now considers whether Plaintiffs have stated such a claim against Salesforce and concludes that they have not. Specifically, Plaintiffs have failed to allege plausibly that Salesforce knew, or should have known, about G.G.'s specific trafficking or any of the advertisements trafficking her on Backpage. *Compare Twitter*, 555 F. Supp. 889, 925 (finding that plaintiffs adequately pleaded a § 1595 claim where they alleged that the defendant website was alerted to the existence of videos involving the plaintiffs and provided evidence that the plaintiffs were underage in response to a request for more information). Plaintiffs do not contend that they have pleaded such

knowledge, instead relying on their argument that § 1595 does not require that Salesforce have any knowledge or involvement as to G.G's specific trafficking. But, as has already been discussed, this Court disagrees with that approach and finds that § 1595 requires a defendant to have participated in a venture that the defendant knew or should have known was involved in sex trafficking of the plaintiff, not sex trafficking more generally. Thus, because Plaintiffs have not alleged that Salesforce had actual or constructive knowledge of G.G.'s trafficking, they have not adequately pleaded that element of a § 1595 claim.

Plaintiffs also have not adequately alleged that Salesforce "participated" in the venture with Backpage that trafficked G.G. Considering the TAC as a whole, Plaintiffs allege that Backpage used Salesforce's CRM software to cultivate and expand a customer base of sex traffickers, including G.G.'s trafficker. At times, the TAC appears to suggest that Salesforce itself took actions to assist Backpage's efforts. (*See* TAC ¶ 41 ("Salesforce was the driving force that enabled Backpage to scale its operations and increase the trafficking conducted on Backpage.").) But the factual allegations directly underlying these claims make it clear that Salesforce provided the technology (and corresponding technological support) that Backpage utilized to grow its own business. (*See Id.* ("By providing technology, implementation skills, and ongoing support that all constitute affirmative acts by Salesforce that encouraged the wrongdoing in which Backpage.com was engaged.").) In other words, while Salesforce may have provided the tools that Backpage used to build a business based on sex trafficking, Salesforce did not take part in the construction of the business itself.

Allegations concerning Salesforce's role in marketing Backpage to sex traffickers illustrate how the actions Plaintiffs allege Salesforce took to assist and support Backpage in its sex trafficking venture are, in actuality, actions that Backpage took using Salesforce's CRM software.

The TAC describes Salesforce's CRM technology as providing companies "access to a coordinated set of applications tailored to its business model, including applications that . . . manage all marketing functions." (*Id.* ¶ 31.) Plaintiffs then allege that Salesforce "facilitat[ed] and provid[ed] support for direct marketing campaigns for Backpage to expand Backpage's sex trafficking venture." (TAC ¶ 87(c).) But even in this allegation, Plaintiffs acknowledge that it is Backpage, not Salesforce, that actually expanded the operations through marketing activities. (*See also* Pls.' Resp. to Mot. to Dismiss at 25, Dkt. No. 66 ("Among other things, Salesforce facilitated trafficking through Backpage by assisting Backpage in its marketing efforts that allowed Backpage to solicit sex traffickers and their victims.") The mere fact that Salesforce's software played a critical role in Backpage's expansion, indeed, even if such expansion would not be possible without the capabilities provided by that software, is not enough to demonstrate Salesforce's own participation in any venture with Backpage. *See United States v. Papagno*, 639 F.3d 1093, 1098 (D.C. Cir. 2011) (explaining the difference between "assistance" and "participation," noting that insurers who cover operations do not participate in that operation, fans who cheer the home team may help the team win but do not participate in the game, and engineers who design soldiers' weapons may support the war effort but do not participate in the war). Thus, to the extent Plaintiffs' claims rest on any actions taken by Backpage using Salesforce's software, they have not adequately alleged Salesforce "participated" in any venture.

Plaintiffs contend that they have plausibly alleged that Salesforce did not just sell Backpage off-the-shelf software but instead also offered Backpage "personalized support." Yet, although the complaint contains multiple mentions of Salesforce providing Backpage with "personalized services tailored specifically to the needs of its illegal business," Plaintiffs provide no examples of these services, or description, or even suggestion, of how Salesforce altered its

software to better facilitate sex trafficking. (TAC ¶ 46.) For instance, Plaintiffs emphasize that Salesforce provided technical support in moving some of Backpage's operations overseas— ostensibly to help Backpage avoid U.S. law enforcement. But even assuming that Backpage's fear of criminal liability motivated its desire to have a duplicate copy of its system, the TAC contains no facts indicating that **Salesforce** was aware of this motivation, nor do Plaintiffs explain how, given that the complaint alleges that G.G. was trafficked on backpage.com (and not any overseas website), this duplicate copy relates to their claims.

Similarly, Plaintiffs point to the allegation that an in-house Salesforce executive recommended that, based on Backpage's needs (which Plaintiffs assume to be related to sex trafficking and prostitution), Backpage use Salesforce's Enterprise CRM edition. Plaintiffs emphasize that the Enterprise CRM edition is described as "fully customizable," suggesting that this means that Salesforce then took action to tailor the software to better meet Backpage's needs (which, Plaintiffs allege, were solely related to sex trafficking). Yet the mere fact that the Enterprise CRM edition is customizable (that is, capable of being customized) does not, without more, support a reasonable inference that Salesforce actually customized the software to meet Backpage's needs. In sum, Plaintiffs have failed to allege facts supporting that Salesforce "took part in" Backpage's sex-trafficking venture.

Thus, for the reasons stated above, the Court finds that Plaintiffs have failed to state a claim against Salesforce for beneficiary liability under § 1595. If this were the only basis for dismissal, the Court would consider dismissal without prejudice to allow Plaintiffs one final opportunity to amend their complaint to state a viable claim. But as discussed above, the allegations of the TAC establish that Salesforce is entitled to dismissal based on the affirmative

defense in § 230 of the Communications Decency Act as well. Accordingly, the dismissal is with prejudice.

## CONCLUSION

Accordingly, this case is dismissed with prejudice because Salesforce is protected from liability under § 230 of the Communications Decency Act. Even if § 230 did not apply, Plaintiffs have failed to plead adequately the required elements of a claim for beneficiary liability under § 1595. The Clerk will enter final judgment in favor of Salesforce.

ENTERED:

Dated:  May 16, 2022

Andrea R. Wood
United States District Judge