UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

G.G. (a minor) *et al.*,

                  *Plaintiffs*,

     v.

SALESFORCE, INC.,

                  *Defendant*.

Case No. 1:20-CV-2335

MOTION BY DEFENDANT SALESFORCE, INC. TO COMPEL FURTHER DEPOSITION
TESTIMONY FROM THIRD-PARTY WITNESS

**TABLE OF CONTENTS**

<u>Page</u>

I.     INTRODUCTION ........................................................................................................... 1

II.    BACKGROUND .............................................................................................................. 2

     A.    Mr. Conner Is Identified by The Parties as a Third-Party Witness and
           Provides Truthful Responses in Interviews with Salesforce's Counsel................. 2

     B.    After Plaintiffs' Counsel Retains and Apparently Agrees to Fund
           Counsel for the Witness, Mr. Conner Invokes the Fifth Amendment in
           Response to Virtually All Substantive Questions Regarding Salesforce.............. 7

III.    ARGUMENT .................................................................................................................... 9

     A.    The Court Should Compel Mr. Conner's Testimony Because His
           Truthful Answers Would Be Non-Incriminatory.................................................. 11

     B.    Mr. Conner's Truthful Answers to Salesforce's Questions Would Not
           Place Him at Risk of Criminal Prosecution ......................................................... 15

     C.    The Court Should Also Compel Mr. Conner to Answer Some of
           Plaintiffs' Questions to Prevent the Use of the Privilege as a Sword.................. 18

IV.    CONCLUSION................................................................................................................ 20

# TABLE OF AUTHORITIES

Page(s)

## Cases

*A.B. and J.F. v. Salesforce.com, Inc., et al.*,
  Case No. 4:20-CV-01254 (S.D. Tex.) ................................................................. 2, 3

*A.S. v. Salesforce, Inc., et al.*,
  Case No. 3:23-CV-01039-B (N.D. Tex.) .............................................................. 2, 3

*Coil Tubing Rentals and Supply Co. v. Camco Intern., Inc.*,
  1994 WL 25522 (E.D. La. Jan. 21, 1994) ............................................................... 11

*In re Corrugated Container Anti-Trust Lit.*,
  620 F.2d 1086 (5th Cir. 1980) ................................................................. 9, 10, 17

*G.G. v. Salesforce, Inc.*,
  Case No. 1:20-CV-2335 (N.D. Ill.) ...................................................................... 2, 3

*In re High Fructose Corn Syrup Antitrust Litig.*,
  295 F.3d 651 (7th Cir. 2002) ................................................................................ 10

*Hillman v. City of Chicago*,
  918 F. Supp. 2d 775 (N.D. Ill. 2013) ............................................................... 10, 19

*Hoffman v. United States*,
  341 U.S. 479 (1951) ......................................................... 10, 13, 15, 16, 19

*Martin-Trigona v. Gouletas*,
  634 F.2d 354 (7th Cir. 1980) ........................................................... 10, 16, 18

*Molina v. Transocean Deepwater, Inc.*,
  2009 WL 10736478 (S.D. Tex. Dec. 28, 2009) ...................................................... 18

*Ruiz-Cortez v. City of Chicago*,
  931 F.3d 592 (7th Cir. 2019) ................................................................................ 16

*S.M.A. v. Salesforce, Inc., et al.*,
  Case No. 3:23-CV-0915-B (N.D. Tex.) ..................................................... 2, 3, 6, 7

*Shakman v. Democratic Org. of Cook Cnty.*,
  920 F. Supp. 2d 881 (N.D. Ill. 2013) .............................................. 10, 16, 17

*United States v. Lacey*,
  No. 2:18-CR-00422 (D. Ariz. July 25, 2018), Dkt. 230 ................................... 14, 18

*United States v. Melchor Moreno*,
  536 F.2d 1042 (5th Cir. 1976) ...................................................................... 11, 19

*United States v. Zicarelli*,
  92 S. Ct. 1670 (1972) ............................................................................................ 10

**TABLE OF AUTHORITIES**
*(continued)*

Page(s)

*Wehling v. Columbia Broad. Sys.*,
  608 F.2d 1084 (5th Cir. 1979) ..........................................................................16, 20

**Statutes**

18 U.S.C. § 1382 ..............................................................................................18

18 U.S.C. § 1952 ..............................................................................................18

18 U.S.C. § 1956 ..............................................................................................18

18 U.S.C. § 1957 ..............................................................................................18

**Other Authorities**

E. Nolan, *Secret Memos Show the Government Has Been Lying About Backpage
  All Along*, Reason, Aug. 26, 2019, available and linked at
  https://reason.com/2019/08/26/secret-memos-show-the-government-has-been-
  lying-about-backpage/..........................................................................................18

**Constitutional Provisions**

U.S. Const. Amend. V ........................................................................................9

## I.   INTRODUCTION

Defendant Salesforce, Inc. seeks an order compelling further deposition testimony from third-party witness James Patrick Conner under Rule 37 of the Federal Rules of Civil Procedure. In the initial session of his deposition, held on August 15, 2025, Mr. Conner invoked the Fifth Amendment as a basis for refusing to provide substantive answers to a broad range of questions concerning a business software contract between his former employer, Website Technologies, and defendant Salesforce. Those questions related to the basic functionalities of the Salesforce software, known as Customer Relationship Management ("CRM") software, and critical issues regarding Salesforce's alleged activities with respect to Website Technologies and its affiliate, Backpage.com LLC ("Backpage")—including (a) whether Salesforce customized its CRM software for Website Technologies or Backpage, (b) whether Salesforce performed market research, developed marketing materials, or conducted marketing campaigns for Website Technologies or Backpage, (c) whether Salesforce provided general business advice or assistance to Website Technologies or Backpage, (d) whether Salesforce accessed customer data stored by Website Technologies or Backpage on the Website Technologies "instance" of Salesforce (a secure location on the CRM server where each customer can store its data), and (e) whether and to what extent Salesforce employees interacted with Mr. Conner and/or other employees of Website Technologies and/or Backpage.

