**THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| G.G. (a minor), et al., | ) | |
| | ) | |
| *Plaintiffs*, | ) | No. 20 C 2335 |
| v. | ) | |
| | ) | Chief Judge Virginia M. Kendall |
| | ) | |
| SALESFORCE.COM, INC. | ) | |
| | ) | |
| *Defendant.* | ) | |
| | ) | |

**MEMORANDUM OPINION & ORDER**

Plaintiff G.G. and her mother (together, "Plaintiffs") bring this civil lawsuit against Defendant Salesforce.com, Inc. ("Salesforce") under the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C. § 1589 *et seq.*[1] When she was only 13 years old, G.G. fell into the hands of sex traffickers who advertised her on the now-defunct Backpage.com ("Backpage"). Backpage contracted with Salesforce for its customer relationship management business software. Plaintiffs sued Salesforce pursuant to 18 U.S.C. § 1595, alleging that, through its contracts with Backpage, Salesforce violated the TVPRA by knowingly benefiting from and participating in a venture that it knew, or should have known, was engaged in illegal sex trafficking. Plaintiffs also seek damages from Salesforce under 18 U.S.C. § 2255 for violations of the TVPRA's criminal liability provision, 18 U.S.C. § 1591. Salesforce moves to dismiss the

---

[1] On August 27, 2025, this matter was consolidated with the following cases: *Does v. Salesforce, Inc.*, 25-CV-6867; *Does v. Salesforce, Inc.*, 25-CV-6868; *K.B. et al v. Salesforce, Inc.*, 25-CV-6869; *N.R.J. et al v. Salesforce, Inc.*, 25-CV-6870; *M.K. et al v. Salesforce, Inc.*, 25-CV-6871; and *N.A.M. et al v. Salesforce, Inc.*, 25-CV-6872. (Dkt. 268). The additional plaintiffs did not join G.G. and her mother's operative Fourth Amended Complaint. The pending Motion to Dismiss involves only the above-captioned case.

Fourth Amended Complaint in its entirety pursuant to Federal Rule of Civil Procedure 12(b)(6). For the reasons given below, the Court denies the Motion [241] in part.

## BACKGROUND

For the purpose of Salesforce's Motion to Dismiss, the Court accepts as true all well-pleaded facts in the Fourth Amended Complaint ("FAC") and views those facts in the light most favorable to Plaintiffs as the non-moving parties[2]. *Killingsworth v. HSBC Bank Nev., N.A.*, 507 F.3d 614, 618 (7th Cir. 2007).

### I.    Backpage and Salesforce

Backpage was created in 2004. (Dkt. 235 ¶ 45). During the 2000s, classified advertisement platforms and social media sites were facilitating and profiting from pornography and commercial sex. (*Id.* ¶ 46). In 2008, Craigslist, the then-leading online marketplace, took steps to reduce ads for sex on its platform. (*Id.* ¶ 49). Following this, Backpage experienced "explosive growth" in part by capitalizing on displaced Craigslist ad volume. (*Id.*). Backpage's gross revenues increased from $5.3 million to $29 million between 2008 and 2010. (*Id.* ¶ 48). Plaintiffs allege that between 2008 and 2011, Backpage became "publicly identified by law enforcement as the biggest and most notorious sex trafficking and pimping website in the United States" and the "unchallenged leader in online advertising for human trafficking." (*Id.* ¶¶ 47, 50). In August 2011, the National Association of Attorneys General sent a letter to Backpage expressing its concerns over Backpage's "facilitation of the sexual exploitation of children" and declaring Backpage as "a hub" for human trafficking of minors. (*Id.* ¶¶ 50-51); (Dkt. 242-1 at 1). Backpage was also regularly

---

[2] In addition to the complaint, a court deciding a motion to dismiss may consider exhibits attached to the complaint, other documents referenced in the complaint, and information that is properly subject to judicial notice. *Phillips v. Prudential Ins. Co. of Am.*, 714 F.3d 1017, 1019–20 (7th Cir. 2013). The Court considers the documents incorporated within the FAC for the purpose of deciding Salesforce's Motion. Plaintiffs have requested that the Court take judicial notice of several documents that are not included with the FAC. (Dkt. 248). The Court will rule on this Motion at a later date.

featured in the news during this time as a website that offered women and children for sale. (Dkt. 235 ¶¶ 52, 59). A 2012 article in the New York Times titled "Where Pimps Peddle Their Goods" described the prevalence of minors being trafficked for sex through ads placed on Backpage. (Dkt. 235 ¶ 52); (*See generally* Dkt. 242-2).

Salesforce is the leading customer relationship management ("CRM") technology company worldwide. (Dkt. 235 ¶ 88). CRM technology enables companies to manage their relationships and interactions with customers and potential customers. (*Id.*). Salesforce's CRM platform has a "customer org," which is a portal that serves as a point of interaction between Salesforce and its customers. (*Id.* ¶ 100.) The customer org is confidential to each Salesforce customer and consists of that customer's users, data, and automation. (*Id.*). In addition to CRM technology, Salesforce sells marketing software and tools designed to work with the CRM platform to enhance a business's customer acquisition, customer communication, and sales. (*Id.* ¶ 89). This software must be tailored to the individual business to work effectively. (*Id.* ¶ 90). Salesforce assists and supports its customers by adapting this software to each customer's needs and business goals. (*Id.* ¶ 92). As Plaintiffs allege, "the essence" of Salesforce's business model is the CRM technology it offers and the affirmative customer support it provides, both of which "are designed to aid in the success of the customer's business operations." (*Id.* ¶ 91).