None of these questions—all of which directly related to contested allegations in this action—would tend to yield responses that would incriminate Mr. Conner in any criminal conduct or put him at risk of criminal prosecution. On the contrary, the truthful answers to these questions would be entirely innocuous. Because the Fifth Amendment provides no basis for Mr. Conner's blanket refusal to respond to these essential questions, he should be compelled to respond to the questions set out in Appendices A and B.

## II. BACKGROUND

### A. Mr. Conner Is Identified by The Parties as a Third-Party Witness and Provides Truthful Responses in Interviews with Salesforce's Counsel

Early in these cases,[1] the parties identified third-party witness James Patrick Conner, a former Director of Data at Website Technologies, as a relevant witness. (Declaration of Kristin A. Linsley ("Linsley Decl.") Decl. ¶ 3.) As part of his responsibilities at Website Technologies, Mr. Conner configured and implemented the standard business software that was the subject of a subscription agreement between Website Technologies and Salesforce—specifically, Salesforce's Customer Relationship Management (CRM) software, a standard business software package that hundreds of thousands of businesses, government entities, and other organizations use to organize their customer data and interactions. The documents produced in these cases, some of which are reproduced in the Fourth Amended Complaint in *G.G.*, show that Mr. Conner interacted with Salesforce on such issues as the purchase of new software licenses for Website Technologies personnel (each user who has access to the Salesforce system within a customer's organization must have a "license"), additional data storage needs, tech support issues, and similar topics. (*Id.*) As part of preparing its defense in these cases, Salesforce's counsel reached out to Mr. Conner via LinkedIn, and, after some time had passed, he responded and agreed to speak with them. (*Id.* at ¶¶ 4-5.)

Salesforce's counsel conducted two substantive interviews with Mr. Conner, the first on October 7, 2024, and the second on March 19, 2025. (*See* Linsley Decl. ¶¶ 6, 8.) At the outset of the first interview, Mr. Conner volunteered that he agreed to speak with Salesforce's counsel because

---

[1] Defendant is filing materially identical versions of this Motion to Compel in the four cases in which the Deposition of Mr. James Patrick Conner was noticed: *S.M.A. v. Salesforce, Inc., et al.*, Case No. 3:23-CV-0915-B (N.D. Tex.), *G.G. v. Salesforce, Inc.*, Case No. 1:20-CV-2335 (N.D. Ill.), *A.B. and J.F. v. Salesforce.com, Inc., et al.*, Case No. 4:20-CV-01254 (S.D. Tex.), and *A.S. v. Salesforce, Inc., et al.*, Case No. 3:23-CV-01039-B (N.D. Tex.).

he thought it was unfair that Salesforce was being sued for its relationship with Website Technologies. (*Id.* at ¶ 6)—a sentiment that he confirmed later in a message to counsel saying that he wanted to be "transparent" with both sides and "confirm the truth." (*Id*., Ex. 1 (Screenshots of LinkedIn conversation between Salesforce counsel and Mr. Conner) at 3.)

Both interviews covered the key sets of allegations that the plaintiffs have asserted in their operative pleadings, and in both interviews, Mr. Conner, addressed and repudiated plaintiffs' key allegations in these cases concerning Salesforce's interactions with Website Technologies and Backpage. For example, in the operative pleadings, the plaintiffs allege that Salesforce "built Backpage's platform," and that Backpage "was unable to integrate and migrate its data without Salesforce's assistance." (Linsley Decl. Ex. 4, *A.S. v. Salesforce, Inc., et al.*, Case No. 3:23-CV-01039-B, Dkt. 110, First Amended Complaint ("*A.S.* FAC") (N.D. Tex.) ¶ 129; Linsley Decl. Ex. 5, *S.M.A. v. Salesforce, Inc., et al.*, Case No. 3:23-CV-0915-B, Dkt 51, First Amended Complaint ("*S.M.A.* FAC") (N.D. Tex.) ¶ 105, *see* Linsley Decl. Ex. 6, *A.B. and J.F. v. Salesforce.com, Inc., et al.*, Case No. 4:20-CV-01254, Dkt. 96, Fourth Amended Complaint ("*A.B.* 4AC") (S.D. Tex.) ¶ 75.) And the *G.G.* plaintiff—although she has now removed many of the allegations that existed at the time of these interviews—continues to assert that Salesforce "configured" or "adapted" its software to "each customer's unique needs." (*See, e.g.*, Linsley Decl. Ex. 7, *G.G. v. Salesforce, Inc.*, Case No. 1:20-CV-2335, Dkt. 235, Fourth Amended Complaint ("*G.G.* 4AC") (N.D. Ill.) ¶¶ 91-93.)