Backpage first contacted Salesforce[3] in July 2012. (*Id.* ¶ 94). During their subsequent months-long negotiations, Salesforce employees inquired about Backpage's business objectives and the ability for Backpage to customize the CRM platform. (*Id.* ¶¶ 95-96, 98-99). A Salesforce account executive then continued those conversations, offering Backpage discounts on its services.

---

[3] Backpage contracted with Salesforce through a shell corporation it created called Website Technologies. (Dkt. 235 ¶ 108, 114). Plaintiffs maintain that Salesforce knew it was pursuing a deal with Backpage. (*Id.* ¶ 97). Salesforce does not contest this.

(*Id.* ¶¶ 103-06). Backpage signed its first contract with Salesforce in November 2013 for 500MB of data storage and 56 licenses for a version of Salesforce's CRM platform and software called "Salesforce Enterprise Edition." (*Id.* ¶ 113).

Over the next five years, Backpage regularly sought and received technical support from Salesforce employees for using, implementing, and customizing the CRM platform. (*See, e.g., id.* ¶¶ 117-122, 127-130, 132 135, 141-44, 146). Plaintiffs contend that this technical support constitutes Salesforce's tailoring and customization of its software to conform to Backpage's goals and business needs. (*Id.* ¶¶ 123, 132). Backpage also provided Salesforce access to its customer org to accomplish various technical support tasks. (*See, e.g., id.* ¶¶ 125-127, 129, 133, 141). Additionally, Salesforce provided "targeted solutions" tailored to specific problems Backpage was facing or goals it was pursuing. (*See, e.g., id.* ¶¶ 196-200, 206-209, 212).

Beginning in 2015, Salesforce and Backpage employees regularly discussed Backpage's business goals and needs. (*Id.* ¶¶ 148, 156, 170, 175, 177-79, 183, 188, 202). On one occasion, Backpage praised a Salesforce account executive after she proposed marketing solutions that allowed Backpage to keep up with its "exponential growth." (*Id.* ¶¶ 139-40). Backpage noted this employee had a "solid understanding of [its] growth related needs." (*Id.* ¶ 140). Over the course of five years, Backpage renewed its contract with Salesforce several times and purchased additional software. (*Id.* ¶¶ 153-54, 184, 191-92). Backpage's then-CEO Carl Ferrer was involved with at least two of the contract renewals (*Id.* ¶¶ 153-54, 184). Salesforce was aware as early as 2013 that Backpage wanted to expand its business overseas. (*Id.* ¶147). In 2015, Backpage began discussing moving its entire business abroad instead. (*Id.* ¶ 148). Between 2015 and 2017, Salesforce assisted Backpage in creating a separate customer org in the Netherlands and moving

data into it, allegedly to help it evade law enforcement scrutiny in the United States. (*Id.* ¶¶ 172-73, 201-05, 210-11).

Plaintiffs assert that Salesforce's CRM, marketing technology, and "personalized operational support" were critical to Backpage's operations–namely, Backpage's ability to manage its data, communicate with its customers, and engage in marketing. (*Id.* ¶¶ 159-69, 217). Using Salesforce's CRM tools and the support provided by its employees, Backpage scaled its operations and grew its business. (*Id.* ¶¶ 224-25). Plaintiffs claim that Salesforce also benefitted from this business relationship; according to Plaintiffs, Backpage earned over $1.4 million from its contract with Backpage. (*Id.* ¶ 75).

The nature of Backpage's business—and Salesforce's knowledge of it—are at the center of the present lawsuit. Plaintiffs allege that Backpage was primarily a sex-trafficking business. (*Id.* ¶¶ 167, 225). In 2016, Carl Ferrer, Backpage's former CEO, was charged with pimping a minor. (*Id.* ¶ 181). In 2017, the United States Senate found that Backpage knowingly facilitated prostitution and child sex trafficking. (*Id.* ¶ 185); (Dkt. 242-3 at 3). In 2018, Backpage plead guilty to one count of human trafficking and one count of engaging in organized criminal activity in Texas and Arizona. (Dkt. 235 ¶¶ 71, 73). As part of its plea agreement with the Government in the Arizona case, Backpage admitted to having knowingly benefitted from participating in a venture that involved the trafficking of a minor. (*Id.* ¶ 72).

Salesforce continued its business relationship with Backpage despite the persistent public allegations that Backpage facilitated sex trafficking. (*Id.* ¶¶ 80, 82-85, 151-52, 170-71, 181-83, 186-87). Backpage and Salesforce even referenced the legal and public relations issues Backpage was facing in their communications. (*Id.* ¶¶ 155-56, 178, 195). Salesforce employees also discussed Backpage's legal troubles internally. (*Id.* ¶¶ 189, 194). One Salesforce employee alluded

5

to the "nature of [Backpage's] business" in an internal discussion about the possibility of Backpage hiring a consultant to assist with implementing new Salesforce technology. (*Id.* ¶ 209). In March 2018, Backpage and Salesforce discussed the impact of the FOSTA-SESTA anti-trafficking legislation on Backpage's business and the security of Salesforce's platform. (*Id.* ¶¶ 219-22). A Salesforce account executive offered Saleforce's ongoing assistance as Backpage's plans developed in response to the legislation. (*Id.* ¶ 222). Two weeks later, on April 6, 2018, the federal government shut down Backpage as part of a multi-agency enforcement action. (*Id.* ¶ 223).

## II. G.G.'s Trafficking

G.G. was trafficked by two individuals beginning in 2016, when she was 13 years old. (*Id.* ¶ 228). Her traffickers posted G.G. on Backpage in advertisements for commercial sex. (*Id.* ¶ 229). The ads included pictures of G.G. using an alias and offering her phone number. (*Id.*). G.G. was trafficked for several months in four states, including Illinois. (*Id.* ¶¶ 233-32). As a result of her trafficking, G.G. suffered, and continues to suffer, physical and psychological injuries. (*Id.* ¶ 239).