During both interviews, Mr. Conner made clear that Salesforce did not customize the software for Website Technologies in any way and that, on the contrary, he had to do all the configuration and implementation of the software himself. At the initial sign up, he noted in the March 2025 interview, Salesforce's attitude was "kind of do what you want with it," with the result

that he had to "googl[e] how to do stuff." (Linsley Decl. Ex. 2 (Transcription of March 19, 2025 Recorded Interview with James Patrick Conner) at 3:6-7.) Mr. Conner gave similar statements in the October 2024 interview. (Linsley Decl. ¶ 7 .)

Mr. Conner also refuted the plaintiffs' effort to cast the technical support that Website Technologies received from Salesforce as part of the CRM software package as somehow constituting nefarious "customization" or "manipulat[ion]" to build Backpage's alleged illicit business, (*see, e.g.*, *G.G.* 4AC ¶¶ 120, 123, 132) or as "direct support . . . to draw more sex traffickers into Backpage." (*A.S.* FAC ¶ 401; *see also S.M.A.* FAC ¶ 109 (Salesforce provided "ongoing, personalized operational support" making it possible for Backpage to "engage in . . . sex trafficking, and compelled prostitution"). In his October 2024 interview, Mr. Conner stated the plaintiffs' allegations concerning customization were not true. (Linsley Decl. ¶ 9.) He also stated in both interviews that, during the period of the subscription, his conversations with Salesforce representatives about the CRM software were largely "transactional," such as "setting things up." (*see* Ex. 2 at 4:7-9). And although Mr. Conner was invited by Salesforce sales representatives for drinks or meals, he said they "never actually met in-person." (*Id.* at 6:17-20, 8:7-15; *see G.G.* 4AC ¶ 156 (citing email between Salesforce representative and Mr. Conner inviting Mr. Conner to lunch or drinks).)

Mr. Conner also discussed how Backpage used the CRM software—and the extent of the CRM software's involvement in Backpage's marketing—in ways that significantly undercut plaintiffs' narrative about Salesforce in these cases. The plaintiffs allege that Salesforce developed and conducted marketing campaigns for Backpage and/or Website Technologies, and that it also conducted market research and market analytics to help Backpage obtain new customers for its online classified ads website. (*See A.S.* FAC ¶ 401 (Salesforce "assisted and facilitated Backpage's

creation of direct marketing campaigns"), ¶ 392(f) (Salesforce "analyz[ed] information and behavior of pimps and victims to target through direct email campaigns to advertise and promote illegal prostitution"); *S.M.A.* FAC ¶ 162 (Salesforce "facilitated and supported Backpage's analysis of customer and user activity . . . enabling Backpage to more effectively target traffickers and sex buyers"); *A.B.* 4AC ¶ 78 (Salesforce "provided Backpage with capabilities and support for direct marketing campaigns"). The plaintiffs also allege that the Salesforce CRM was used to conduct marketing campaigns and that Salesforce was aware of this use. (*See, e.g.*, *G.G.* 4AC ¶ 161 ("Backpage's use of the Salesforce platform for email marketing is documented throughout the Backpage Org."). And some of the complaints allege that Salesforce itself actually went out and found new "trafficking" customers for the Backpage.com website. (*See, e.g.*, *A.S.* ¶ 401 (alleging "[t]hrough Pardot . . . Salesforce assisted Backpage in creating connections with more sex traffickers, generating a continuous pipeline of sex traffickers direct towards Backpage . . .and encouraging sex traffickers to use Backpage to sell their victims").

Mr. Conner refuted these allegations, stating that Backpage's marketing campaigns were "completely independent of Salesforce entirely." (Ex. 2 at 14:14-15:1.) He explained that Backpage conducted email marketing campaigns through other, non-Salesforce programs, such as MailChimp. (Linsley Decl. ¶ 7.) He noted that the Salesforce CRM program comes with "thousands" of "prebuilt templates" and that a customer can "just click them and then you can edit them yourself." (Ex. 2 at 15:8-13.) This description aligns with examples the *G.G.* plaintiff cites in her Fourth Amended Complaint that show computer coding suggestive of a template, (*see G.G.* 4AC ¶¶ 161-165), but in any event, Mr. Conner made clear that the marketing that Backpage conducted was largely done through other programs, not Salesforce. And he made clear that Salesforce certainly did not itself develop or implement marketing campaigns on Backpage's behalf. (Ex. 2 at 14:14-14:18

(Mr. Conner stating "No" in response to a question regarding plaintiffs' allegations that Salesforce helped Backpage develop and implement marketing campaigns.))

Plaintiffs in these related cases have tried to suggest that interactions between Salesforce and Backpage evince an illegal venture to promote sex trafficking—alleging, for example, that Salesforce "guided Backpage" to "identify individuals who used Backpage.com in the last 90 days" to keep only those users in Backpage's new CRM system, (*G.G.* 4AC ¶¶ 196-197), or that Salesforce "directly assisted Backpage" in "utilizing and weaponizing Salesforce's software" to expand and operate the alleged trafficking venture (*A.S.* FAC ¶ 401; *S.M.A.* FAC ¶ 162). But Mr. Conner flatly refuted the suggestion that Salesforce and Backpage/Website Technologies were somehow working together or that Salesforce was helping Backpage with its business—he made clear that there were not even discussions about what Backpage did, that the relationship was entirely "transactional," and that that the "primary reason for using Salesforce was to keep track of contact information," such as "email, phone number." (Ex. 2 at 16:22-25.)