## III. Procedural History

Plaintiffs filed this action on March 30, 2020 before Judge Andrea R. Wood asserting claims under Section 1595 of the TVPRA against Salesforce and Backpage. (Dkt. 1). Backpage was later dismissed from the case. (Dkt. 101). After Salesforce moved to dismiss Plaintiffs' Second Amended Complaint, (Dkt. 40), Plaintiffs amended their complaint for a third time and Salesforce moved to dismiss again (Dkt. 63). On May 16, 2022, Judge Wood granted Salesforce's motion and dismissed the Third Amended Complaint ("TAC") with prejudice. *G.G. v. Salesforce.com, Inc.,* Dkt. 105, 603 F. Supp. 3d 626 (N.D. Ill. 2022), *rev'd and remanded,* 76 F.4th 544 (7th Cir. 2023). Of relevance here, Judge Wood held that Plaintiffs failed to plausibly allege that Salesforce knew or should have known about G.G.'s specific trafficking or any advertisements trafficking her on

Backpage. (*Id.* at 647). She further held that Plaintiffs failed to adequately allege that Salesforce participated in a venture with Backpage, noting that the allegations only indicated that Salesforce provided technology and support that Backpage utilized, which was not sufficient to demonstrate participation. (*Id.* at 647-48).

On appeal, the Seventh Circuit reversed the dismissal. *G.G. v. Salesforce.com, Inc.,* 76 F.4th 544 (7th Cir. 2023)[4]. First, the court held that, based on the allegations, G.G. was a victim of violations of Section 1591 of the TVPRA at the hands of her trafficker and Backpage. (*Id.* at 552). Second, the court held that Plaintiffs sufficiently alleged a venture under Section 1595; the venture was Backpage's business, including the growth, expansion, and profitability of that business. (*Id* at 554). Third, the court held that Plaintiffs plausibly alleged that Salesforce at least should have known that Backpage violated Section 1591 before Salesforce began working with Backpage and that Backpage continued to violate the TVPRA during their business relationship. (*Id.* at 555). The court noted that constructive knowledge could be reasonably inferred from allegations that Salesforce repeatedly consulted with Backpage to assess its operational needs, designed targeted solutions to address those needs, and provided ongoing, tailored support as Backpage worked to expand its business. (*Id.* at 556).

Next, the court held that Plaintiffs sufficiently plead that Salesforce participated with Backpage in the venture of Backpage's sex trafficking business by helping it grow. (*Id.* at 564). The court specifically cited the following allegations that showed participation: Salesforce provided Backpage with software designed specifically for Backpage; Salesforce provided Backpage with affirmative, personalized support targeted to Backpage's specific needs; and Salesforce repeatedly consulted with Backpage, including its CEO, to assess its operational needs

---

[4] Unless otherwise noted, citations to "*G.G.*" refer to the Seventh Circuit case G.G. v. Salesforce.com, Inc., 76 F.4th 544 (7th Cir. 2023).

and continue providing active, ongoing, and tailored support. (*Id.* at 563). Finally, the court held that Plaintiffs satisfied the last element of a Section 1595 beneficiary claim by alleging that Salesforce was aware it was benefitting from its contracts with Backpage. (*Id*. at 565).

After the case was remanded by the Seventh Circuit, Salesforce served Plaintiffs with a draft Rule 11 motion requesting removal of several allegations Salesforce claimed were without evidentiary basis. (Dkt. 241 at 6). On June 12, 2025, Plaintiffs filed the FAC. (Dkt. 235). Plaintiffs assert one claim against Salesforce for participant liability under Section 1595 of the TVPRA. (Dkt. 235 ¶¶ 244-66). Plaintiffs also bring a claim under 18 U.S.C. § 2255, alleging that Salesforce is liable for damages for violations of Section 1591 of the TVPRA. (*Id.* ¶¶ 267-73). Salesforce moves to dismiss the FAC with prejudice. (Dkt. 241 at 3).

## LEGAL STANDARD

To survive a motion to dismiss for failure to state a claim, the complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." *Kaminski v. Elite Staffing*, 23 F.4th 774, 776 (7th Cir. 2022) (quoting Fed. R. Civ. P. 8(a)(2)). Specifically, "a plaintiff must allege 'enough facts to state a claim that is plausible on its face.'" *Allen v. Brown Advisory, LLC*, 41 F.4th 843, 850 (7th Cir. 2022) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

At the same time, "allegations in the form of legal conclusions are insufficient to survive a Rule 12(b)(6) motion." *McReynolds v. Merrill Lynch & Co., Inc.*, 694 F.3d 873, 885 (7th Cir. 2012) (citing *Iqbal*, 556 U.S. at 678). As such, "[t]hreadbare recitals of the elements of the cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

8

Further, the moving party bears the burden of establishing the insufficiency of the plaintiff's allegations. *Marcure v. Lynn*, 992 F.3d 625, 631 (7th Cir. 2021).

Salesforce attached a declaration and various exhibits to its Motion. (Dkt. 242); (Dkt. 242-1); (Dkt. 242-2); (Dkt. 242-3). If a motion under Rule 12(b)(6) presents matters outside the pleadings which are not excluded by the court, "the motion must be treated as one for summary judgment under Rule 56." Fed. R. Civ. P. 12(d). However, a district court may "consider other documents attached to a motion to dismiss when they are referenced in the complaint and central to the plaintiff's claim." *Lax*, 20 F.4th at 1181 n.1 (citing *188 LLC v. Trinity Indus., Inc.*, 300 F.3d 730, 735 (7th Cir. 2002)). All three exhibits are referenced in the Complaint and are central to Plaintiffs claims. (Dkt. 235 ¶¶ 51-53, 79, 81, 185); (Dkt. 247 at 15-18). The Court will consider these exhibits without converting Salesforce's Motion to a motion for summary judgment.