Mr. Conner's interview also threw cold water on plaintiffs' allegation that Salesforce helped Backpage "migrate" its data overseas allegedly to evade law enforcement. (*See G.G.* 4AC ¶¶ 172-173; *A.S.* FAC ¶¶ 152, 392(j); *A.B.* 4AC ¶¶ 74, 97(k); *S.M.A.* FAC ¶ 128.) Mr. Conner explained that Backpage's "reasons" for trying to separate the European data from the U.S. data "w[as]n't for anything other than simple location" because "if we had them all in one system things would just get crossed . . . [causing] duplication of efforts towards the same advertiser" and Salesforce was used primarily for the United States. (Ex. 2 at 10:10-12:5.)

Finally, the plaintiffs allege generally that Salesforce "facilitated the growth of Backpage's business, a business that was largely a sex-trafficking business," (*G.G.* 4AC ¶ 225), or that Salesforce was aware that "Backpage was in the business of selling sex through prostitution and the sex

trafficking of minors and adults." (*A.S.* FAC ¶ 121; *see S.M.A.* FAC ¶ 162 (Salesforce knew "Backpage was a sex trafficker and engaged in the promotion of prostitution"). Mr. Conner, again one of the main Backpage/Website Technologies contacts with Salesforce, stated that "at no point did I think we were an adult site," referring to Backpage, and that he felt as though "we actually helped a lot of people, for a number of reasons." (Ex. 2 at 21:21-22, 22:2-3.) He also mentioned that Backpage received a "global award from NCMEC" for combating sex trafficking with children and there was a "plaque on the wall from the FBI for the work [Backpage] d[id] to save children." (*Id.* at 22:2-8).

**B.     After Plaintiffs' Counsel Retains and Apparently Agrees to Fund Counsel for the Witness, Mr. Conner Invokes the Fifth Amendment in Response to Virtually All Substantive Questions Regarding Salesforce**

During his discussions with Salesforce's counsel, Mr. Conner stated that he was willing to receive a deposition subpoena and to sit for a deposition. (Linsley Decl. ¶ 13.) As noted above, he told Salesforce's counsel that he was willing to do so because he felt that the lawsuits against Salesforce relating to Backpage were unjust and he wanted to "confirm the truth" regarding Salesforce and Backpage. (Linsley Decl. ¶ 6, Ex. 1 at 3.) After Salesforce served the subpoena and plaintiffs' counsel became involved, all of that changed. At his deposition, Mr. Conner testified that, at some point after his interviews with Salesforce's counsel, he was contacted by Tommy Fibich, one of plaintiffs' counsel in the *G.G.* case. Mr. Conner testified that █████████████████

████████████████████████████████████████████████████

███████████████████████████     ████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████ Following that

introduction, on July 11, 2025, Mr. Clift advised counsel for the parties by email that his client would

be invoking the Fifth Amendment and declining to answer any substantive questions during the

deposition. (Linsley Decl. ¶ 15). The deposition was then rescheduled for August 15, 2025.

On August 13, 2025, counsel for Salesforce met with Mr. Clift by telephone in an effort to

determine whether there were areas of questioning as to which he would not instruct the witness to

testify. (Linsley Decl. ¶ 16.) In particular, Salesforce's counsel described the substance of

Mr. Conner's previous statements during October 2024 and March 2025 interviews with the witness.

(*Id.*) During that call, Mr. Clift asked whether either of the interviews had been recorded. (*Id.*) That

evening, the associate who had participated in the March 2025 interview recalled that he had

recorded it for note-taking purposes. (Linsley Decl. ¶ 17.) On the following day, Salesforce's

counsel was able to have the recording extracted from the associate's iPhone. (*Id.*) Salesforce's

counsel then notified Mr. Clift about the recording and, in response to Mr. Clift's request, produced

it to both Mr. Clift and plaintiffs' counsel. (*Id.* at ¶ 18.) Salesforce's counsel also had the interview

transcribed, and, also at Mr. Clift's request, provided that transcript to Mr. Clift and Plaintiff's

counsel. (*Id.*). Salesforce's counsel also offered to postpone the Conner deposition so that counsel

for the witness and/or plaintiffs' counsel could have a complete opportunity to review the recording

and the transcript prior to the deposition. (*Id.* at ¶ 19.) Neither the witness's counsel nor plaintiffs'

counsel accepted this offer, and the deposition went forward on August 15, 2025. (*Id.*)

At the deposition, Mr. Conner's counsel (Mr. Clift) again advised counsel for both sides that

the witness would invoke the Fifth Amendment as a basis for refusing to answer all questions beyond

███████████████████████████████████ As directed by his counsel, Mr. Conner then

invoked the Fifth Amendment in response to the vast majority of substantive questions posed to him, and effectively all questions relating to his interactions with Salesforce.

The substantive questions Mr. Conner refused to answer covered the same subject areas that he had discussed in his prior interviews with Salesforce's counsel, including the business relationship between Salesforce and Website Technologies, the witness's interactions with Salesforce, and information about the technology that Salesforce sold Website Technologies. In particular, Mr. Conner repeatedly refused to answer questions that he had freely answered during the March 19, 2025 conversation with Salesforce, including questions drawn directly from the recorded interview and related transcript.