## DISCUSSION

The TVPRA provides for criminal sanctions against sex traffickers and civil remedies for victims of sex trafficking. 18 U.S.C. § 1589 *et seq*. Relevant here, Section 1591 creates primary criminal liability for engaging in an enumerated act of sex trafficking and secondary criminal liability for benefitting from participation in a venture that engaged in one of those acts. *See* 18 U.S.C. § 1591; *G.G.*, 76 F.4th at 551-52. Section 1595 provides a civil remedy for anyone who is a victim of a violation of Section 1591 against the direct perpetrator of that violation *and* "whoever knowingly benefits, or attempts or conspires to benefit, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter." *See* 18 U.S.C. § 1595(a). Additionally, under 18 U.S.C. § 2255, commonly referred to as "Masha's Law," a minor who was a victim of a violation of certain

enumerated statutes, including Sections 1589, 1590, and 1591 of the TVPRA, may recover damages in federal court.

## I.    Civil Liability Under the TVPRA (18 U.S.C. § 1595(a))

The Seventh Circuit's decision in *G.G.* was the first in this Circuit to define the parameters of a Section 1595 beneficiary claim under the TVPRA, and its holdings and reasoning are instructive here. To bring a Section 1595 claim, a plaintiff must first assert that they are a victim of a criminal violation of Section 1591. *G.G.*, 76 F. 4th at 552. Next, a plaintiff who is a victim of a criminal violation must allege (1) a venture has engaged in an act in violation of Section 1591; (2) the defendant knew or should have known that the venture violation Section 1591; (3) the defendant participated in that venture; and (4) the defendant knowingly benefitted from its participation. *Id.* at 553. Plaintiffs allege that all elements are met here. (Dkt. 235 ¶¶ 244-66). Defendants argue that Plaintiffs fail to sufficiently allege that Salesforce participated in a venture with Backpage or that Salesforce had any knowledge of Backpage's alleged sex-trafficking activities. (Dkt. 241 at 2-3).

As a preliminary matter, Salesforce asserts that Plaintiffs removed many allegations from the FAC that the Seventh Circuit relied on in overturning the previous dismissal, effectively eliminating any factual basis for their claims. (Dkt. 241 at 1). Salesforce repeatedly references and relies on these allegations. "Because an amended complaint supersedes and replaces the original pleading. . . facts or admissions from the earlier complaint are not considered on a motion to dismiss." *Labriola v. Clinton Ent. Mgmt., LLC*, 2016 WL 1106862, at *2 (N.D. Ill. Mar. 22, 2016) (citing *Flannery v. Recording Indus. Assoc.*, 354 F.3d 632, 638 n.1 (7th Cir. 2004)). Accordingly, the Court only considers what *is* alleged in the FAC, not what may be missing.

Salesforce does not dispute Plaintiffs' allegation that G.G. is a victim of sex-trafficking under Section 1591 due to Backpage advertising her for sale before and after learning she was a minor. (Dkt. 235 ¶ 245); (*See generally* Dkt. 241). This is sufficient to make G.G. a proper plaintiff under Section 1595. *See G.G.*, 76 F. 4th at 552. The parties do, however, dispute whether Salesforce violated Section 1591. The Court will address this dispute in its analysis of Plaintiffs' Section 2255 claim.

### A. Venture

The first issue is whether Plaintiffs sufficiently allege the existence of "a venture which . . . has engaged in an act in violation" of Section 1591. 18 U.S.C. § 1595(a). Salesforce argues that Plaintiffs fail to do so. (Dkt. 241 at 22-23). It asserts that there are no allegations in the FAC that Salesforce's contract with Backpage was devised to grow Backpage's sex-trafficking business, and that "Backpage alone cannot be a venture." (*Id.*). Not only is Salesforce's position unsupported by case law, but it is directly contradicted by precedent from this Circuit and others. The Seventh Circuit explicitly held that the relevant venture under Section 1595 need not be specifically a sex-trafficking venture. *G.G.*, 76 F. 4th at 554. Courts across the Circuits agree. *Id.* at 554 n.8 (collecting cases). In alignment with the Eleventh Circuit, the Seventh Circuit further noted that the alleged venture can be a "commercial venture like running or expanding a business." *Id.* at 554 (citing *Doe #1 v. Red Roof Inns, Inc.*, 21 F.4th 714, 727 (11th Cir. 2021). In *G.G.*, the court held that the relevant venture alleged by Plaintiffs was Backpage's business itself, including the growth, expansion, and profitability of that business. *Id.*

Plaintiffs once again have alleged the existence of a relevant venture. They make the same allegations that the Seventh Circuit found sufficient from the TAC, that "[b]y 2013, Backpage found itself in need of a partner who could facilitate and support [Backpage's] exponential

growth." (Dkt. 235 ¶ 250); *see also See G.G.*, 76 F. 4th at 554. Plaintiffs further assert that, after Backpage reached out to Salesforce, the two entities entered into "several lucrative contracts" through which Salesforce helped Backpage expand its business. (Dkt. 235 ¶¶ 86, 94). Finally, Plaintiffs claim that Backpage violated Section 1591 by advertising G.G. while she was a minor. (Dkt. 235 ¶ 245). Thus, Plaintiffs have sufficiently alleged the existence of a venture (Backpage's business) which has violated Section 1591.