The only substantive questions to which Mr. Conner did respond to were questions on topics separate from his work at Backpage, such as questions regarding his knowledge of certain industry terms, ██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
████████████████████████████████

## III.    ARGUMENT

Rule 26(b)(1) of the Federal Rules of Civil Procedure allows discovery regarding "any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." If a deponent fails to respond to questions during a deposition, including by invoking a privilege, the witness may be compelled to answer those questions under Rule 37(a)(3)(B)(i).

The Fifth Amendment states that no person "shall be compelled in any Criminal Case to be a witness against himself." U.S. Const. Amend. V. A witness such as Mr. Conner may invoke the Fifth Amendment as a basis for refusing to respond to questioning only where he establishes two

requirements. *First*, the testimony he would give must tend to incriminate him in criminal conduct. *See In re Corrugated Container Anti-Trust Lit.*, 620 F.2d 1086, 1091 (5th Cir. 1980). If the "truthful[]" answer to the question would not be incriminating, *In re High Fructose Corn Syrup Antitrust Litig.,* 295 F.3d 651, 663 (7th Cir. 2002), the witness "must answer." *In re Corrugated Container*, 620 F.2d at 1091; *see also United States v. Zicarelli*, 92 S. Ct. 1670, 1676 (1972) (inquiry focuses on "what a truthful answer might disclose"); *Hoffman v. United States*, 341 U.S. 479, 488 (1951) (court considers where a "truthful answer" is incriminating). This is because the right to refuse to testify under the Fifth Amendment is "confined to instances where the witness has reasonable cause to apprehend danger from a direct answer." *Hoffman*, 341 U.S. at 486.

To sustain the privilege, courts must undertake a context-specific inquiry, considering factors such as "the implications of the question," "the setting in which it is asked," and "why it cannot be answered." *Hoffman*, 341 U.S. at 486-87. The court also should consult its "personal perception of the peculiarities of the case as by the facts actually in evidence." *Id.* at 487. Ultimately, the witness "must" offer "some credible reason why a response would pose a real danger of incrimination, not a remote and speculative possibility." *Hillmann v. City of Chicago*, 918 F. Supp. 2d 775, 779 (N.D. Ill. 2013) (citing *Martin-Trigona v. Gouletas*, 634 F.2d 354, 360 (7th Cir. 1980)); *see Shakman v. Democratic Org. of Cook Cnty.*, 920 F. Supp. 2d 881, 888 (N.D. Ill. 2013) ("the person claiming the privilege must establish the possibility of self-incrimination with respect to *each question* and assist the court in its job of weighing the validity of the privilege claim").

*Second*, even if a truthful answer to the questions posed might incriminate the witness, the court still must consider whether the witness faces a real risk of criminal prosecution. *In re Corrugated Container Anti-Trust Lit.*, 620 F.2d at 1091.

*Finally*, a witness may not take a "carte blanche" approach for invoking the Fifth Amendment as a basis for refusing to provide testimony. *In re High Fructose Corn Syrup*, 295 F.3d at 663; *see also Coil Tubing Rentals and Supply Co. v. Camco Intern., Inc.*, 1994 WL 25522, at *1 (E.D. La. Jan. 21, 1994) (deponent may not make "blanket" invocation of his Fifth Amendment rights but must justify the defense on a question-by-question basis).

Here, at all steps of the inquiry, Mr. Conner cannot meet his burden of establishing his right to invoke the privilege because his truthful answers would not incriminate him or create any real risk of criminal prosecution. *See, e.g., United States v. Melchor Moreno*, 536 F.2d 1042, 1049 (5th Cir. 1976).

## A. The Court Should Compel Mr. Conner's Testimony Because His Truthful Answers Would Be Non-Incriminatory

During his deposition, Mr. Conner repeatedly refused to answer questions regarding Website Technologies' contract with Salesforce, information regarding the technology Salesforce sold to Website Technologies, and the types of access Salesforce and its employees had to Website Technologies, despite previously answering questions on these same topics in his interviews with Salesforce's counsel in connection with this case. For example, Mr. Conner improperly invoked the privilege as to topics and questions such as:

***Salesforce's Limited Involvement in Implementing Website Technologies' CRM Software***



***Salesforce's Lack of Customization of its Software for Website Technologies***

MOTION BY DEFENDANT SALESFORCE, INC. TO COMPEL FURTHER DEPOSITION TESTIMONY OF THIRD-PARTY WITNESS

***Salesforce's Lack of Involvement in Backpage Marketing Research or Analytics***

- 

As set forth below, Mr. Conner's invocation of the Fifth Amendment privilege to each of these topics and questions, as well as the topics and questions set forth in Appendix A, was improper.

The touchstone for invocation of the Fifth Amendment is whether a truthful answer to the question would tend to reveal that the witness participated in criminal activities. And the Supreme Court's decision in *Hoffman* makes clear that evaluating a witness's assertion of the Fifth Amendment privilege is a context-driven inquiry. In *Hoffman*, the Supreme Court considered whether the petitioner properly invoked the Fifth Amendment in response to a series of questions posed during a grand jury session about a fugitive witness that the petitioner knew. 341 U.S. at 480-81. In upholding the invocation, the Court found that the courts below had improperly limited their inquiry to the bare questions posed to the witness and had improperly disregarded a separate document that he submitted explaining his reasons why questions, although apparently innocuous, would yield answers that would incriminate him. *Id.* at 489. The Court also found it important that the judge who ruled on the petitioner's claim of privilege had himself impaneled the special grand jury before which the petitioner appeared to investigate "rackets" in the district. *Id.* at 487, 490. The petitioner had a lengthy, publicized criminal record and was known to be a "gangster" in the area. *Id.* at 489. And the questions posed to the petitioner about the fugitive "all" could "easily have required answers that would force links in a chain of facts imperiling petitioner with conviction of a federal crime." *Id.* at 488.