### B. Knowledge

The next issue is whether Plaintiffs plausibly allege that Salesforce knew or should have known that Backpage's venture violated Section 1591. 18 U.S.C. § 1595(a). To satisfy this element at the pleading stage, "a plaintiff needs to allege plausibly that the defendant had constructive knowledge that a venture *generally* has violated Section 1591." *G.G.*, F. 4th at 558 (emphasis in original). Plaintiffs assert that Salesforce knew or should have known that Backpage had engaged in illegal sex trafficking based on the nature of its relationship with Backpage and on the public information about Backpage's reputation and criminal violations. (Dkt. 247 at 12). Salesforce argues that these allegations are not sufficient to show constructive knowledge. (Dkt. 241 at 16-22).

Salesforce's argument is based on a faulty premise. Salesforce asserts that constructive knowledge under Section 1595 exists only where a plaintiff plausibly alleges that a defendant had a duty to investigate and would have uncovered the relevant facts through reasonable diligence. (Dkt. 249 at 8). As Plaintiffs correctly point out, that is not the correct standard for constructive knowledge in this Circuit. Constructive knowledge under Section 1595 is a negligence standard. *G.G.*, F. 4th at 555 n. 9. The Court is unpersuaded by Salesforce's argument that it should depart from this precedent.

To support its position, Salesforce cites a case wherein the Seventh Circuit held that constructive knowledge in a products liability context creates a duty for manufacturers to investigate possible hazards. *Johnson v. Edward Orton, Jr. Ceramic Found.*, 71 F.4th 601, 613 (7th Cir. 2023). There, the court relied on the definition of "should know" from the Second Restatement of Torts, which states that the phrase implies "that the actor owes another the duty of ascertaining the fact in question." *Id.* (citing Restatement (Second) of Torts § 12 cmt. a (Am. L. Inst. 1965). That holding speaks to the requisite knowledge of a manufacturer in a products liability negligence action and is not controlling here. If the Seventh Circuit wanted to define constructive knowledge for a Section 1595 using a duty to investigate standard, it would have. Instead, as *G.G.* makes clear, all that is required at this stage is allegations that create a reasonable inference that Salesforce should have known that Backpage was engaged in criminal sex trafficking. *G.G.*, F. 4th at 555-56.

Constructive knowledge can be reasonably inferred, in part, from information available through news coverage and public discourse. *See id.* at 555. According to Plaintiffs' allegations, by 2008, five years before Backpage contracted with Salesforce, Backpage had been publicly identified by law enforcement and nationwide news coverage as the biggest sex trafficking website in the United States. (Dkt. 235 ¶¶ 60, 81). Salesforce argues that this news coverage is ambiguous as to whether Backpage engaged in sex trafficking, but this is blatantly incorrect. (Dkt. 241 at 20-21). In August 2011, there was widespread reporting about a letter sent to Backpage by all United States Attorneys General regarding Backpage's facilitation of sex trafficking. (*Id.* ¶¶ 50-51); (Dkt. 242-1 at 1). A 2012 article in the New York Times detailed stories of minors who were trafficked on Backpage. (Dkt. 235 ¶ 52); (*See generally* Dkt. 242-2). The San Francisco Chronicle published at least 400 stories about Backpage between 2009 and 2017, including several linking Backpage

to the sex trafficking of minors. (Dkt. 235 ¶ 59). In 2017, the United States Senate published a report of its investigation into Backpage's facilitation of sex trafficking. (Dkt. 235 ¶ 185); (Dkt. 242-3). Contrary to Salesforce's claim, the Seventh Circuit considered almost all of these exact allegations in the TAC and concluded "these facts about its customer should have be known to Salesforce." *G.G.*, 76 F. 4th at 555. Moreover, the communications provided by Plaintiffs indicate that Salesforce employees were aware of Backpage's reputation as a website for sex trafficking and of the multiple criminal investigations into Backpage. (Dkt. 235 ¶¶ 155-56, 178, 189, 194-95, 209, 219-22, 223). This indicates, at the very least, that Salesforce employees were aware of the public discourse surrounding Backpage's alleged involvement in sex trafficking.

Plaintiffs also plausibly allege that Salesforce knew or should have known that Backpage was involved in illegal sex trafficking based on its relationship with Backpage. In *G.G.*, the Seventh Circuit held that constructive knowledge of Backpage's Section 1591 violations could be inferred "from the allegations that Salesforce repeatedly consulted with Backpage to assess its operational needs, designed targeted solutions addressed to those needs, and provided active, tailored, and ongoing support as Backpage worked to expand its business and scale its operations." 76 F. 4th at 556 (internal citations omitted). Plaintiffs make the same allegations in the FAC, (Dkt. 235 ¶¶ 93, 116, 150), and provide numerous examples of communication between Backpage and Salesforce as support. For instance, in 2015, Salesforce and Backpage discussed Backpage's goals involving customer communication and the specific "deliverables" Salesforce could offer. (Dkt. 235 ¶ 148). That same year, Backpage praised a Salesforce employee who proactively developed "thoughtful solutions" to keep up with Backpage's "exponential growth". (*Id.* ¶ 170). In 2016, a Salesforce account executive told a Backpage employee that he was "excited to hear about [Backpage's] growth plans" and that Salesforce wanted "to do whatever [it] can to help you all get

14

there." (*Id.* ¶ 170). At one point, a Salesforce team spent several days creating a solution for Backpage when it was unable to identify and filter prior customers for targeted marketing messages. (*Id.* ¶¶ 142-46). After selling Backpage an advanced marketing software, Salesforce paid for a third-party to help Backpage implement the software after Backpage struggled to do so on its own. (*Id.* ¶¶ 191-93).