Here, in contrast, the context shows precisely the opposite. The truthful answers to Salesforce's questions, as evidenced by Mr. Conner's prior statements in the October 2024 and March 2025 interviews, would not incriminate Mr. Conner in any way. None of the questions Salesforce's counsel asked would tend to implicate Mr. Conner in any criminal conduct. There is no criminal investigation into Salesforce and the use of its CRM software by Website Technologies or Backpage. Although Backpage and some of its senior executives have been investigated and criminally prosecuted based on allegations that Backpage, an online classified advertisement service, facilitated prostitution by allowing users to post advertisements for prostitution, *see, e.g.*, *United States v. Lacey*, No. 2:18-CR-00422 (D. Ariz. July 25, 2018), Dkt. 230, Salesforce is not a defendant in those proceedings, and its subscription agreement with, and provision of CRM software to, Website Technologies is not a focus or even a subject of the criminal proceedings. It also is undisputed that neither Salesforce nor its CRM software had anything to do with the operation of the Backage.com classified ads website.

For these reasons, Salesforce's questions regarding whether and how Mr. Conner interacted with Salesforce, what he knew about the contract between Salesforce and Website Technologies, how Website Technologies and/or Backpage used the CRM software Salesforce provided, and whether Salesforce customized that software or provided marketing research and analytics, developed marketing campaigns, or otherwise assisted Website Technologies or Backpage in the conduct of their classified ads business do not and cannot incriminate Mr. Conner with respect to any actual or potential criminal charge. As Mr. Conner explained in the interviews, Salesforce just provided a standard, out-of-the-box CRM software package and did not provide any assistance in configuring or implementing it, much less customizing it for an illegal business. And he also made clear that Website Technologies/Backpage did not even use the Salesforce CRM software for its

marketing, instead using other programs sold by other companies like Mailchimp. Nor, he explained, did Website Technologies seek to evade law enforcement when it considered housing some of its data overseas, much less did it do so with Salesforce's help. Not only would Mr. Conner's truthful answers to these questions undermine Plaintiffs' liability theories against Salesforce, but they would not in any way provide a link to a chain of evidence that would incriminate Mr. Conner in any criminal investigation. *Hoffman*, 341 U.S. at 486. Certainly, completely innocuous questions such as his use of Google to figure out how to use Salesforce's CRM software would not possibly provide an incriminating link in such a criminal chain of evidence.

The same analysis applies to truthful answers questions that reference advertisements on the Backpage.com website, such as whether Backpage ads were housed or sold on Salesforce's server (according to Mr. Conner's statements, they were not), what types of data from Backpage was stored on the Salesforce CRM (as Mr. Conner clearly indicated, this would have been customer contact information), and whether individuals from Salesforce could see the content of ads posted on Backpage through the "Salesforce Org," the area of the Salesforce server where a specific customer's data is stored (known as an "Instance"). It is well known, and Mr. Conner himself testified in his deposition, that ████████████████████████████████████████████████████

████████████████████████████████ Mr. Conner also testified that ████████████████████

████████████████████████████████████ Given that the questions asked by Salesforce would apply to all advertisements at Backpage and Mr. Conner has already testified that Backpage sold ads and that he worked at Website Technologies, these questions about the presence or absence of Backpage ads on Salesforce's servers would not implicate Mr. Conner in any criminal conduct. *None* of Salesforce's deposition questions concerned the types of conduct for which Backpage and related individuals have been investigated and prosecuted, namely Backpage's

content moderation policies and internal content policies that allegedly allowed the posting of ads for commercial sex on its website and encouraged editing such ads to hide illegal prostitution.

Mr. Conner voluntarily provided answers to several of the same questions posed in his deposition just a few months prior on two separate occasions. Then, after being advised by plaintiffs' counsel that he needed a lawyer and being provided with an attorney secured and paid for by Plaintiffs' counsel, he suddenly decided to broadly invoke the privilege. This is like what occurred in *Shakman v. Democratic Org. of Cook Cnty.*, 920 F. Supp. 2d 881, 892 (N.D. Ill. 2013), where a court found a claim of privilege "undermine[d]" by the invoker's prior conduct of willingly responding to questions in earlier interviews and hearings without invoking the Fifth Amendment privilege. This Court should reach the same result here and find that Mr. Conner's prior interviews— in addition to showing that the truthful answers to Salesforce's questions will not incriminate him— significantly undermine his invocation of the privilege during his deposition.

The Court can and should review Mr. Conner's actual answers from his October 2024 and March 2025 interviews to aid in determining whether answering any of Salesforce's deposition questions in Appendix A would incriminate him. (*See* Linsley Decl. Ex. 2.) They do not. Mr. Conner's prior answers establish that he has no "valid reason" to invoke the Fifth Amendment, as his "truthful answers" do not incriminate him. *Ruiz-Cortez v. City of Chicago*, 931 F.3d 592, 603 (7th Cir. 2019); *Hoffman*, 341 U.S. at 488.