Salesforce argues that these communications were "transactional and technical, addressing generic customer support" and do not suggest that Salesforce provided the type of customized business advice and operational support the Seventh Circuit found sufficient for an inference of constructive knowledge. (Dkt. 241 at 18). It is true that some communications at the beginning of the relationship indicate that Salesforce was providing routine technical support. For example, Salesforce assisted Backpage employees with log-in issues and activation of certain features of the CRM software. (*Id.* ¶¶ 118-19). Plaintiffs' allegations, however, show that Salesforce increasingly offered more tailored and proactive support as the relationship progressed. It is not necessary, as Salesforce argues, for Plaintiffs to show that Salesforce engaged with any specific advertisements or moderation practices. (Dk.t 249 at 10). Plaintiffs' allegations relating to Salesforce's relationship with Backpage are sufficient to create a plausible inference of constructive knowledge. *G.G.*, F. 4th at 555-56.

Plaintiffs also assert that Salesforce should have known of Backpage's sex-trafficking violations because it routinely accessed Backpage's customer org, which contained Backpage's data. (Dkt. 235 at ¶ 125). Salesforce argues that none of the communications offered by Plaintiffs show that Salesforce learned anything problematic when it went into Backpage's customer org. (Dkt. 241 at 18-19). What Salesforce saw in Backpage's data is a matter for discovery. At this stage, this allegation, together with Plaintiffs' claims regarding Backpage and Salesforce's

relationship and the public discourse surrounding Backpage, is enough to satisfy Section 1595's constructive knowledge requirement. Plaintiffs have plausibly alleged that Salesforce at least should have known that Backpage was engaged in criminal sex trafficking.

### C. Participation

Next, Plaintiffs must sufficiently allege that Salesforce, with constructive knowledge, participated in Backpage's venture. 18 U.S.C. § 1595(a); *G.G.*, F. 4th at 558. The Court finds that they have.

To plead participation under Section 1595, a plaintiff must show that a defendant assisted, supported, or facilitated a venture that violated Section 1591. *G.G.*, 76 F.4th at 558 (adopting Eleventh Circuit's interpretation that participation under § 1595 is not the same as § 1591's requirement of "knowingly assisting, supporting, or facilitating a violation" of the TVPRA). This element does not require allegations of direct participation in the sex trafficking itself. *Id.* at 559. Rather, what must be shown is an "ordinary understanding of culpable assistance to a wrongdoer, which requires only a desire to promote the wrongful venture's success," that also can be alleged "by showing a continuous business relationship between the participant and the trafficker." *Id.* Thus, at this stage, "all that is necessary is for a plaintiff to allege such a continuous business relationship, which gives rise to an inference, drawn in the plaintiff's favor, that the civil defendant facilitated the venture's success." *Id.*

In *G.G.*, the Seventh Circuit held that Plaintiffs plausibly alleged participation through its allegations that (1) Backpage entered into contracts with Salesforce to grow its business; (2) Salesforce provided Backpage with targeted solutions addressed to the needs of its business, repeatedly assessed Backpage's operational needs, and provided active ongoing support that was tailored to those needs; and (3) with Salesforce's support, Backpage's business profited and

16

expanded. 76 F.4th at 560. Plaintiffs assert the same claims now. They allege that Backpage contracted with Salesforce because it was looking for a partner that could facilitate and support its growth. (Dkt. 235 ¶¶ 94, 250). Backpage was specifically interested in Salesforce's CRM software and technology solutions related to sales, marketing, and customer service. (*Id.* ¶ 96). As discussed, Plaintiffs show that, as the relationship progressed, Salesforce repeatedly spoke with Backpage about its goals and operational needs, offered tailored support and solutions, and assisted Backpage in modifying the CRM software to best suit its business. *Supra* Discussion, I.B. With Salesforce's support, Plaintiffs allege that Backpage was able to scale it operations, generate profit, and "become the largest sex trafficking entity in the world." (Dkt. 235 ¶¶ 93, 224). Specifically, Backpage used Salesforce's technology and support to collect and manage customer data, communicate with customers, and engage in marketing. (*Id.* ¶¶ 146-150, 159-69). Backpage's revenue grew from $71.2 million in 2012, before it began working with Salesforce, to $346 million between 2013 and 2015. (*Id.* ¶¶ 49, 63).

Salesforce argues that Plaintiffs' allegations only show that Salesforce sold Backpage generic software and provided "routine technical support incidental to its sale of software," which is insufficient to satisfy the participation element. (Dkt. 241 at 13-14). Participation in a venture "requires more than providing off-the-shelf software" or "other common products or services." *G.G.*, F. 4th at 562. Plaintiffs concede that Salesforce initially sold Backpage a generic software product and that Backpage employees independently customized some aspects of it. (Dkt. 235 ¶¶ 132, 150). They allege, however, that Salesforce regularly assisted Backpage in configuring, utilizing, and tailoring the software to its needs. (*Id.* ¶¶ 120, 132, 150). For example, Salesforce provided recommendations for how Backpage could configure "formula fields" the way Backpage wanted. (*Id.* ¶ 133). It instructed Backpage on how to conduct "advanced searches" to locate the

type and amount of customer information it needed. (*Id.* ¶¶ 142-46). When Backpage bought additional software from Salesforce, Salesforce ensured that the software would have specific functions Backpage needed. (*Id.* ¶¶ 197-200). Salesforce also proactively offered to help Backpage use and develop marketing tools. (*Id.* ¶¶ 139-40). When Backpage began moving its business overseas, Salesforce assisted Back in duplicating its customer org and migrating specific data into that system. (*Id.* ¶¶ 201-05).