**B.     Mr. Conner's Truthful Answers to Salesforce's Questions Would Not Place Him at Risk of Criminal Prosecution**

Because Mr. Conner cannot establish that his answers to Salesforce's questions would incriminate him, the Court need not reach the question of whether there is a "risk" that Mr. Conner would be prosecuted for that criminal conduct. *Wehling v. Columbia Broad. Sys.*, 608 F.2d 1084, 1087 n.5 (5th Cir. 1979); *Martin-Trigona*, 634 F.2d at 360 (7th Cir. 1980) (some "nexus" between

the "risk" of criminal conviction and the information requested "must exist"). But any consideration of this factor overwhelmingly indicates that there is nothing but a "fanciful possibility of prosecution" against Mr. Conner. *In re Corrugated Container Anti-Trust Lit.*, 620 F.2d at 1091. Such speculative risk does not warrant the extreme step of allowing a witness to withhold relevant testimony under the cloak of the Fifth Amendment.

In *Shakman*, the witness invoking the privilege declined to answer nearly every question in a third-party witness deposition. In response to a motion to compel her testimony, the witness claimed that she had a credible fear of prosecution because both civil and criminal investigations were ongoing, her County-employer had been associated with criminal prosecutions, and she had received a subpoena for grand jury testimony in the past. 920 F. Supp. 2d at 890-91. The court in *Shakman* disagreed with each proffered reason, noting that there was no "current or pending criminal investigation" to justify her invocation of the privilege and her prior willingness to respond to questions on the same topics undercut her latter invocation. *Id.* at 891-93.

Here, the questions Salesforce seeks to compel Mr. Conner to answer do not concern any involvement he may have had with respect to ads for commercial sex activity on Backpage.com, his knowledge regarding the presence of such ads, or whether he participated in activities that have been criminally alleged against Backpage and its senior executives, such as systematically removing terms referencing prostitution and human trafficking from advertisements—the subjects of the federal criminal investigation and prosecution, *see Lacey*, No. 2:18-CR-00422, Dkt. 230. And, as noted, no part of the criminal prosecutions against Backpage and its senior executives involved the Salesforce CRM software or anything related thereto. So, there is nothing in the truthful answers to Salesforce's questions that would link Mr. Conner to any of the charges advanced by the Department of Justice against Backpage and its senior executives. And as for other types of charges, such as the sex-

trafficking claims in this case, the Department of Justice thoroughly investigated Backpage for sex trafficking crimes and concluded that such a prosecution would be unsupported by the evidence.[2] In line with this conclusion, Backpage was *never* federally prosecuted for sex trafficking.

It strains belief to suggest that Mr. Conner's testimony now, over a decade after the federal investigation closed and years after the state investigation ended, would expose him to criminal liability when he was never a person of interest even when the investigations were taking place. The five-year statute of limitations for all the charges brought against Backpage and its employees in the District of Arizona has passed, making Mr. Conner's possible concerns of criminal liability in relation to his testimony essentially zero. *See United States v. Lacey*, No. 2:18-CR-00422, Dkt. 230; 18 U.S.C. § 1382 (requiring a five-year statute of limitations for non-capital offenses unless otherwise expressly provided by law); 18 U.S.C. § 1952; 18 U.S.C. § 1956; 18 U.S.C. § 1957. And, again, the likelihood of a criminal prosecution for a federal trafficking offense is even less than zero, given that the Department of Justice concluded that no such claim was sustainable even against senior Backpage executives who, unlike Mr. Conner, actually developed and implemented Backpage's challenged content moderation policies. *See* note 2, *supra*. Mr. Conner cannot establish any "nexus between the risk of criminal conviction and the information requested." *Martin-Trigona*, 634 F.2d at 360.

Because answering questions about Website Technologies' business relationship with Salesforce, the customization of the CRM software that Salesforce completed for Backpage, if any, and Salesforce's involvement in Backpage's marketing efforts, if any, poses at best "a remote and speculative possibility" of prosecution, *see Molina v. Transocean Deepwater, Inc.*, 2009 WL

---

[2] *See* E. Nolan, *Secret Memos Show the Government Has Been Lying About Backpage All Along*, Reason, Aug. 26, 2019, available and linked at https://reason.com/2019/08/26/secret-memos-show-the-government-has-been-lying-about-backpage/.

10736478, at *6 (S.D. Tex. Dec. 28, 2009), Mr. Conner cannot invoke the Fifth Amendment as a basis for refusing to answer such questions and should be compelled to provide responses. *See Hoffman*, 341 U.S. at 487 (the court must "require him to answer" if his silence is not "justified"); *United States v. Melchor Moreno*, 536 F.2d 1042, 1049 (5th Cir. 1976) (reversing district court ruling that witness properly invoked self-incrimination privilege because he did not carry burden to show his testimony would expose him to "risk of prosecution"); *Hillmann*, 918 F. Supp. 2d at 779 (court finding improper deponents' invocation of the privilege to "basic factual questions" and questions "directly related to the subject of the present litigation" with "no link to the possibilities of prosecution that deponents suggest").