The Court agrees with Salesforce that providing limited technology support when a customer has a question about a specific feature would not constitute participation. (Dkt. 241 at 14). Salesforce's alleged actions, however, go far beyond that; it was "in a direct, prolonged, and supportive contractual relationship" with Backpage. *G.G.*, F. 4th at 561. Salesforce points to the lack of any allegations that Salesforce sold Backpage custom software as dispositive to the participation element. (Dkt. 241 at 10-12). Nothing in the Seventh Circuit's opinion implies that its holding as to participation rested on those now-removed allegations. Plaintiffs provide detailed accounts of communications between Backpage and Salesforce showing how Salesforce facilitated the success of Backpage's business. They have more than met their burden of pleading that Salesforce participated in Backpage's venture. Any arguments over the sufficiency or truth of the evidence presented by Plaintiffs are better suited for resolution later in litigation.

Salesforce also attempts to equate the facts here with those of cases where courts held that defendant companies were intermediaries "normally indifferent to the content of" what they transmit. *Doe v. GTE Corp.*, 347 F.3d 655, 659 (7th Cir. 2003); *Backpage.com, LLC v. Dart*, 807 F.3d 229, 234 (7th Cir. 2015); *Chicago Lawyers' Comm. for C.R. Under L., Inc. v. Craigslist, Inc.*, 519 F.3d 666, 670 (7th Cir. 2008), *as amended* (May 2, 2008). First, these cases deal with immunity under Section 230(c) of the Communications Decency Act, which is not at issue here.

Second, the Seventh Circuit rejected these same arguments in Salesforce's first motion to dismiss when it held that the alleged relationship between Salesforce and Backpage was "the active participation of a contractual partner", not "a sale by a remote intermediary." *G.G.*, F. 4th at 562-63. Plaintiffs' allegations one again sufficiently show that Salesforce was not at all indifferent to Backpage's business–it spent the better part of five years actively invested in Backpage's success.

Salesforce also argues that Plaintiffs fail to sufficiently allege participation because they do not claim that Salesforce altered its software to facilitate trafficking, assisted with marketing activities directed toward traffickers, or supported the growth of a trafficking business. (Dkt. 241 at 13). What matters is whether Plaintiffs allege that Salesforce participated in a venture that violated Section 1591, not whether Plaintiffs allege that Salesforce participated in a sex-trafficking venture. *G.G.*, F. 4th at 562. Plaintiffs plausibly claim that Salesforce took part in the expansion and success of Backpage and that Backpage violated Section 1591. That is all that is required to plead participation under Section 1595.

### D. Knowing Benefit

To satisfy the fourth and final element, a plaintiff may allege that the defendant "knowingly benefitted" by alleging only that "the defendant was aware that it was benefitting in some way from its participation in the venture." *G.G.*, F. 4th at 564. The benefit need not be "profits that are the specific result of a sex-trafficking venture." *Id.* (internal citations omitted). Salesforce does not address or challenge Plaintiffs' claims that it knowingly benefitted from its participation in the venture that violated Section 1591. Plaintiffs allege that Salesforce and Backpage entered into multiple contracts over several years that resulted in close business advice and consulting. (Dkt. 235 at ¶ 77). Salesforce earned over $1.4 million pursuant to these contracts. (*Id.* at ¶ 75). Thus, Plaintiffs argue, Salesforce knowingly benefitted from its relationship with Backpage. (*Id.* ¶ 249).

Plaintiffs' unchallenged allegations are enough to satisfy this element at the pleading stage. *G.G.*, F. 4th at 565.

Accordingly, Plaintiffs plausibly allege that Salesforce violated Section 1595 of the TVPRA by knowingly benefitting from its participation in a venture that it knew or should have known violated Section 1591. Salesforce's Motion to Dismiss as to Plaintiffs' Section 1595 claim is denied.

## II.    Section 2255 Violation

Plaintiffs also allege a violation of 18 U.S.C. § 2555, commonly referred to as "Masha's Law." Masha's Law creates a civil remedy for personal injuries caused by the sexual exploitation of children. *Doe v. Cotterman*, 2018 WL 1235014, at *9 (N.D. Ill. Mar. 9, 2018). It provides:

> Any person who, while a minor, was a victim of a violation of section 1589, 1590, 1591, 2241(c), 2242, 2243, 2251, 2251A, 2252, 2252A, 2260, 2421, 2422, or 2423 of this title and who suffers personal injury as a result of such violation ... may sue in any appropriate United States District Court and shall recover the actual damages such person sustains or liquidated damages in the amount of $150,000, and the cost of the action, including reasonable attorney's fees and other litigation costs reasonably incurred. The court may also award punitive damages and such other preliminary and equitable relief as the court determines to be appropriate.

18 U.S.C. § 2555(a).

This Court agrees with the majority view that Section 2255 does not require a defendant to have been criminally convicted of a predicate offense; it is enough for a civil plaintiff to show by a preponderance of the evidence that a defendant violated an enumerated statute. *See, e.g., Prewett v. Weems*, 749 F.3d 454, 458 (6th Cir. 2014); *In re Hotel TVPRA Litig.*, 2023 WL 3075851, at *7 (S.D. Ohio Apr. 25, 2023); *Doe 9 v. Varsity Brands, LLC*, 679 F. Supp. 3d 464, 479 (D.S.C. 2023); *Doe v. Atascadero Unified Sch. Dist.*, 2022 WL 17080165, at *3 (C.D. Cal. Sept. 12, 2022); *N.S. v. Rockett*, 2018 WL 6920125, at *5 (D. Or. Oct. 19, 2018); *Dixson v. Goodhue Child. Ctr.*, 2024 WL 1704729,

at *1 (E.D.N.Y. Apr. 19, 2024); *Smith v. Husband*, 376 F.Supp.2d 603, 610 (E.D. Va. 2005). Plaintiffs acknowledge this in their response brief yet incorrectly assert that it is unnecessary to allege that Salesforce violated an enumerated statute. (Dkt. 247 at 22).