**C.    The Court Should Also Compel Mr. Conner to Answer Some of Plaintiffs' Questions to Prevent the Use of the Privilege as a Sword**

Much of the plaintiffs' questioning at Mr. Conner's deposition constituted a transparent effort to capitalize on the witness's decision to plead the Fifth Amendment—principally by posing outlandish questions that implied extreme conduct or knowledge on Salesforce's part and that they knew the witness would not answer. Plaintiffs asked these types of questions not only knowing that Mr. Conner would invoke the Fifth Amendment to refuse to answer them, but also knowing from the transcript of the March 2025 interview with Mr. Connor that the premises underlying the questions were false. Presumably, plaintiffs employed this tactic in the hope of later trying to seek some kind of adverse inference against Salesforce based on those non-answers.

For example, plaintiffs' counsel repeatedly asked Mr. Conner questions that they knew he would refuse to answer implying facts that directly contradicted what Mr. Conner had stated previously, clearly in the hope of an adverse inference on these subjects. For example, plaintiffs' counsel asked the following:



██████████████████████████████ support that Salesforce sold and helped them run their illegal trafficking venture, right?

All these questions implied responses that would directly contradict the answers the witness had previously provided during the interviews with Salesforce counsel.

Similarly, plaintiffs' counsel also asked Mr. Conner, ███████████████████████ ████████████████████████████████████████████████████████████ even though Mr. Conner had stated in the March 2025 interview that Salesforce did *not* customize the CRM software for Website Technologies or Backpage—specifically, that Salesforce set up the software initially and then it was left to Website Technologies to decide how they wanted to configure the software, and that Mr. Conner had done all the initial configuration and implementation himself. (Ex. 2 at 3:2-9.) Obviously, any adverse inference from this invocation of the Fifth Amendment on this question would be false and prejudicial to Salesforce.

In another series of questions, plaintiffs' counsel sought to paint a close relationship between Mr. Conner and Salesforce representatives, referring to ███████████████████████ ████████████████████████████████████ Plaintiffs presumably wanted to argue for an adverse inference here that would suggest that Mr. Conner had a close relationship with

Salesforce representatives, but that too would be false.  As he stated in his March interview, Mr. Conner "never actually met [the Salesforce representatives] in person," and the relationship was "very transactional." (Ex. 2 at 8:14, 4:1.) Permitting plaintiffs to seek adverse inferences after asking knowingly false questions would "enable" them to "use [the] Fifth Amendment shield as a sword." *Wehling*, 608 F.2d at 1087.  This they "cannot do." *Id.*

In yet another series of questions, counsel elicited a Fifth Amendment refusal to questions about Salesforce's knowledge that, again, contradicted what Mr. Conner had said previously:



Again, as counsel well knew, the truthful answers to these questions would have been "No." (*See* Ex. 2 at 3:23-4:15 (the relationship with Salesforce was "transactional"), 21:10-25 (Backpage as an advertisement site that worked with law enforcement to combat trafficking).)

For these reasons, Salesforce also asks the Court to compel Mr. Conner to answer plaintiffs' questions listed in Appendix B, truthful answers to which will neither incriminate him nor expose him to risk of prosecution and will prevent plaintiffs from distorting Mr. Conner's invocation of the Fifth Amendment privilege to create false evidence in this case.

## IV.    CONCLUSION

Salesforce respectfully requests that the Court enter an order compelling Mr. Conner to resubmit to be deposed and answer every question contained in Appendices A and B.

DATED: September 6, 2025                         Respectfully submitted,

                                                 */s/ Patricia Brown Holmes*

                                                 Patricia Brown Holmes
                                                 Lucas T. Rael
                                                 RILEY SAFER HOLMES & CANCILA LLP
                                                 1 S Dearborn St., Suite 2200
                                                 Chicago, IL 60603
                                                 Telephone: (312) 472-8700
                                                 pholmes@rshc-law.com
                                                 lrael@rshc-law.com

                                                 Kristin A. Linsley (admitted *pro hac vice*)
                                                 GIBSON, DUNN & CRUTCHER LLP
                                                 One Embarcadero Center, Suite 2600
                                                 San Francisco, CA 94111
                                                 Telephone: 415.393.8395
                                                 klinsley@gibsondunn.com

                                                 Bradley J. Hamburger (admitted *pro hac vice*)
                                                 GIBSON, DUNN & CRUTCHER LLP
                                                 333 South Grand Avenue
                                                 Los Angeles, CA 90071-3197
                                                 Telephone: 213.229.7658
                                                 bhamburger@gibsondunn.com

                                                 Gregg Costa
                                                 GIBSON, DUNN & CRUTCHER LLP
                                                 811 Main St., Suite 3000
                                                 Houston, TX 77002
                                                 Telephone: 346.718.6649
                                                 GCosta@gibsondunn.com

                                                 Andrew LeGrand
                                                 Matthew Capoccia
                                                 GIBSON, DUNN & CRUTCHER LLP
                                                 2001 Ross Avenue, Suite 2100
                                                 Dallas, TX 75201
                                                 Telephone: 214.698.3100
                                                 alegrand@gibsondunn.com
                                                 mcapoccia@gibsondunn.com

                                                 *Counsel for Defendant Salesforce, Inc.*

## **CERTIFICATE OF SERVICE**

I hereby certify that on the 6th day of September, 2025, the foregoing document was filed using the Court's CM/ECF system.  In addition, (1) the filing is available for viewing and downloading via the CM/ECF system, and (2) the CM/ECF system will send notification of this filing to all attorneys of record who have registered for CM/ECF updates.

/s/ *Patricia Brown Holmes*
Patricia Brown Holmes