Contrary to Plaintiff's argument, to survive a motion to dismiss, Plaintiffs must sufficiently allege that Salesforce committed a predicate offense under Section 2225. *See, e.g., M.B. v. Camp Stewart for Boys, Inc.*, 2013 WL 2297112, at *4 (W.D. Tex. May 24, 2013); *T.E. v. Wyndham Hotels & Resorts, Inc.*, 2024 WL 474400, at *12 (S.D. Ohio Feb. 7, 2024). Plaintiffs allege in their Complaint that G.G. "is a victim of a violation of [Section 2255]." (Dkt. 235 at ¶ 268). Section 1591 of the TVPRA is listed among the predicate offenses giving rise to liability under Section 2255, but Section 1595 is not. *See* 18 U.S.C. Plaintiffs only assert a Section 1595 claim against Salesforce. (*Id.* at ¶¶ 224-73). Moreover, they repeatedly claim that G.G. was a victim of Section 1591 at the hands of her traffickers and Backpage, not Salesforce. (*Id.* at ¶¶ 225, 245, 256-57, 264-65). Based on the allegations in the Complaint, Plaintiffs have failed to state a claim for liability under Section 2255 because they do not claim that Salesforce violated Section 1591 or any other predicate offense.

Plaintiffs assert a Section 1591(a)(2) claim against Salesforce for the first time in their response brief. (Dkt. 247 at 23). They claim that "Salesforce is subject to secondary liability under 1591." (*Id*). Allegations raised for the first time in a response brief are generally not considered on a motion to dismiss. *See* Fed. R. Civ. P. 12(b); *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1107 (7th Cir. 1984) (stating that "it is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss" and that "consideration of a motion to dismiss is limited to the pleadings."). Courts may,

however, consider a new theory presented in an opposing brief if it is supported by allegations in the complaint. *Thomas v. Dart*, 2018 WL 4016315, at *4 (N.D. Ill. Aug. 22, 2018) (citing *Epstein v. Epstein*, 843 F.3d 1147, 1151 n.5 (7th Cir. 2016)). Plaintiffs fail to allege sufficient facts showing that Salesforce violated Section 1591(a)(2).

The elements of a Section 1591(a) claim differ from those of a Section 1595(a) claim, which the Seventh Circuit recognizes. *G.G.*, 76 F. 4th at 558 (declining to import Section 1591's "participation" definition into Section 1595). Under Section 1591(a), "participation in a venture" means knowingly assisting, supporting, or facilitating a sex-trafficking violation. 18 U.S.C. § 1591(e)(4). In dismissing Plaintiffs' TAC, Judge Wood held that a secondary actor under Section 1591(a)(2) must knowingly assist or facilitate a trafficking violation tied to a specific victim. *G.G.*, 603 F. Supp. 3d at 642. The Seventh Circuit did not disturb this holding when it over-ruled the dismissal. *See generally G.G.*, 76 F. 4th. In *United States v. Williams*, the Seventh Circuit recognized that criminal liability under Section 1591 requires specific knowledge of the victim. 127 F.4th 676, 685 (7th Cir. 2025) ("Section 1591 criminalizes facilitating or profiting from sex trafficking if the defendant knows or should know that the victim is under eighteen."). Plaintiffs do not allege that Salesforce knew of G.G. or assisted, supported, or facilitated her trafficking. Accordingly, Plaintiffs have not pleaded that Salesforce itself violated Section 1591, which is required to state a claim under Section 2255.

Finally, to the extent Plaintiffs seek to hold Salesforce secondarily liable for violations of Section 1591 by Backpage or her traffickers, a plain reading of Section 2255 and case law foreclose that argument. "[S]tatutory silence on the subject of secondary liability means there is none." *Boim v. Holy Land Found. for Relief & Dev.*, 549 F.3d 685,

689 (7th Cir. 2008). This Seventh Circuit holding reflects controlling precedent from the Supreme Court's decision in *Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.,* 511 U.S. 164 (1994). There, the Supreme Court declined to extend the private cause of action under § 10(b) of the Securities and Exchange Act to aiders and abettors of securities fraud. *Id.* at 167. The Court held that Congress has imposed forms of secondary liability in other statutes, so the lack of such liability in a statute indicates "a deliberate congressional choice with which the courts should not interfere." *Id.* at 184. Because Section 2255 makes no mention of secondary liability, this Court joins others in declining to read it into the statute. *See Doe 9* 679 F. Supp. 3d at 481; *Doe v. City of Gauley Bridge*, 2022 WL 3587827, at *13 (S.D.W. Va. Aug. 22, 2022); *Doe v. Varsity Brands, LLC*, 2023 WL 4931929, at *8 (N.D. Ohio Aug. 2, 2023); *Doe v. Hansen*, 2018 WL 2223679, at *5 (E.D. Mo. May 15, 2018). Accordingly, Plaintiffs fail to state a Section 2255 claim against Salesforce. This claim is dismissed.

**CONCLUSION**

For the forgoing reasons, Salesforce's Motion to Dismiss [241] is denied in part.


Virginia M. Kendall
United States District Judge

Date: January 7, 2026

23
